1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEX MEDIA WEST, INC.; SUPERMEDIA
LLC; and YELLOW PAGES INTEGRATED
MEDIA ASSOCIATION d/b/a YELLOW
PAGES ASSOCIATION,

              Plaintiffs,

       v.

CITY OF SEATTLE and RAY HOFFMAN, in
his official capacity as Director of Seattle
Public Utilities,

              Defendants.

No. 10-CV-1857

**PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
February 4, 2011

ORAL ARGUMENT REQUESTED

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857)

42414-0030/LEGAL19779831.14

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................. 3

    A.  The Ordinance ............................................................................................. 3

    B.  Yellow Pages Phone Books ......................................................................... 6

    C.  Yellow Pages Distribution ........................................................................... 8

    D.  Publishers' Opt-Out Systems and the City's New
        Requirement ................................................................................................. 8

    E.  The City's Goals .......................................................................................... 9

    F.  Recycling of Yellow Pages and Other Materials ......................................... 9

III. STANDARD FOR SUMMARY JUDGMENT .................................................. 10

IV. THE ORDINANCE VIOLATES THE FIRST AMENDMENT ......................... 10

    A.  Yellow Pages Are Fully Protected Speech ................................................ 11

    B.  Because Yellow Pages Are Fully Protected Speech, the
        Ordinance Plainly Violates the First Amendment ..................................... 16

        1.  Required License .............................................................................. 16

        2.  Distribution Fee ............................................................................... 17

        3.  Required Message ............................................................................ 18

        4.  Opt-Out Registry .............................................................................. 19

    C.  Even If Yellow Pages Were Commercial Speech, the
        Ordinance Would Violate the First Amendment ....................................... 20

        1.  *Discovery Network* Requires Invalidation of the
            Ordinance as a Whole ...................................................................... 21

        2.  Each Part of the Ordinance Violates Commercial
            Speech Standards ............................................................................. 23

            a.  Required License .................................................................. 23

            b.  Distribution Fee ................................................................... 23

            c.  Required Message ................................................................ 24

            d.  Opt-Out Registry .................................................................. 24

V.  THE ORDINANCE VIOLATES THE COMMERCE CLAUSE ....................... 24

    A.  The Ordinance Has a Discriminatory Purpose or Effect ........................... 25

    B.  The Burdens Imposed by the Ordinance Outweigh Its Local
        Benefits ..................................................................................................... 26

VI. CONCLUSION ................................................................................................. 29

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (No. 10-CV-1857) – i

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

42414-0030/LEGAL19779831.14

# TABLE OF AUTHORITIES

## CASES

*Ad World, Inc. v. Doylestown Twp.*, 672 F.2d 1136 (3rd Cir. 1982) ............................................. 15

*Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099 (9th Cir. 2004) ............................................ 13

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ....................................................... 2

*Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564 (2002) ....................................................... 11

*Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726 (9th Cir. 1994) ............................. 13, 14

*Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298 (11th Cir. 2003) .................................................................................................................. 2

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) ........................................................... 24, 25

*Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006) ......................................................... 24

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ............................................. 3, 14

*Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) .................................................. 16, 18, 23

*Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) ...................................... 13

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) ......................................... 13, 19, 20

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) ............. 3, 24, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 10

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ........................................................................................................ 20, 21, 23, 29

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) .................................... passim

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178 (9th Cir. 2010), *reh'g granted*, 623 F.3d 1054 (9th Cir. 2010) ...................................... 14

*Edenfield v. Fane*, 507 U.S. 761 (1993) ............................................................................. 2, 20

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ............................................................. 19, 20

*Fla. Star v. B.J.F.*, 491 U.S. 524 (1989) .................................................................................. 19

*Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) .................................... 16, 18

*Friends of E. Fork, Inc. v. Thom*, 688 F. Supp. 2d 1245 (W.D. Wash. 2010) ............................ 10

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ............................................................... 17

*G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006) ................................. 17

*Gaudiya Vaishnava Soc'y v. City & County of San Francisco*, 952 F.2d 1059 (9th Cir. 1990) ........................................................................................................................ 17

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) ....................... 24

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ....................................................................... 3

*Hays County Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) ............................................... 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## TABLE OF AUTHORITIES

(continued)

*Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989) ................................................................. 28

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) ............................. 12

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) ............... 25

*Lovell v. City of Griffin, Ga.,* 303 U.S. 444 (1938) ........................................................ 2

*Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004) ................. 17, 22

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ..................... 3, 12, 13

*Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009) ...................... 23

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) ............... 17

*Nat'l Meat Ass'n v. Deukmejian*, 743 F.2d 656 (9th Cir. 1984), *aff'd*, 469 U.S. 1100 (1985) ................................................................................................................. 26

*Nationalist Movement v. City of York*, 481 F.3d 178 (3d Cir. 2007) ............................ 18

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004) .......... 3, 12, 13

*O'Day v. King County*, 109 Wash. 2d 796, 804, 749 P.2d 142 (Wash. 1988) ............... 17

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93 (1994) ............................ 25

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986) ................. 18, 24

*Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008 (9th Cir. 1994) .......................... 29

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ........................................................ 26

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ......................................... 19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ............................. 14

*S.O.C., Inc. v. County of Clark*, 152 F.3d 1136 (9th Cir. 1998) ............................ 14, 15

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ........................................ 17

*Spafford v. Echostar Commc'ns Corp.*, 448 F. Supp. 2d 1220 (W.D. Wash. 2006) ................. 22

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ............................................. 23

*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851 (9th Cir. 2003) ........ 28, 29

*United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957 (9th Cir. 2008) ................................................................................................................. 11

*United States v. Edge Broad. Co.*, 509 U.S. 418 (1993) ............................................. 20

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ..................... 11, 16, 19

*United States v. Stevens*, 130 S. Ct. 1577 (2010) .................................................. 11, 29

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ........................................... 12

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001) ......................... 13

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748 (1976) .......... 20

*Wooley v. Maynard*, 430 U.S. 705 (1977) .................................................................. 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# TABLE OF AUTHORITIES
(continued)

**STATUTES**

SMC 6.255.025(B) ........................................................................................................... 5

SMC 6.255.025(D) ........................................................................................................... 5

SMC 6.255.025(E) ...................................................................................................... 5, 11

SMC 6.255.030 ............................................................................................................ 1, 4

SMC 6.255.030(A) ........................................................................................................... 4

SMC 6.255.080(B) ........................................................................................................... 4

SMC 6.255.090(A) ........................................................................................................... 4

SMC 6.255.090(D) ........................................................................................................... 4

SMC 6.255.100(A) ........................................................................................................... 4

SMC 6.255.110 ................................................................................................................. 4

SMC 6.255.130 ................................................................................................................. 4

SMC 6.255.140 ................................................................................................................. 4

SMC 21.36.082-.083 ........................................................................................................ 9

SMC 21.40.050 ................................................................................................................. 9

**REGULATIONS AND RULES**

Fed. R. Civ. P. 56(c) ...................................................................................................... 10

Washington Administrative Code 480-120-251 ............................................................. 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# I.    INTRODUCTION

Seattle Ordinance 123427 violates basic constitutional principles.  The Ordinance taxes and regulates yellow pages, burdening speech without the compelling justification and narrow tailoring the First Amendment requires.  The City seems to think these requirements do not apply because yellow pages carry advertising, but yellow pages are, as a matter of law, fully protected speech.  And even if they were commercial speech, the Ordinance would still violate the First Amendment because there is no basis for singling out yellow pages and because the City cannot justify the Ordinance's restraints under even commercial speech standards.  The Ordinance also violates the Commerce Clause by discriminating against out-of-state publishers and imposing burdens on interstate commerce far exceeding its putative benefits.  The facts the City might prove cannot justify these violations and are thus immaterial.  The Court should grant summary judgment.

Yellow pages directories have been around almost as long as the telephone, Declaration of Neg Norton ("Norton Decl.") ¶ 7, and today we take the information they provide for granted.  We expect to be able quickly to find companies that could provide us with a certain product or service, the phone numbers of our elected officials, and the location of the nearest park or library.  Millions of Americans use yellow pages for these and other purposes every day; the average American uses a yellow pages directory once a week.  *Id.* ¶ 21.

Of course, the Internet now provides another route to this information, and Seattle residents and elected officials take pride in being technologically savvy.  But the rise of the Internet does not make incumbent media less deserving of protection, just as the Kindle™ does not reduce the First Amendment protection afforded books.  And the ubiquity of the information provided by yellow pages does not mean the information lacks value; on the contrary, its ubiquity confirms its usefulness.  *See* Declaration of Gerald Baldasty ("Baldasty Decl.") ¶ 7.

That said, because the availability of electronic alternatives means that some people no longer want a printed yellow pages directory, yellow pages publishers offer Internet versions and

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

have made it easier for people to decline hardcopy delivery.  The publishers have no desire to irritate their audience or waste money printing and delivering directories that will not be used.

Unsatisfied with the pace of this market transition, dismissive of the value of the information provided by yellow pages, and ignoring the First Amendment's core principles, the Seattle City Council enacted Ordinance 123427, which bans distribution of yellow pages without a license, charges publishers for every book they distribute, and forces publishers to print the City's messages on their books and to participate in a duplicative and burdensome City-run delivery opt-out scheme. The City's stated reasons for the Ordinance are to reduce unwanted deliveries and the number of books distributed, and to fund recycling, but the Ordinance singles out yellow pages even though their contribution to unwanted deliveries and recycling costs is, in the words of the Ordinance's sponsor, a "drop in the bucket."  Declaration of Kimball Mullins ("Mullins Decl.") Exhibit B.

The Ordinance targets yellow pages in the belief that they are of less value and because a broader approach—targeting more sources of recyclable paper—would have been politically difficult.  The First Amendment, however, prohibits governments from deciding the value of publications or favoring some publications over others: "[T]he speaker and the audience, not the government, assess the value of the information presented." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *see also Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987) ("[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment[] . . . .").  And the First Amendment protects not only the content of speech, but also its distribution.  *See, e.g.*, *Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1305 (11th Cir. 2003) ("[D]istribution of newspapers, no less than the publication of the newspapers themselves, is an activity protected by the First Amendment.") (citing *Lovell v. City of Griffin, Ga.,* 303 U.S. 444, 452 (1938)).

The City will argue that yellow pages are commercial speech and thus entitled to less protection than other speech.  But yellow pages contain large amounts of non-commercial speech, and "'[i]f speech is not "purely commercial" . . . then it is entitled to full First Amendment

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 2

42414-0030/LEGAL19779831.14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

protection.'" *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004) (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002)).  That yellow pages are published for a profit and financially supported by advertising does not strip them of full First Amendment protection, as the same is true of magazines and television, and "[s]ome of our most valued forms of fully protected speech are uttered for a profit." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).  Indeed, the First Amendment itself was largely a response to taxes and restrictions on for-profit newspapers and the advertisements they carried.  *See generally Grosjean v. Am. Press Co.*, 297 U.S. 233, 244-51 (1936).

Moreover, even if yellow pages were pure commercial speech, they would still be entitled to significant protection, and the Ordinance would still be unconstitutional because the City cannot show a relationship between the City's stated goals and yellow pages' content.  *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993).

In enacting the Ordinance, the City not only violated the First Amendment, it also violated the Commerce Clause by imposing large burdens on out-of-state publishers while intentionally leaving local publishers unregulated.  The Ordinance thus has both the purpose and effect of "favor[ing] [local] economic interests over out-of-state interests," and therefore should be "struck down . . . without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  Even if the Ordinance were not deliberately discriminatory, however, it would still be invalid under the Commerce Clause, as the burden it imposes "on interstate commerce clearly exceeds [its] local benefits." *Id.*

## II.      BACKGROUND

### A.      The Ordinance

In October 2010, the City of Seattle enacted Ordinance 123427 (codified at Seattle Municipal Code ch. 6.255), which bans distribution of "yellow pages phone books" in Seattle unless phone book publishers meet these conditions:

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

- **License:** First, phone book publishers must "obtain[] an annual yellow pages phone book distributor license," "separate from and in addition to . . . the business license required pursuant to chapter 5.55." SMC 6.255.030.  To obtain the license, publishers must pay a fee, SMC 6.255.060, and provide all information specified by the Director of Seattle Public Utilities (SPU).  SMC 6.255.080(B).  No limit or deadline is imposed on the Director's discretion to grant or deny a license, but as of April 1, 2011, "it shall be unlawful for any person to engage in business as a distributor of yellow pages phone books in the City" without such a license.  SMC 6.255.030(A).

- **Distribution Fee:** Second, yellow pages publishers must pay the City fourteen cents "for each yellow pages phone book distributed within the City plus [$148.00] per ton of yellow pages phone books distributed within the City."  SMC 6.255.100(A).

- **Required Message:** Third, yellow pages publishers must "prominently and conspicuously display on . . . the front cover of each yellow pages phone book distributed within the City" and "on their websites" a message mandated by the City about the City's program for opting out of receiving yellow pages phone books. SMC 6.255.110.

- **Opt-Out Registry:** Finally, the Ordinance directs Defendant Hoffman, as Director of SPU, to create an "Opt-Out Registry . . . for residents and businesses to register and indicate their desire not to receive delivery of some or all yellow pages phone books."  SMC 6.255.090(A).  The Ordinance forbids yellow pages publishers from distributing yellow pages to these residents.  SMC 6.255.090(D).

A yellow pages publisher who fails to comply with any part of the Ordinance may be fined, SMC 6.255.140, or may lose its license.  SMC 6.255.130.

The City Council crafted the Ordinance so that it does not apply to Seattle-based directories. The Ordinance defines a "[y]ellow pages phone book" as "a publication that consists primarily of a

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 4

42414-0030/LEGAL19779831.14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

listing of business names and telephone numbers and contains display advertising for at least some of those businesses," and it applies to "distributors" of phone books, i.e., the entities "primarily responsible for . . . publication and distribution." SMC 6.255.025(D), (E). Standing alone, these definitions would have covered directories published by Seattle organizations—such as the Greater Seattle Business Association (GSBA) Guide and Directory and various directories published by local chambers of commerce. Mullins Decl. Exhibits C, E. To avoid this result, some early versions of the Ordinance expressly exempted such "[l]ocal business organizations," *id.* Exhibit F, but this exemption was removed early in the drafting process, possibly because of the obvious legal problems. Mullins Decl. ¶ 9 (Councilmember O'Brien explaining that "we recognize that there will be legal challenges" to the Ordinance and "we crafted it in a way . . . to withstand challenges").

Thus, when the Ordinance passed the relevant Council committee, it still would have regulated local directory publishing organizations, but that quickly changed. When the Ordinance came before the full Council, these local organizations protested, saying, for example, that "[t]his ordinance as written will threaten the financial well being of the GSBA." *Id.* Exhibit G. The City Council responded by postponing its scheduled vote on the Ordinance. *Id.* ¶ 7. The GSBA then proposed adding a definition of "Distribution" to the Ordinance designed to exempt local organizations. *Id.* Exhibit G. The Council added such a definition to the Ordinance, defining "Distribution" to limit the Ordinance's coverage to "unsolicited delivery of more than four tons annually of yellow pages phone books to the addresses of residents and businesses within the City, but . . . not . . . delivery of yellow pages phone books by membership organizations to their members or to other residents or businesses requesting or expressly accepting delivery." SMC 6.255.025(B). The four-ton limit was chosen to ensure that none of the "nine community Chamber of Commerce business directories in King and Snohomish counties including the ones in Seattle" would be subject to the Ordinance. *See* Mullins Decl. Exhibit H. With this definition in place, the Council passed the Ordinance; as one local headline put it: "*After Tweaks for Local Interests, City Council Set to Pass Yellow Pages Bill.*" *Id.* Exhibit D.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 5

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**B.      Yellow Pages Phone Books**

Utilities regulators have long required telephone companies to publish and distribute residential and business listings and certain consumer information.  Norton Decl. ¶ 8.  Washington imposes such requirements in WAC 480-120-251 and in Washington Utilities and Transportation Commission tariffs.  For example, the WUTC tariff for Qwest, the primary local telephone company serving Seattle, requires Qwest to provide all business customers "a listing in the alphabetical [i.e., white pages] and classified [i.e., yellow pages] sections of the directory at no additional charge."  Norton Decl. Exhibit A.  Dex publishes directories that satisfy this requirement on behalf of Qwest.  *Id.* ¶ 9.  SuperMedia does the same on behalf of Verizon.  *Id.*

Directory companies may not charge residents and businesses for basic listings of name, address, and telephone number, and consumers are not charged for the white and yellow pages directories they receive.  *Id.* ¶¶ 12-13.  Like newspapers and magazines, yellow pages publishers turned to advertising to defray the costs of printing and distribution.  Over time, the potential profitability of such advertising caused new entrants to compete with "official" directories of the incumbent telephone companies.  *Id.* ¶ 17.

The addition of advertising was not at the expense of the information historically provided by yellow pages, which have long included a wide range of non-advertising content.  First, they contain business "white pages" sections, providing the names, addresses, and phone numbers of local businesses and professionals in alphabetical order, with a small amount of advertising intermixed.[1]  For example, the 2010 Dex Seattle Metro yellow pages contains 404 pages of business "white pages" listings.  Declaration of Maggie Stonecipher ("Stonecipher Decl.") ¶ 5.  These listings typically do not advertise any specific product.  Norton Decl. ¶ 12.

Of further value are the listings of businesses by category of product or service.  These sections contain significant amounts of advertising, but here too businesses receive a free basic listing of name, address, and telephone number, *id.*, and such unpaid listings make up a large part of

---

[1] Often a single volume includes the residential white pages as well as the business white and yellow pages.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 6

42414-0030/LEGAL19779831.14

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

the categorical listings.  Moreover, the advertisements themselves often provide a variety of useful information, ranging from hours of operation to years in business to forms of payment accepted and specific details about a company's products or services.

Finally, yellow pages contain a significant amount of public-interest information.  For example, for years Dex directories have opened with many pages of community information, maps, and government listings.  Stonecipher Decl. ¶ 6.  The 2010 Dex Seattle Metro yellow pages continues the tradition, containing 28 pages of emergency and community information, including guides to public schools, SeaTac, public transportation, area attractions, performing arts, parks and recreation, and spectator sports; 36 pages of maps, street guides, and zip and area code information; and 32 pages of government office listings and voting information.  *Id.*  Dex has dozens of employees dedicated to this "front-of-book" content in its various directories, and its surveys reveal that about half of its readers consult this section.  *Id.*

Ultimately, advertising comprises less than half the content of a typical yellow pages directory.  Norton Decl. ¶ 24.  Display advertising, in-column display and trade advertising, coupons, and advertising on the covers and tabbed inserts comprise less than 35% of the Dex 2010 Seattle Metro yellow pages directory.  Stonecipher Decl. ¶ 8.  Similarly, display advertising ranges from 15% to 33% of the yellow pages portions of SuperMedia's Seattle-area directories.  Declaration of Frank Gatto ("Gatto Decl.") ¶ 4.

These ratios of advertising to non-advertising content are lower than those for many newspapers and magazines.  Baldasty Decl. ¶ 6.  For example, in 2009, issues of *Vogue* magazine contained an average of 58% advertising and 42% non-advertising content, issues of *Forbes* magazine contained an average of 52% advertising and 48% non-advertising content, and issues of *Bride's* magazine contained an average of 74% advertising and 26% non-advertising content.  *Id.*  Recent issues of the *Seattle Times* Sunday edition contained similar levels of advertising.  The November 28, 2010, edition weighed 46 ounces, and advertising inserts comprised 30.3 ounces, or 66%, of that total.  *Id.*  The December 12, 2010, edition weighed 58.3 ounces, and advertising

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 7

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

inserts comprised 42.2 ounces, or 72%, of that total.  *Id.*  These percentages do not even include the advertising contained within the body of the newspaper itself; if that were included it would raise the percentage of advertising even higher, possibly above 80%.  *Id.*

## C.    Yellow Pages Distribution

Yellow pages directories generally include business and other information aimed at audiences based on economic and practical boundaries (such as consumer shopping and communication patterns) rather than political boundaries.  Norton Decl. ¶ 22.  State regulators typically require that the directory delivered to a particular consumer include business and residential listings from the entire "local calling area" (the geographic area in which calls are toll free).  *Id.*  Such local calling areas generally have nothing to do with political boundaries.  *Id.*

Dex and SuperMedia publish directories for Seattle and nearby areas, and they distribute Seattle directories to many recipients outside of the city and even the state.  For example, Dex distributed 847,235 copies of its 2010 Seattle Metro yellow pages, but 60% were distributed outside of Seattle.  Stonecipher Decl. ¶ 3.  SuperMedia publishes five directories that are distributed partly in Seattle; 55% of these directories are distributed outside the city limits.  Gatto Decl. ¶ 2.

## D.    Publishers' Opt-Out Systems and the City's New Requirement

Plaintiffs have no economic incentive to distribute directories to those who do not want them, as the cost of printing and delivering each copy ranges from $2 to over $4.  Norton Decl. ¶ 27.  Plaintiffs thus seek to make it easy for those who wish to opt out of delivery to do so, and they seek to assure that those wishes are honored.

Dex, for example, offers a program called "Select Your Dex," which allows consumers to opt out or otherwise change the number and selection of directories Dex delivers to them.  Stonecipher Decl. ¶ 9.  Consumers may access "Select Your Dex" through a dedicated website, www.selectyourdex.com, or by calling a toll-free number.  Dex publishes the website and toll-free number on the covers of all its telephone directories, including the Seattle Metro Dex white and yellow pages directories.  *Id.*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 8

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Publishers carefully manage their delivery systems to honor opt-out requests.  Stonecipher Decl. ¶¶ 12-13, Exhibit B; Gatto Decl. ¶¶ 7-11.  Because of their efforts, the rate of erroneous deliveries to those who have opted out is extremely low.  Stonecipher Decl. ¶ 15; Gatto Decl. ¶ 12.  The City has identified no means by which publishers could reduce the error rate further.  In considering the Ordinance, the City Council heard some anecdotes of undesired delivery, but also heard anecdotal evidence of publishers' opt-out systems working (including from one of its own members), Mullins Decl. ¶ 10, and undertook no effort to determine the actual extent of erroneous delivery or the causes of any mistakes.  *See, e.g.*, *id.* Exhibit I ("Resident feedback via general anecdotes during the legislation development process was the extent of our information.").

The City could publicize and encourage use of the publishers' or third party opt-out systems without imposing any of the Ordinance's requirements; indeed, that approach was SPU's "preferred alternative" when the City Council first raised the issue.  *Id.* Exhibit J.

## E.      The City's Goals

The City forthrightly acknowledged that the Ordinance aimed to reduce the amount of speech.  *See id.* Exhibit K (draft version of the Ordinance describing one of its purposes as "to discourage and decrease the unwanted distribution of yellow pages phone books in the city").  The City wants fewer yellow pages directories to be distributed, both to reduce recyclables (since—like other time-limited publications—most directories are ultimately recycled) and to protect some City residents from books they might not want.  There was no suggestion that the advertising published in yellow pages is fraudulent or misleading, nor that regulating fraudulent or misleading advertising is the Ordinance's objective.

## F.      Recycling of Yellow Pages and Other Materials

Seattle requires residents to recycle paper and other materials, including yellow pages.  SMC 21.36.082-.083.  And the City charges residents fees for collecting and processing recyclables.  SMC 21.40.050.  Ordinance 123427 is the only instance in which the City also charges publishers for ultimately recycling their publications.  (This motion assumes that the charges to yellow pages

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

publishers do not exceed the cost of recycling yellow pages and running the City's opt-out scheme.)
No other City ordinance imposes licensing, fees, or opt-out and messaging requirements on other
producers of printed speech, such as newspapers, magazines, bill inserts, direct mail circulars, or
catalogs.  The Ordinance does not attempt to reduce any other sources of paper recyclables.

Each yellow pages edition is published only once a year, and the contribution of all yellow
pages to Seattle's recycling stream is, in the words of the Ordinance's prime sponsor, "merely a
drop in the bucket."  Mullins Decl. Exhibit B.  Specifically, white and yellow pages directories (the
City's records do not distinguish between the two) comprise less than 2% of total waste recycled in
Seattle every year.  *Id.* Exhibit L.  This low figure includes not only white pages but other
directories not regulated by the Ordinance, so Ordinance 123427's targets make up an even smaller
percentage of recycled material.  By comparison, "mixed low grade paper" (including "junk mail,"
catalogs, and magazines) represents 29% of total waste recycled in Seattle, while newspapers and
their advertising inserts represent another 18%.  *Id.*

### III.      STANDARD FOR SUMMARY JUDGMENT

As the Court knows, "[s]ummary judgment is appropriate where there are no genuine issues
of material fact and the moving party is entitled to judgment as a matter of law."  *Friends of E.
Fork, Inc. v. Thom*, 688 F. Supp. 2d 1245, 1250 (W.D. Wash. 2010) (citing Fed. R. Civ. P. 56(c);
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Here, the burden is on the City to satisfy
the First Amendment; it must show what material facts are genuinely in dispute.[2]

### IV.      THE ORDINANCE VIOLATES THE FIRST AMENDMENT

Yellow pages, like other publications from magazines to church bulletins, contain a
combination of information (or entertainment) and advertising.  While the advertising itself can be
regulated as commercial speech, the presence of advertising does not turn these publications as a

---

[2] Even if the City were able to establish genuine issues of material fact, preliminary injunctive relief would be required
in light of the likelihood that Plaintiffs will ultimately succeed, the constitutional interests at stake, and the burdens on
Plaintiffs.  In case the Court is unable to resolve this motion before the Ordinance begins to burden Plaintiffs' rights,
Plaintiffs will separately move for preliminary injunctive relief and an expedited trial date.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 10

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

42414-0030/LEGAL19779831.14

whole into commercial speech.  Supreme Court and Ninth Circuit precedent make clear that yellow pages, like other publications supported by advertising, are entitled to the First Amendment's full protection.  Applying this standard, there can be no doubt that the Ordinance—content-based and restricting speech—violates the First Amendment.  But even if the Court concludes that yellow pages are pure commercial speech, the Ordinance still violates the First Amendment, as the relationship between the City's stated goals and yellow pages' content or recyclable status does not justify singling them out for these burdens.

## A.    Yellow Pages Are Fully Protected Speech

"'[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)).  Ordinance 123427 "explicitly regulates expression based on content," *id.*, as its onerous requirements apply only to "publication[s] that consist[] primarily of a listing of business names and telephone numbers and contain[] display advertising for at least some of those businesses."  SMC 6.255.025(E); *see also United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 964 (9th Cir. 2008) ("Rules are generally considered content-based when the regulating party must examine the speech to determine if it is acceptable."); *Discovery Network*, 507 U.S. at 429 (explaining that when the applicability of a regulation "is determined by the content of the publication," the regulation is content based, even if "there is no evidence that the city has acted with animus toward the ideas contained within [the] publications").  "As such, [the Ordinance] is 'presumptively invalid, and the Government bears the burden to rebut that presumption.'"  *Stevens*, 130 S. Ct. at 1584 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000)).

The City believes that the first step to rebutting this presumption is to demonstrate that yellow pages are commercial speech and thus entitled to less protection.  This it cannot do.  Yellow pages fall outside the existing definitions of commercial speech, and the City cannot suggest a

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

broader definition that would not capture all sorts of other publications that even the City Council (hopefully) would agree deserve the full protection of the First Amendment.

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).[3] "'If speech is not "purely commercial"—that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection.'" *Nissan*, 378 F.3d at 1017 (quoting *Mattel*, 296 F.3d at 906). Yellow pages plainly do "more than propose a commercial transaction," *United Foods*, 533 U.S. at 409, as they provide a guide not only to commercial activities, but also to community, public safety, and political information.

The community information in yellow pages—e.g., contact information for government agencies and officials, details about local attractions, information on nonprofits ranging from food banks to theaters, and local guides such as maps—is undeniably fully protected speech. Such information makes up nearly 100 pages of Dex's 2010 Seattle Metro yellow pages, as it has for years. Stonecipher Decl. ¶¶ 5-6. Thus, even if this were their only non-commercial content, yellow pages would not be "purely commercial" and would be "'entitled to full First Amendment protection.'" *Nissan*, 378 F.3d at 1017 (quoting *Mattel*, 296 F.3d at 906).

The business and professional listings in yellow pages, however, also do "more than propose a commercial transaction," *id.*, because they provide a comprehensive list of and contact information for product and service providers rather than merely proposing a transaction with any one of them. Advertisements often contain contact information, of course, but that is ancillary to the seller's purpose of selling. Here the contact information is the purpose, and selling is ancillary. Yellow pages contact listings are first a tool for buyers, not sellers, and not just to buy but to find where to shop and compare, where to complain, and where to get repairs. Just as a travel guidebook that provides contact information for restaurants and hotels in an area plainly does more than

---

[3] *See also Mattel*, 296 F.3d at 906 ("Although the boundary between commercial and noncommercial speech has yet to be clearly delineated, the 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'") (quoting *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001)).

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 12

42414-0030/LEGAL19779831.14

propose a commercial transaction, so do yellow pages.  That directory listings do not generally rank or grade businesses, but leave that next step to users, is irrelevant, for "[e]ven dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection."  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2nd Cir. 2001).[4]  If these listings served no purpose beyond proposing a transaction, then regulators (including those in Washington) would not require telephone companies to provide them to the public.  In short, yellow pages are plainly not "purely commercial"—indeed, they contain more non-commercial content than most magazines and newspapers, Baldasty Decl. ¶ 6—and are "'entitled to full First Amendment protection.'"  *Nissan*, 378 F.3d at 1017 (quoting *Mattel*, 296 F.3d at 906).

The City might argue that the Supreme Court used a somewhat different test in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), where it "held that speech could properly be characterized as commercial" even if it did more than propose a commercial transaction "when (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech."  *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Bolger*, 463 U.S. at 66-67).  But yellow pages are not commercial speech under this test because much of their content is not advertising (again, they contain less advertising than most newspapers and magazines, Baldasty Decl. ¶ 6), much of their content does not refer to a specific product, and the speaker for the non-advertising content does not have the advertiser's economic motive.  *Cf. Joseph*, 353 F.3d at 1106 (finding that statute regulated only commercial speech under *Bolger* because it "identifies that the object of its regulation is 'advertising,'" and "[t]he advertising regulated relates to a specific product, medical services").[5]

---

[4] *See also Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) (noting that although computer code, "[i]nstructions, do-it-yourself manuals, recipes, [and] even technical information about hydrogen bomb construction are often purely functional[,] they are also speech") (citation omitted).

[5] *See also Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 728 (9th Cir. 1994) (finding that statute regulated only commercial speech under *Bolger* because "the statute regulates representations concerning a specific consumer good which take the form of advertisements or product labels" and "specifically requires that the representation be made about a specific consumer good which a firm manufactures or distributes").

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 13

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

If the Ordinance regulated only the advertisements in yellow pages, the City would have an argument that it was regulating only commercial speech, but, tellingly, the Ordinance could not address its goals if it only did that.  Instead, the Ordinance regulates yellow pages as a whole, including content that is plainly not advertising, and the Ninth Circuit has repeatedly held that unless the "explicit terms of" a law "limit its restrictions to purely commercial speech," the law should be treated as a regulation of fully protected speech.  *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1144 (9th Cir. 1998); *see also id.* at 1143 (holding that Las Vegas ordinance would not be analyzed under commercial speech standards because "the Ordinance's plain language does not limit the scope of the regulated activity to purely commercial expression").[6]

Finally, when speech contains both commercial and non-commercial elements, the Supreme Court has said that the speech as a whole must be treated as fully protected if the two elements are "inextricably intertwined."  *Fox*, 492 U. S. at 474 (citing *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)).[7]  The advertising and non-advertising content of yellow pages are inextricably intertwined both because the City could not address its objectives without regulating the combination and because the funding provided by advertising is what allows publishers to distribute the non-advertising content for free.  The latter is the same manner in which newspaper ads are inextricably intertwined with newspapers' editorial content, and it is the reason why newspapers are treated as fully protected speech even when they are largely or even primarily composed of advertising: newspapers could not survive without funding from advertisers.

As the Fifth Circuit held in striking down a public university's restrictions on on-campus distribution of newspapers containing advertising: "The advertisements in the *Guardian* were included to finance the publication.  Under such circumstances, commercial speech was inextricably

---

[6] Although not precedential, a panel summarized the Ninth Circuit's cases as follows: "We have narrowly interpreted Supreme Court precedents defining commercial speech, holding that unless statutes or ordinances expressly 'limit the scope of the regulated activity to purely commercial expression,' such laws must be analyzed as if they imposed restrictions on fully protected speech."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178, 1184 n.3 (9th Cir. 2010), *reh'g granted*, 623 F.3d 1054 (9th Cir. 2010) (quoting *S.O.C.*, 152 F.3d at 1143-44).
[7] *See also Lungren*, 44 F.3d at 730 ("Where commercial and non-commercial speech are inseparable, strict scrutiny is required." (citing *Fox*, 492 U.S. at 477)).

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 14

42414-0030/LEGAL19779831.14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

linked to the newspaper's non-commercial speech, making the whole paper non-commercial." *Hays County Guardian v. Supple*, 969 F.2d 111, 120 (5th Cir. 1992); *see also id.* at 119 ("Of course, the *Guardian* could avoid these restrictions by not printing commercials.  Without commercials, however, the *Guardian* could not meet expenses."); *Ad World, Inc. v. Doylestown Twp.*, 672 F.2d 1136, 1137, 1140 (3rd Cir. 1982) (treating "Piggy Back, a 16 page tabloid which includes extensive advertising and a few pages of consumer and community information," as fully protected speech because "each issue of Piggy Back contains noncommercial material deserving of full first amendment protection").  In *S.O.C., Inc.*, the Ninth Circuit cited *Hays* approvingly in striking down a Las Vegas ordinance that prohibited "distributing . . . on public sidewalks, handbills . . . or other printed . . . materials . . . which advertise or promote services or goods . . . and which specifically refer to products or services for sale, . . . and which are distributed with an economic motivation." 152 F.3d at 1140 n.3.  The Court found that the ordinance regulated "not only purely commercial speech, but also fully protected noncommercial speech inextricably intertwined with commercial speech," *id.* at 1140, in part because the ordinance could "prohibit the distribution of a newspaper . . . if the paper's production costs were covered by revenue generated from advertisements."  *Id.* at 1144 (citing *Hays*, 969 F.2d at 114).

Thus, as these cases demonstrate, while governments may regulate newspaper ads—or ads in yellow pages—under commercial speech standards, they may not regulate newspapers—or yellow pages—as a whole under commercial speech standards.  This is not to say that yellow pages possess the news or entertainment value of newspapers, only that they contain valuable non-commercial information, Baldasty Decl. ¶ 7, that they fall outside every definition of commercial speech, and that they are at least as socially valuable as many other forms of speech, including video games and music videos, that receive the First Amendment's full protection.  *Id.*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 15

42414-0030/LEGAL19779831.14

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**B.    Because Yellow Pages Are Fully Protected Speech, the Ordinance Plainly Violates the First Amendment**

Each of the core provisions of the Ordinance—licensing, taxation, compelled message, and government control of audience—is a recognized restraint on free speech and can survive only if the City meets its burden of satisfying strict scrutiny.  Even if the Ordinance's requirements were merely time, place, or manner restrictions, however, because the Ordinance "is a content-based speech restriction, it can stand only if it satisfies strict scrutiny."  *Playboy Entm't*, 529 U.S. at 813.  Thus, "it must be narrowly tailored to promote a compelling Government interest," and "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  *Id.*  It is plain that the City cannot satisfy strict scrutiny, and the Court should invalidate the Ordinance.

**1.    Required License**

"A permitting requirement" like this one "is a prior restraint on speech and therefore bears a 'heavy presumption' against its constitutionality."  *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009) (en banc) (quoting *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).  The City has shown neither a compelling need for this registration system, nor that it is narrowly tailored to address the problem it is supposedly designed to address.  There is little evidence that yellow pages publishers have delivered directories to citizens who have asked not to receive them (as opposed to wishing they had so requested when they see the book on their stoop).  Even if there were, there is no reason to think that the City could not achieve its goals by simply punishing companies that ignore opt-out requests.  *See id.* at 1044 ("The Supreme Court has consistently struck down prior restraints on speech where a state could achieve its purported goal of protecting its citizens from wrongful conduct by punishing only actual wrongdoers, rather than screening potential speakers.").  While such a requirement would raise its own constitutional issues if applied solely to yellow pages, it would be far less restrictive than the Ordinance.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Moreover, the permitting system established by the Ordinance violates free speech rights in several other ways.  First, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional," *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969), yet Ordinance 123427 "provides no specific grounds for granting or denying permits."  *Gaudiya Vaishnava Soc'y v. City & County of San Francisco*, 952 F.2d 1059, 1065 (9th Cir. 1990).  Second, "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion); *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006) ("[P]rior restraints . . . may stand only if they are imposed for a short period of time and provide a process for adequate and swift appeal to a judicial body.").  But the Ordinance places no limit on how long the City has to respond to a license application and provides no swift appeal.  Finally, even if this permitting scheme could survive under the federal Constitution, "[u]nlike the First Amendment, article 1, section 5" of the Washington Constitution "categorically rules out prior restraints on constitutionally protected speech under any circumstances."  *O'Day v. King County*, 109 Wash. 2d 796, 804, 749 P.2d 142, 146-47 (Wash. 1988).

### 2.    Distribution Fee

Although "the government is permitted to exact a fee in order to defray the cost of legitimate [time, place, or manner] regulations, even though such a fee incidentally burdens speech," *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1247 (10th Cir. 2004), here the fee does much more.  It not only charges yellow pages publishers for a new regulatory scheme aimed at them, but it also singles them out to pay for recycling costs that residents already have paid.  This is like a city not only charging a fee to only some people who want parade permits, but also charging those same people to maintain a park near the parade route.  It is thus essentially a large tax on certain speech, not a neutral fee with incidental effects.  *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("[D]ifferential treatment . . . suggests that the

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 17

goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.").

Moreover, even incidental fees to support legitimate regulations "cannot be based on the content of the proposed speech." *Nationalist Movement v. City of York*, 481 F.3d 178, 184 (3d Cir. 2007); *see also Forsyth County*, 505 U.S. at 137 ("[T]he Forsyth County ordinance relating to fees is invalid because it unconstitutionally ties the amount of the fee to the content of the speech . . . ."). The yellow pages fee is plainly content based—"by its very terms, [it] singles out particular content for differential treatment," *Berger*, 569 F.3d at 1051—and thus cannot stand.

### 3. Required Message

The requirement that yellow pages include on their front cover the City's message about its opt-out website violates the First Amendment by "requir[ing] that [yellow pages publishers] use their private property as a '. . . billboard' for the State's ideological message or suffer a penalty." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). The First Amendment protects "both the right to speak freely and the right to refrain from speaking," *id.* at 714, so the government may not force a company to "use its property as a vehicle for spreading a message" absent a compelling interest and a narrowly tailored burden. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 17 (1986); *see also id.* at 16 ("[T]he choice to speak includes within it the choice of what not to say.").

Although the publishers advertise their own opt-out systems on their directories, they are entitled to favor that message but not the City's, and the City has shown no compelling interest in forcing yellow pages publishers to advertise the City's opt-out regime (and give up prime space on their covers). Moreover, even if the City had a compelling interest in promoting its own opt-out website, the City could "serve that interest through means that would not violate [the publishers'] First Amendment rights." *Id.* at 19. It could pay to advertise its message or promote its opt-out website using its own ample means of communicating with residents. This requirement thus "is not a narrowly tailored means of furthering [the City's] interest." *Id.* at 20.

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

#### 4.    Opt-Out Registry

The City's proposed opt-out registry is unconstitutional for several reasons.  First, the City has shown no compelling interest in avoiding the burden on Seattle residents of picking up an undesired book and placing it in the recycle bin.  *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 631 (1995) ("[T]he 'short, though regular, journey from mail box to trash can . . . is an acceptable burden, at least so far as the Constitution is concerned.'") (quoting *Bolger*, 463 U.S. at 72).  Even were this somehow a compelling interest, yellow pages publishers already offer a means for residents to opt out of delivery.  Second, the City's approach is not narrowly tailored because "a less restrictive alternative would serve the Government's purpose."  *Playboy Entm't*, 529 U.S. at 813.  Namely, the City could advertise publishers' opt-out systems and punish publishers who fail to honor opt-out requests.  *See Berger*, 569 F.3d at 1044 (stating that courts have consistently rejected limitations on speech "where a state could achieve its purported goal of protecting its citizens from wrongful conduct by punishing only actual wrongdoers").  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."  *Playboy Entm't*, 529 U.S. at 816.  But the City has made no such showing.  Finally, the registry is "woefully underinclusive," as it allows residents to opt out solely of yellow pages delivery but not of delivery of other items they might find objectionable; this underinclusiveness "render[s] belief in [the City's stated] purpose a challenge to the credulous."  *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring in judgment) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." (internal quotation marks and citation omitted)).

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 19

42414-0030/LEGAL19779831.14

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**C. Even If Yellow Pages Were Commercial Speech, the Ordinance Would Violate the First Amendment**

If yellow pages were pure commercial speech, the Ordinance would still be invalid.  As the Supreme Court has recognized, commercial speech serves crucial functions:

> Commercial expression . . . assists consumers and furthers the societal interest in the fullest possible dissemination of information. . . .  "People will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication rather than to close them. . . ."

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561-62 (1980) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976)). Yellow pages plainly advance these interests by giving people information to compare providers and find the services and products they need.

Commercial speech restrictions are evaluated under the test established in *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980):

> Under *Central Hudson*, . . . [c]ommercial speech . . .  may be regulated if the government satisfies a test consisting of three related prongs: First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be "narrowly drawn."

*Fla. Bar*, 515 U.S. at 623-24 (citing *Central Hudson*, 447 U.S. at 564-65).  "[T]he last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends."  *United States v. Edge Broad. Co.*, 509 U.S. 418, 427-28 (1993) (internal quotation marks and citation omitted).

"The party seeking to uphold a restriction on commercial speech carries the burden of justifying it."  *Bolger*, 463 U.S. at 71 n.20.  "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  *Edenfield*, 507 U.S. at 770-71.  The City cannot meet this burden here, or even create genuine issues of material fact.  First, the Supreme Court's ruling in *City of Cincinnati v.*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 20

42414-0030/LEGAL19779831.14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*Discovery Network, Inc.*, 507 U.S. 410 (1993), makes clear that the Ordinance as a whole fails *Central Hudson* and must be struck down.  Moreover, each provision of the Ordinance individually fails the *Central Hudson* test.

### 1.    *Discovery Network* Requires Invalidation of the Ordinance as a Whole

In *Discovery Network*, Cincinnati had banned the use of sidewalk racks to distribute commercial handbills but not newspapers.  The City's stated reason for the policy was to reduce the litter and visual blight caused by newsracks, *id.* at 417, but there were only 62 commercial handbill racks in the city, compared to 1,500-2,000 containing newspapers.  *Id.* at 417-18.  Thus, commercial handbill racks constituted only 3% to 4% of the problem the city sought to address.

The Supreme Court accepted Cincinnati's desire to reduce litter and visual blight as a substantial (but not compelling) interest under the first prong of *Central Hudson*, but found that the City's policy failed the second and third prongs because "the city did not 'establish the reasonable fit we require.'"  *Id.* at 417 (quoting *Fox*, 492 U.S. at 480).  Specifically:

> The benefit to be derived from the removal of 62 newsracks while about 1,500-2,000 remain in place was considered "minute" by the District Court and "paltry" by the Court of Appeals.  We share their evaluation of the "fit" between the city's goal and its method of achieving it.

*Id.* at 417-18.  Cincinnati argued that "that there is a close fit between its ban on newsracks dispensing 'commercial handbills' and its interests in safety and esthetics because every decrease in the number of such dispensing devices necessarily effects an increase in safety and an improvement in the attractiveness of the cityscape."  *Id.* at 418.  The Court "accept[ed] the validity of the city's proposition, but consider[ed] it an insufficient justification for the discrimination against [commercial] newsracks that are no more harmful than the permitted newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks."  *Id.*  The Court also stated that "the city's argument attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech."  *Id.* at 419.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 21

42414-0030/LEGAL19779831.14

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

The Court went on to say that "the distinction" between newspapers and commercial handbills "bears no relationship *whatsoever* to the particular interests that the city has asserted," as racks containing newspapers caused the same sort of litter and visual blight as commercial handbill racks. *Id.* at 424. Moreover, "Cincinnati has not asserted an interest in preventing commercial harms by regulating the information distributed by [the handbill] newsracks, which is, of course, the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech." *Id.* at 426. There, as here, "the principal reason for drawing a distinction between commercial and noncommercial speech has little, if any, application to a regulation of their distribution practices." *Id.* at 426 n.21.

This reasoning controls the outcome here. As in *Discovery Network*, there is no "fit" between the Ordinance and its goals. The Ordinance heavily regulates yellow pages distribution, but imposes no similar requirements on distribution of any other printed material. Yet the City's asserted justifications for the Ordinance—reducing solid waste and protecting residents from unwanted materials—apply just as strongly to other materials as they do to yellow pages. Indeed, yellow pages comprise even less of the problem here than commercial handbills did in *Discovery Network*, making up less than 2% of the waste the City recycles. Mullins Decl. Exhibit M. This tiny percentage alone distinguishes this ordinance from laws regulating commercial phone solicitation, which have often been upheld because they addressed a large part of the problem they aimed to solve. *See, e.g.*, *Mainstream Mktg.*, 358 F.3d at 1240 ("The record demonstrates that a substantial share of all solicitation calls will be governed by the do-not-call rules."); *Spafford v. Echostar Commc'ns Corp.*, 448 F. Supp. 2d 1220, 1225 (W.D. Wash. 2006) (finding "reasonable fit" because "commercial . . . calls were more frequent than non-commercial calls" and "more invasive"). In short, "the distinction" the City has drawn between yellow pages and all other printed material "bears no relationship *whatsoever* to the particular interests that the city has asserted," and "is therefore an impermissible means of responding to the city's . . . interests." *Discovery Network*, 507 U.S. at 424; *see also Metro Lights, LLC v. City of Los Angeles*, 551 F.3d

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 22

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

42414-0030/LEGAL19779831.14

898, 906 (9th Cir. 2009) ("[D]istinctions among different kinds of speech must relate to the interest the government seeks to advance.") (citing *Discovery Network,* 507 U.S. at 418-19).  These problems with the Ordinance exemplify the Court's point that "the principal reason for drawing a distinction between commercial and noncommercial speech has little, if any, application to a regulation *of their distribution practices*," *Discovery Network*, 507 U.S. at 426 n.21 (emphasis added), and demonstrate that there is no way to reconcile the Ordinance with *Discovery Network*.

## 2.   Each Part of the Ordinance Violates Commercial Speech Standards

Although the Ordinance as a whole must be struck down under *Discovery Network* even if the Court deems yellow pages pure commercial speech, it is also clear that no part of the Ordinance can survive the *Central Hudson* test.

### a.   Required License

Under the "final prong of the *Central Hudson* test, we have made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002). Here it is clear that the City "could achieve its interests in a manner that . . . restricts less speech," *id.*, namely, the City "could achieve its purported goal of protecting its citizens . . . by punishing only actual wrongdoers, rather than screening potential speakers." *Berger*, 569 F.3d at 1044.

### b.   Distribution Fee

The distribution fee lacks the "fit" required to satisfy the second and third prongs of *Central Hudson* because it singles out yellow pages directories—and only those directories published by out-of-state companies—for discriminatory treatment.  The City's basis for creating the fee is to "recover the costs of collection and disposal of yellow pages phone books and the costs of an Opt-Out Registry," but the City already charges residents for recycling materials they no longer want, and it imposes no such fee on other distributors of commercial or other speech that citizens might not want to receive.  Yet those other materials, from newspaper advertising inserts to junk mail, impose far larger recycling costs on the City than do yellow pages.  This underinclusiveness is fatal.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 23

42414-0030/LEGAL19779831.14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*See, e.g.*, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188-95 (1999) (finding no "fit" between federal law banning advertising by private casinos and government's asserted goal of preventing compulsive gambling because law allowed advertising by Indian casinos and state lotteries); *Ballen v. City of Redmond*, 466 F.3d 736, 743 (9th Cir. 2006) (rejecting regulation of some commercial signs because regulated signs no more harmed city's interests than did unregulated signs).

### c.    Required Message

This provision, too, fails *Central Hudson*'s third prong, for the City could achieve its interest in informing citizens of their opt-out options "through means that would not violate [yellow pages publishers'] First Amendment rights." *Pac. Gas & Electric*, 475 U.S. at 19.  For example, the City could use its own website, recycling bills, and other mailings to inform citizens how to use the industry's mechanisms for opting out of receiving yellow pages.  *See id.* (rejecting requirement that corporation publicize speech with which it disagreed when many other options allowed dissemination of the same speech).

### d.    Opt-Out Registry

The "Opt-Out Registry" furthers no "substantial interest" of the City's because it merely duplicates yellow pages publishers' existing opt-out websites.  Moreover, it suffers from the same lack of "fit" as the "Distribution Fee," as it singles out one class of allegedly commercial speech when there is no reason to think that Seattle residents have any greater desire to opt out of receiving yellow pages than they do true commercial speech.  *See Ballen*, 466 F.3d at 743.

### V.    THE ORDINANCE VIOLATES THE COMMERCE CLAUSE

A local law violates the Commerce Clause if it has either the purpose or effect of "favor[ing] in-state economic interests over out-of-state interests." *Brown-Forman*, 476 U.S. at 579; *see also Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).  Even if a law has no such purpose or effect, however, it still violates the Commerce Clause if the burden it imposes "on interstate

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 24

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

commerce clearly exceeds the local benefits" of the law.  *Brown-Forman*, 476 U.S. at 579.

Ordinance 123427 fails under either standard.

### A.      The Ordinance Has a Discriminatory Purpose or Effect

As explained above, early versions of the Ordinance applied to directories published by

Seattle organizations, but after those groups protested that the Ordinance would "threaten the[ir]

financial well being," Mullins Decl. Exhibit G, the City Council amended the proposed Ordinance

with the specific purpose of exempting them.  This change impermissibly discriminated against out-

of-state publishers.  In the Commerce Clause context, "'discrimination' simply means differential

treatment of in-state and out-of-state economic interests that benefits the former and burdens the

latter.  If a restriction on commerce is discriminatory, it is virtually *per se* invalid."  *Or. Waste Sys.,*

*Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).

The Ordinance not only had the *purpose* of favoring local interests, it also has the *effect* of

doing so.  Under the Ordinance, Plaintiffs must obtain City permits, pay large fees, and publish

City-mandated speech on their directories, while local directory publishers, such as GSBA, and

other local companies that compete with Plaintiffs for advertising, such as newspapers, bear none of

these burdens.  The Ordinance thus makes it easier for GSBA and other local organizations to

publish and distribute their materials than it is for Plaintiffs, giving them an advantage over

Plaintiffs in soliciting advertising.  Plaintiffs and local groups seek advertising from many of the

same businesses, Norton Decl. ¶ 18, and "as long as there is some competition between the locally

produced exempt products and non-exempt products from outside the State, there is a

discriminatory effect."  *Bacchus Imports*, 468 U.S. at 271.

The City will likely argue that the final Ordinance draws no explicit distinction between

local and out-of-state publishers, even though early versions were more transparent.  *E.g.*, Mullins

Decl. Exhibit F.  But artfulness is not the same as lawfulness, and a statute may have a

discriminatory purpose or effect even without drawing explicit distinctions.  For example, in *Hunt v.*

*Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), North Carolina had passed a

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 25

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

42414-0030/LEGAL19779831.14

law regulating apple distribution that drew no explicit distinctions between in-state and out-of-state apple growers.  "Despite the statute's facial neutrality," *id.* at 352, however, the Supreme Court found that "the challenged statute has the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them." *Id.* at 350-51.  As relevant here, the statute discriminated against Washington growers by "raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected"; "this disparate effect result[ed] from the fact that North Carolina apple producers, unlike their Washington competitors, were not forced to alter their marketing practices in order to comply with the statute." *Id.* at 351.  Here, the "disparate effect results from the fact that" Seattle directory publishers, unlike their out-of-state competitors, are "not forced to alter their [distribution] practices" and pay a fee "in order to comply with the statute." *Id.*

The City will also likely argue that it exempted the GSBA and other local groups because they are membership organizations and the City assumes that they will only distribute directories to people who want them.  But even if that were true, the Ordinance discriminates against Plaintiffs with respect to directories they deliver to people who want them, as the Distribution Fee and other requirements of the Ordinance apply even to directories residents expressly request or willingly accept from Plaintiffs, but not to such directories distributed by local organizations.

In short: "By taxing out-of-state [publishers] and not taxing their in-state competitors, [Seattle] gives a direct commercial advantage to local business.  The Supreme Court has repeatedly held that the Commerce Clause forbids such preferential treatment." *Nat'l Meat Ass'n v. Deukmejian*, 743 F.2d 656, 660 (9th Cir. 1984), *aff'd*, 469 U.S. 1100 (1985).

**B.      The Burdens Imposed by the Ordinance Outweigh Its Local Benefits**

Even if the Ordinance had no discriminatory purpose or effect, it would still be invalid under the Commerce Clause because "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  The benefits the City claims to seek under the Ordinance are reductions in unwanted deliveries and solid

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 26

42414-0030/LEGAL19779831.14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

waste.  The Ordinance, however, will have only minimal impacts on both goals, and at a cost that far exceeds any benefit achieved.

To begin with, yellow pages publishers already offer their own means of opting out of delivery, and many Seattle residents take advantage of those systems.  For example, 17,000 people have opted out of delivery of Dex's Seattle Metro yellow pages.  Stonecipher Decl. ¶ 10.  And during deliberations on the Ordinance, the City Council repeatedly heard from its own staff that these opt-out systems "work[] pretty well."  Mullins Decl. ¶ 11.  Although the City Council complained that residents had to contact multiple publishers to opt out of delivery of all yellow pages, the Yellow Pages Association recently developed a website that addresses that concern, allowing consumers to decline delivery of any particular yellow pages they receive or of all yellow pages directories at one location.  Norton Decl. ¶ 29.  In short, because citizens who wish not to receive yellow pages already have a means of achieving that goal, there is little reason to think the Ordinance will generate any significant benefit.  Indeed, the City conducted no study and provided no estimate of how many more residents it believes will opt out under the Ordinance than have already done so.  *See, e.g.*, Mullins Decl. Exhibit J ("Resident feedback via general anecdotes during the legislation development process was the extent of our information.").

This meager benefit comes at enormous cost, not only in the burdens it imposes on protected speech, but also in the harms the Ordinance will inflict on yellow pages publishers and the companies that advertise in their publications.  The most obvious costs to publishers are the fees that will be charged.  Dex and SuperMedia estimate that they would each owe the City $200,000 to $250,000 under the Ordinance in 2011.  Stonecipher Decl. ¶ 17; Gatto Decl. ¶ 14.  These costs are substantial on their own, but represent only a small part of the burden imposed by the Ordinance.

The Ordinance confiscates a significant portion of the front cover and first page of every yellow pages distributed in Seattle to advertise the City's opt-out program.  Moreover, all of the yellow pages that are distributed in Seattle are also distributed in the surrounding areas, meaning that publishers are faced with a Hobson's choice: either (1) deliver directories to people outside of

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 27

Seattle containing information about Seattle's opt-out program; or (2) undertake expensive customization efforts to use different covers in the areas around Seattle from the one used in Seattle and to change distribution routes and practices.  The first option would confuse and frustrate non-Seattle residents, directing them to an opt-out program that would not work for them.  The second option would impose enormous costs on publishers, and would mean that Seattle was effectively regulating activity outside of its borders, an evil the Commerce Clause is meant to prevent.  *See, e.g.*, *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (holding that if "the practical effect of [a] regulation is to control conduct beyond the boundaries of the" local government then the law "is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature").

Furthermore, the Ordinance will require publishers to take costly steps to comply with the City's opt-out system rather than simply using their own systems.  Yellow pages publishers have already implemented their own systems to ensure that their directories are delivered to the right people and have detailed systems for respecting opt-out requests.  Stonecipher Decl. ¶¶ 12-13, Exhibit B; Gatto Decl. ¶¶ 7-11.  The Ordinance is burdensome because it "does not merely adopt the [publishers'] own rules.  Instead, it requires the [publishers] to . . . implement new" policies.  *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003).

In considering the impacts of these burdens, "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."  *Healy*, 491 U.S. at 336.  Here, the Court need not wonder long about how great a burden would arise if every city created its own version of Seattle's opt-out system, as the Ordinance's sponsor himself repeatedly has said: "[I]f every single city in the nation decided to create their own system, that would be quite burdensome on the industry."  Mullins Decl. ¶ 12; *see also id.* ¶ 13 ("If 50 cities around the country came up with different self-managed systems, that clearly would create a significant burden on [the industry].").  Plaintiffs could not agree more, and courts have repeatedly

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 28

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

recognized that "[t]he effect of such a patch-work regulatory scheme would be immense." *Union Pac.*, 346 F.3d at 871.

Furthermore, "certain types of impacts on interstate commerce are of special importance in the balance with the state's putative interest," including "impacts on commerce beyond the borders of the defendant state, and impacts that fall more heavily on out-of-state interests." *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994) (citations omitted).  Both such impacts are present here.

In short, whatever minimal benefits the Ordinance may achieve are far outweighed by the costs it imposes only on out-of-state publishers, rendering it invalid under the Commerce Clause.

## VI.   CONCLUSION

Yellow pages provide valuable services to millions of people every day, guiding them to products, services, and community information they need.  They are fully protected speech, and Ordinance 123427 cannot survive the strict scrutiny it must receive.  Even if yellow pages were purely commercial speech, however, the Ordinance would still violate the First Amendment because, among other reasons, there is no "fit" between the City's stated goals and its means of pursuing them.

At bottom, the City Council has targeted Plaintiffs' directories because it believes the costs imposed by their distribution outweigh the benefit of their contents.  But "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive" a government's "ad hoc balancing of relative social costs and benefits.  The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs." *Stevens*, 130 S. Ct. at 1585.  In addition, the Commerce Clause forbids the types of discriminatory and needlessly burdensome regulations the City has imposed here.

Seattle cannot possibly prove that the Ordinance satisfies strict scrutiny or *Central Hudson*. Seattle also cannot show that the Ordinance lacks a discriminatory purpose or effect, or that its benefits justify its burdens on commerce.  The Court should grant summary judgment to Plaintiffs.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 29

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

DATED this 13th day of January, 2011.

*s/ David J. Burman*
David J. Burman, WSBA No. 10611
DBurman@perkinscoie.com
Kathleen M. O'Sullivan, WSBA No. 27850
KOSullivan@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Plaintiffs Dex Media West, Inc.,
SuperMedia LLC, and Yellow Pages
Integrated Media Association d/b/a Yellow
Pages Association

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 30

42414-0030/LEGAL19779831.14

**CERTIFICATE OF SERVICE**

On January 13, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

Gregory C. Narver
William C. Foster
Seattle City Attorney's Office
600 Fourth Avenue, 4th Floor
Seattle, WA 98124
Gregory.Narver@seattle.gov
William.Foster@seattle.gov

Jessica Goldman
Summit Law Group
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
jessicag@summitlaw.com

Attorneys for Defendants The City of
Seattle and Ray Hoffman

Attorney for Defendants The City of
Seattle and Ray Hoffman

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 13th day of January, 2011.

s/ David J. Burman
David J. Burman, WSBA No. 10611
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
DBurman@perkinscoie.com

Attorney for Plaintiffs Dex Media West, Inc.,
SuperMedia LLC, and Yellow Pages Integrated
Media Association d/b/a Yellow Pages Association

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (NO. 10-CV-1857) – 31

42414-0030/LEGAL19779831.14