UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DEX MEDIA WEST, INC., et al., | CASE NO. C10-1857JLR |
| Plaintiffs, | ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| CITY OF SEATTLE, et al., | |
| Defendants. | |

## I.    INTRODUCTION

This matter comes before the court on Plaintiffs Dex Media West, Inc. ("Dex"), SuperMedia, LLC ("SuperMedia"), and Yellow Pages Integrated Media Association's (collectively "Plaintiffs") motion for preliminary injunction (Dkt. # 41). Having

ORDER- 1

reviewed the submissions of the parties and the relevant law, the court DENIES

Plaintiffs' motion for preliminary injunction.[1]

## II.   BACKGROUND & FINDINGS OF FACT

### A.  The Ordinance

Over a period of six meetings, between June and October 2010, Defendant City of

Seattle ("the City") heard testimony from residents who were frustrated by the delivery of

unwanted yellow pages directories to their homes.  (Rasmussen Decl. (Dkt. # 30) ¶ 4.)

Residents complained that these unwanted deliveries violated their right to privacy and

pointlessly generated large amounts of waste.  (*Id.*; *see also* O'Brien Decl. (Dkt. # 32)

Ex. 2 (attaching copies of complaints emailed to the City).)

In October 2010, the City enacted Ordinance 123427, which bans the distribution

of "yellow pages phone books" in Seattle unless telephone phone book publishers meet

certain conditions.  First, phone book publishers must "obtain[] an annual yellow pages

phone book distributor license," "separate from and in addition to . . . the business license

required pursuant to [SMC] chapter 5.55."  SMC 6.225.030.  Second, publishers must

pay the City fourteen cents "for each yellow pages book distributed within the City."

---

[1] The parties submitted substantial written testimony in the form of declarations, but also
requested oral argument.  The court finds that the facts material to its resolution of this motion
are undisputed, and therefore a hearing is unnecessary.  It is within the court's discretion to deny
a motion for a preliminary injunction without a hearing when there are no relevant facts in
dispute.  *See Anderson v. Jackson*, 556 F.3d 351, 361 (5th Cir. 2009); *Nat'l Propane Gas Ass'n
v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 19 (D.D.C. 2008); *Rottman v. Penn.
Interscholastic Athletic Ass'n, Inc.*, 349 F. Supp. 2d 922, 928 (W.D. Pa. 2004).

ORDER- 2

SMC 6.255.100(A).[2]  Third, publishers must "prominently and conspicuously display on . . . the front cover of each yellow pages phone book distributed within the City" and "on their websites" a message mandated by the City about the City's program for opting out of receiving phone books.  SMC 6.255.110.  Finally, the Ordinance creates an "Opt-Out Registry . . . for residents and businesses to register and indicate their desire not to receive delivery of some or all yellow pages phone books."  SMC 6.255.090(A).

The Ordinance defines a "[y]ellow pages phone book" as "a publication that consists primarily of a listing of business names and telephone numbers and contains display advertising for at least some of those businesses."  SMC 6.255.025(D).  Three purposes motivated the City in its decision to enact the Ordinance: waste reduction, protection of residents' privacy from unwanted intrusions, and the recovery of costs incurred to maintain and enforce the opt-out registry.  (Mullins Decl. (Dkt. #17) Ex. A, Preamble to Ordinance.)

**B.  Yellow Pages Phone Books**

Washington requires local exchange carriers ("LECs") to publish and distribute residential, business listings, and certain consumer information.  *See* WAC 480-120-251.  Neither Dex nor SuperMedia are LECs.  (Norton Decl. (Dkt. # 18) Ex. A. ¶ 9.)  Nevertheless, Dex contracts to publish directories that satisfy these requirements on behalf of Qwest, while SuperMedia does the same on behalf of Verizon.  (*Id*.)  Directory

---

[2] On January 31, 2011, the City amended the Ordinance to eliminate a $148 per ton recovery fee for the cost of recycling that the City had originally enacted with the Ordinance.  (O'Brien Decl. Ex. 1.)

1  companies, such as Dex and SuperMedia, do not charge residents or businesses for this

2  service.  (*Id.* ¶¶ 12-13.)  Dex and SuperMedia, therefore, have turned to advertising to

3  defray the cost of printing and distribution.  (*Id.* ¶ 17.)

4          The directories published by Dex and SuperMedia are commonly called "yellow

5  pages."  (*Id.* ¶ 7.)  The contents of  a yellow pages directory typically include a business

6  "white pages" section, providing the names, addresses, and telephone numbers of local

7  businesses and professionals.  (Stonecipher Decl. (Dkt. # 19) ¶ 5.)  The Dex 2010 Seattle

8  Metro yellow pages directory contains 404 such pages.  (*Id.*)  Further, the publication

9  contains listings of businesses by category of product or service.  (S.J. Mot. (Dkt. # 14) at

10  6.)  Unlike the white pages, this section contains a significant amount of advertising.

11  (*Id.*)  Finally, a yellow pages directory contains a public-interest section that includes

12  pages of community information, maps, and government listings.  (*See* Stonecipher Decl.

13  ¶ 6.)  The Dex 2010 Seattle Metro yellow pages directory contain nearly 100 pages of

14  this type of public interest material.  (*Id.*)  Ultimately, advertising comprises less than

15  half of the content of a typical yellow pages directory.  (Norton Decl. ¶ 24.)  Display

16  advertising, in-column display, coupons, and advertising on the cover and tabbed inserts

17  comprise approximately 35% of the Dex 2010 Seattle Metro yellow pages directory.

18  (Stonecipher Decl. ¶ 8.)  Similarly, display advertising ranges from 15-35% of

19  SuperMedia's Seattle area yellow pages directories.  (Gatto Decl. (Dkt. # 16) ¶ 4.)

20

21

22

1

## III.   ANALYSIS & CONCLUSIONS OF LAW

2

### A. Preliminary Injunction Standards

3      "[A] preliminary injunction is an extraordinary and drastic remedy, one that

4  should not be granted unless the movant, by a clear showing, carries the burden of

5  persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary

6  injunction, the moving party must demonstrate "that he is likely to succeed on the merits,

7  that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

8  balance of equities tips in his favor, and that an injunction is in the public interest."

9  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008).  In addition, the

10  Ninth Circuit has held that its "serious questions" version of the sliding scale test for

11  preliminary injunctions "remains viable after the Supreme Court's decision in *Winter*,"

12  and that this court may still apply that test.  *Alliance for Wild Rockies v. Cottrell*, 632

13  F.3d 1127, 1134-35 (9th Cir. 2011).  In so ruling, the Ninth Circuit formulated its revised

14  sliding scale test as follows:

15          . . . [S]erious questions going to the merits, and a balance of hardships that
            tips sharply toward the plaintiff can support issuance of a preliminary
16          injunction, so long as the plaintiff also shows that there is a likelihood of
            irreparable injury and that the injunction is in the public interest.
17

18  *Id.* at 1135.  Thus, under either the four-part test in *Winter* or the sliding scale test

19  formulated in *Cottrell*, Plaintiffs are required to demonstrate a likelihood of irreparable

20  injury and that the injunction is in the public interest.  *Id.*; *Winter*, 555 U.S. at 24.

21          The court finds the likelihood of irreparable harm and the public interest element

22  to be central to its analysis here.  In support of their motion for preliminary injunction,

1    Plaintiffs assert two types of harm:  Constitutional harm and monetary harm.  (*See infra* §

2    III.C.)  As discussed more fully below, although monetary harm alone is ordinarily

3    insufficient to support the imposition of a preliminary injunction, *Rent-A-Center, Inc. v.*

4    *Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 2001), "[t]he

5    loss of First Amendment freedoms, for even minimal periods of time, unquestionably

6    constitutes irreparable injury."  *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (internal

7    quotation marks omitted).  Further, courts have recognized a significant public interest in

8    upholding First Amendment principles.  *Sammartano v. First Judicial Court,* 303 F.3d

9    959, 974 (9th Cir. 2002).  Thus, the determination of whether Plaintiffs have

10   demonstrated a likelihood of irreparable harm, as well as whether they have demonstrated

11   that a preliminary injunction would be in the public interest, hinges in part on whether

12   Plaintiffs have demonstrated a likelihood of success on the merits of their First

13   Amendment claim.  The court, therefore, turns to each of these three issues, beginning its

14   analysis with Plaintiffs' likelihood of success on the merits of their First Amendment

15   claim.

16        **B.  Likelihood of Success on the Merits of Plaintiffs' First Amendment Claim[3]**

17        The only substantive claim that the court finds necessary to consider in the context

18   of this motion for preliminary injunction is Plaintiffs' claim that the Ordinance violates

19

20        [3] In their motion for preliminary injunction, Plaintiffs incorporate by reference the
     memoranda and declarations filed in support of their motion for summary judgment.  (Mot. at 3-
21   4 (citing Dkt. ## 14, 37).)  Defendants do the same in their responsive memorandum.  (Resp. at
     1.)  Thus, the court periodically refers to these memoranda and the declarations in its order here
22   as well.

ORDER- 6

1    their First Amendment rights.  As discussed below, the court's analysis of Plaintiffs'

2    assertions (1) that they will suffer a likelihood of irreparable injury if a preliminary

3    injunction is not imposed, and (2) that issuance of a preliminary injunction is in the

4    public interest is tied in part to the court's analysis of Plaintiff's likelihood of success on

5    the merits of their First Amendment claim.  Therefore, thorough analysis of this claim is

6    a prerequisite to the court's determination of Plaintiffs' motion for preliminary

7    injunction.  Because the court ultimately concludes that Plaintiffs fail to establish either a

8    likelihood of irreparable injury or that a preliminary injunction would be in the public

9    interest (both of which are required elements under either *Winter* or *Cottrell*), it is

10   unnecessary for the court to consider the likelihood of success on the merits of any of

11   Plaintiffs' other substantive claims in the context of this motion.

12                    **1.   Yellow Pages Directories Are Commercial Speech**

13            Plaintiffs allege that because yellow pages directories are "fully protected" First

14   Amendment speech, the City's Ordinance violates the First Amendment.  (S.J. Mot. at

15   11.)  The degree of protection afforded by the First Amendment depends on whether the

16   activity sought to be regulated constitutes commercial or noncommercial speech.  *Bolger*

17   *v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983).  With respect to noncommercial

18   speech, "content-based restrictions [are permitted] only in the most extraordinary of

19   circumstances."  *Id.*   However, "the Constitution accords less protection to commercial

20   speech than to other constitutionally safeguarded forms of expression."  *Id.* at 64-65.

21   "[C]ontent based restrictions on commercial speech may be permissible."  *Id.* at 65.

22

1   Thus, the Court must first determine the proper classification of the publications at issue.

2   Are yellow pages directories commercial or noncommercial speech?

3          "Although the boundary between commercial and noncommercial speech has yet

4   to be clearly delineated, the 'core notion of commercial speech' is that it 'does no more

5   than propose a commercial transaction.'" *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d

6   894, 906 (9th Cir. 2002) (quoting *Bolger*, 463 U.S. at 66).  However, any consideration of

7   whether speech is commercial should rest on "'the commonsense' distinction between

8   speech proposing a commercial transaction, which occurs in an area traditionally subject

9   to government regulation, and other varieties of speech." *Bolger*, 463 U.S. at 64.

10         Under *Bolger*, "[w]here the facts present a close question, 'strong support' that the

11  speech should be characterized as commercial speech is found where the speech is an

12  advertisement, the speech refers to a particular product, and the speaker has an economic

13  motivation" for engaging in the speech. *Hunt v. City of Los Angeles*, ___ F.3d ___, 2011

14  WL 982475, at *9 (9th Cir. Mar. 22, 2011) (citing *Bolger*, 463 U.S. at 66-67).  In

15  applying this test, a finding of just one of the factors does not make speech commercial.

16  Rather, "the combination of all of these characteristics . . . provides strong support for the

17  . . . conclusion that the [speech in question can be] properly characterized as commercial

18  speech." *Bolger*, 463 U.S. at 67.

19         In *Bolger*, the Supreme Court held that condom pamphlets, which were produced

20  and distributed by a contraceptives manufacturer, and which contained advertising as

21  well as discussions of family planning and disease prevention, were properly regulated as

22  commercial speech.  *Id.* at 66.  Although the Court noted that the pamphlets could not "be

ORDER- 8

1   characterized merely as proposals to engage in commercial transactions" and contained

2   discussion of important public information, they were properly characterized as

3   commercial speech because they were advertisements, referenced specific products, and

4   the publisher had an economic motivation for mailing them.  *Id.* at 66-68.

5          In the present case, Plaintiffs argue that yellow pages directories should receive

6   the highest level of First Amendment protection because each publication provides a

7   guide not only to commercial activities, but also to community, public safety, and

8   political information.  (S.J. Mot. at 12.)  The court disagrees. Although yellow pages

9   directories, like the pamphlets in *Bolger*, "cannot be characterized merely as proposals to

10  engage in commercial transactions," a consideration of the three factors outlined in

11  *Bolger* dictates that yellow pages directories constitute commercial speech.  First, yellow

12  pages directories contain many advertisements for many different products.[4]  Indeed, as

13  noted above, various forms of advertising comprise approximately 35% of the Dex 2010

14  Seattle Metro yellow pages directory and approximately 15-35% of SuperMedia's Seattle

15  area yellow pages directories.  (Stonecipher Decl. ¶ 8; Gatto Decl. ¶ 4.)  Second, yellow

16  pages directories reference specific products.  For example, the front cover of the Dex

17  2010 Seattle Metro Directory contains a specific advertisement for Geico Auto Insurance,

18  while the back cover contains an advertisement for South West Plumbing.  (Dex 2010

19  Seattle Metro Directory (*see* Dkt. # 22).)  In fact, that same directory contains a specific

20

21      [4] (*See, e.g.,* Dex 2010 Seattle Metro Directory (*see* Dkt. # 22) at Business White Pages at
    1, 5, 12, 27, 35, 39, 42; Business Yellow Pages at 6, 30, 31, 38, 39, 44, 45; Government Pages at
22  66 ("You deserve a vacation. Call now…"); Community Pages at 11 ("Call now to learn how to
    donate your car").)

ORDER- 9

1   advertisement for Dex's advertising services.  (*Id.* at Business Yellow Pages 9 ("Discover

2   Directory Advertising Services from Dex").)  Third, Plaintiffs have an economic motive

3   for publishing the directories and delivering the yellow pages to residents' doorsteps.

4   (*See* Norton Dec. ¶¶ 17-20; *see also* Baldasty Decl. (Dkt. # 15) ¶ 7.)  Originally, the

5   LECs published the residential and business listings contained in the yellow pages.  (*See*

6   Norton Dec. ¶ 7.)  Plaintiffs have recognized the "potential profitability of display and

7   other advertising" in yellow pages directories, however, and have contracted with LECs

8   to publish the residential and business listings as a part of their yellow pages directories.

9   (*Id.* ¶¶ 9, 17; *see also* Rasmussen Decl. Exs. 5-6.)

10          Besides the *Bolger* factors, common sense – the touchstone of the commercial

11  speech doctrine – dictates that the yellow pages directories should not receive the highest

12  level of protection afforded by the First Amendment.  *See, e.g., Central Hudson Gas &*

13  *Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980).  Despite

14  Plaintiffs' emphasis on the percentage of noncommercial material contained within the

15  directories, the presence of noncommercial speech does not alter the commonsense

16  conclusion that yellow pages directories are commercial speech.  In fact, one of the

17  pamphlets considered by the Supreme Court in *Bolger* contained only one reference to a

18  product on the bottom of the last page of an eight-page pamphlet.  *Bolger*, 463 U.S. at 67

19  n.13.  Nevertheless, the Supreme Court still found the overall character of the

20  informational pamphlet to be commercial in nature.  *Id.* at 67.  As the Supreme Court has

21  stated, "[a] company has a full panoply of protections available to its direct comments on

22  public issues, so there is no reason for providing similar protection where such statements

are made in the context of commercial transactions."  *Id.* at 68 (footnote omitted).  Thus, the court cannot conclude that Plaintiffs are likely to succeed on the merits of their assertion that yellow pages directories are "fully protected" noncommercial speech under the First Amendment.

## 2.  Commercial and Noncommercial Speech Are Not "Inextricably Intertwined" in the Yellow Pages

Plaintiffs nevertheless assert that even if the court were to find that yellow pages directories constitute commercial speech, the directories would still be entitled to the highest level of First Amendment protection because the commercial speech in the directories is "inextricably intertwined" with fully protected noncommercial speech.  (S.J. Mot. at 14.)  Commercial speech does not retain its commercial character "when it is inextricably intertwined with otherwise fully protected speech."  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

The Supreme Court's decisions in *Riley* and *Board of Trustees of State University of New York  v. Fox*, 492 U.S. 469 (1989), provide a framework for the court's analysis here.  In *Riley*, the Supreme Court considered a state-law requirement that professional fundraisers must include in any appeal for charitable funds information setting forth the percentage of charitable contributions collected and actually turned over to charities.  487 U.S. at 786; *see also Fox,* 492 U.S. at 474 (describing *Riley*).  The Court has held that charitable fundraising is fully protected speech.  *Id.*  Assuming without deciding that the statement compelled by the regulation was commercial speech, the Court concluded that the commercial speech was "inextricably intertwined" with the fully protected charitable

ORDER- 11

1  fundraising.  *See id.* (citing *Riley*, 487 U.S. at 796.)  As a result, the Supreme Court

2  applied its "test for fully protected expression" in evaluating the state law even though

3  portions of the speech may have been considered commercial.  *Id.*

4       Conversely, in *Fox*, the Supreme Court considered a university's refusal to permit

5  product demonstrations, such as Tupperware parties, in dorm rooms.  The Court found

6  that there was "no doubt" that the Tupperware parties proposed commercial transactions.

7  492 U.S. at 473.  The Court also recognized that other subjects were also touched upon

8  during the demonstrations such as "how to be financially responsible and how to run an

9  efficient home."  *Id.* at 474.  Nevertheless, the Court rejected the argument that the

10  commercial speech of selling Tupperware and the fully protected discussions of financial

11  responsibility were inextricably intertwined.  *Id.* at 474-75.  Unlike *Riley*, where the state

12  law at issue made it impossible for the noncommercial messages to be delivered without

13  the compelled commercial speech, in *Fox* the Court found that "no law of man or nature

14  makes it impossible to sell housewares without teaching home economics" and that

15  nothing in the nature of the restriction "requires [the noncommercial messages] to be

16  combined with commercial messages."  *Id.* at 474.  Because the commercial and

17  noncommercial aspects of the demonstrations or Tupperware parties were not

18  inextricably intertwined, the Court analyzed the speech as a whole and the university's

19  regulation of that speech under standards applicable to commercial and not fully

20  protected speech.  *Id.* at 475.

21       The court here finds the regulations in the City's Ordinance to be more like the

22  restriction at issue in *Fox* and less like the state law in *Riley*.  Unlike in *Riley* – where the

1    protected charitable solicitation could not be made without the compelled commercial

2    disclosures – and like *Fox* – where housewares could be sold without teaching economics

3    – nothing in the Ordinance nor in the nature of these directories requires that their

4    noncommercial aspects, such as maps, listings, and street guides, be combined with

5    advertising.  The two aspects of these directories – the commercial and the

6    noncommercial – are therefore not inextricably intertwined.

7        Plaintiffs advance three reasons why yellow page advertising is nevertheless

8    inextricably intertwined with fully protected speech.  First, Plaintiffs assert that the City

9    could not address its objectives without regulating the combination of commercial and

10   noncommercial speech.  (S.J. Mot. at 14.)  This assertion, however, looks at the question

11   through the wrong lens.  The analysis in *Riley* and *Fox* indicates that it is the contents of

12   the speech itself, which determines whether the speech is inextricably intertwined, and

13   therefore entitled to heightened protection or not.  *See Riley*, 487 U.S. at 796-97; *Fox*,

14   492 U.S. at 473-75.

15       Second, Plaintiffs contend that like the regulation in *Riley*, the state law here

16   requires the publication of basic business listings.  (S.J. Rep. at 4.)  This contention is not

17   valid for several reasons.  While it is true that WAC 480-120-251 requires LECs to

18   publish basic business listings, the Plaintiffs are not LECs.  Furthermore, unlike *Riley*,

19   where the restriction at issue required commercial speech to be added to noncommercial

20   speech, here there is no legal requirement that business and residential listings or other

21   noncommercial material be published with commercial advertising.

22

1    Third, Plaintiffs argue that, like newspapers, the distribution of the noncommercial

2   content is dependent on the funding provided by advertising.  (S.J. Mot. at 14.)  As the

3   Court noted in *Fox*, however, including home economics elements in a Tupperware party

4   would no more convert the parties into educational speech, than opening a sales

5   presentation with a prayer or the Pledge of Allegiance would convert it into religious or

6   political speech.  *Fox*, 492 U.S. at 474-75.  While advertising may be a convenient way to

7   defray the expense of the state-mandated directories, and while the noncommercial

8   information may render receipt of the advertising contained in these directories more

9   palatable to portions of the public, Plaintiffs point to no legal or other mandate requiring

10   combination of the commercial and noncommercial aspects of these directories.  The

11   court, therefore, cannot conclude that Plaintiffs are likely to succeed on the merits of their

12   assertion that the various noncommercial aspects of the yellow pages directories are

13   inextricably intertwined with the commercial aspects.

14           **3.  The Ordinance Satisfies the Intermediate Scrutiny of *Central
                   Hudson***

15           Having concluded that Plaintiffs are unlikely to succeed on the merits of their

16   claim that yellow pages directories are fully protected speech, the court considers

17   whether the Ordinance violates the First Amendment under the lesser standard applicable

18   to commercial speech.  A restriction on commercial speech must satisfy the four-part test

19   announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission of

20   New York*: (1) the speech concerns lawful activity that is not misleading; (2) the

21   government interest is substantial; (3) the regulation directly advances that interest; and

1  (4) the regulation is not more extensive than necessary.  447 U.S. 557, 566 (1980).  Here,

2  the parties do not contest the first factor; therefore the court turns to the remaining

3  *Central Hudson* factors.

**a.  The City's Interests are Substantial**

5      The City expresses three primary interests in enacting the Ordinance, summarized

6  as (1) waste reduction, (2) resident privacy, and (3) cost recovery.  (*See* S.J. Resp. (Dkt. #

7  28) at 8-9; Mullins Decl. Ex. A, Preamble.)  First of all, an interest "in promoting

8  resource conservation and reducing the burden on . . . brimming landfills" is substantial.

9  *See Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 735 (9th Cir. 1994).

10 Second, governments have a significant interest in protecting residents' privacy.  *See*

11 *Watchtower Bible & Tract Soc'y of New York., Inc. v. Village of Stratton*, 536 U.S. 150,

12 165 (2002); *Bland v. Fessler*, 88 F.3d 729, 734 (9th Cir. 1996).  Third, the City's interest

13 in recouping the costs expended in the Ordinance's enforcement and administration is

14 substantial.  *See, e.g., Trans. Alts., Inc. v. City of New York*, 218 F. Supp. 2d 423, 439

15 (S.D.N.Y 2002), *aff'd*, 340 F.3d 72 (2d Cir. 2003).

16     Plaintiffs rely on *Bolger*, however, to argue that the City has no substantial privacy

17 interest in enforcing a resident's decision to uninvite the distribution of yellow pages to

18 their doorstep.  (S.J. Rep. at 9.)  In *Bolger*, the Court rejected the government's interest in

19 creating an opt-in regulation in order to shield residents from receiving in the mail

20 potentially offensive and intrusive advertisements for contraceptives, because the City's

21 stated interest and the regulation were paternalistic.  463 U.S. at 71-74.  Here, by

22 contrast, the City's interest in privacy is substantial and does not suffer from the type of

1     paternalism that the Supreme Court rejected in *Bolger*. Unlike the opt-in regulation in

2     *Bolger*, the Ordinance creates an opt-out system, where the resident, and not the City,

3     makes the choice to not receive the speech or directories at issue. *Anderson v. Treadwell*,

4     294 F.3d 453, 464 (2d Cir. 2002) (unlike some commercial restrictions where an interest

5     is vulnerable because of paternalism, a resident opt-out ordinance "entirely avoids such

6     concerns because it applies only where homeowners elect to seek its protection").

7         The City needs only to identify one substantial interest to meet the *Central*

8     *Hudson* test. *See Bland*, 88 F.3d at 734 n.8 (noting that the government need only

9     identify one substantial interest). Based on the record before the court in the context of

10    this motion for preliminary injunction, as well as the foregoing case authority, it appears

11    that the City has established three. The court, therefore, cannot conclude that Plaintiffs

12    are likely to succeed on the merits of their assertion that the City has no substantial

13    interest underpinning the Ordinance.

14                **b.  The Fit Between the Ends and the Means is**
                         **Reasonable**

15

16         The Supreme Court has effectively collapsed the last two *Central Hudson*

17    elements into a single inquiry of whether the City has shown a "reasonable fit" between

18    the government's ends and the means chosen to accomplish those ends. *See City of*

19    *Cincinnati v. Discovery Network*, *Inc.,* 507 U.S. 410, 415 (1993). This fit requirement

20    does not need to be

21           necessarily perfect, but reasonable; that represents not necessarily the single
           best disposition but one whose scope is in proportion to the interest served,

22           . . . that employs not necessarily the least restrictive means but, as we have

put it in the other contexts . . . , a means narrowly tailored to achieve the desired objective.

*Fox,* 492 U.S. at 480 (internal quotation marks and citations omitted).  In other words, regulation of commercial speech (or the means) must simply "provide more than ineffective or remote support for a legitimate governmental policy goal." *Lungren,*  44 F.3d at 732 (internal quotation marks omitted).

The Ordinance's opt-out registry, recovery fee, and license requirement all "provide more than ineffective or remote support" for the City's stated interests.  First, the opt-out registry provides the City a means to enforce residents' choices and is limited because it only restricts delivery to those individuals who do not wish to receive yellow pages directories.  *See e.g., Mainstream Mktg. Servs., Inc. v. Fed. Trade Comm'n*, 358 F.3d 1228 (10th Cir. 2004) (upholding "do-not-call" registry).  Second, the "recovery fee is intended to reflect the cost to the City of administering the Opt-Out Registry" and thus is a precise means to recoup the opt-out registry's actual costs.  SMC 6.255.100(A).  Charges made by cities to recoup expenses incurred as a result of regulation have been upheld even in the realm of fully protected speech.  *See, e.g., Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1081 (9th Cir. 1990).  Finally, the Ordinance's licensing requirement is a narrowly tailored means of protecting residential privacy and recovering administrative costs.[5]  In addition to providing a means for the City to collect distribution

---

[5] Citing *O'Day v. King County*, 749 P.2d 142, 146-47 (Wash. 1988), Plaintiffs argue that even if the licensing system could survive under the federal Constitution, the licensing system would still violate the Washington Constitution which "categorically rules out prior restraints on constitutionally protected speech under any circumstances." (Mot. at 17.)  The Washington

1  data and set proportionate recovery fees, the licensing requirement is a mechanism

2  through which the City may ensure compliance with the opt-out list. *See S.O.C., Inc. v.*

3  *County of Clark*, 152 F.3d 1136, 1147 (9th Cir. 1998) (noting that an acceptable, less-

4  restrictive alternative to banning handbilling would be to issue canvassing permits, and

5  that a "permit system could help regulate congestion and build in accountability should

6  problems arise"), *amended on other grounds*, 160 F.3d 541 (9th Cir. 1998).

7        Plaintiffs rely primarily on *Discovery Network* in support of their argument that

8  the City has failed to establish a reasonable fit between the Ordinance and its interests in

9  waste reduction and resident privacy.  In *Discovery Network*, the Court invalidated a city

10  ordinance that prohibited commercial handbills from being displayed in news racks,

11  while allowing ordinary newspapers.  507 U.S. at 413-14.  The Court concluded that the

12  City's regulation violated the First Amendment under the "reasonable fit" standard.  *Id.* at

13  417.  The City of Cincinnati's purported interest was in limiting sidewalk debris,

14  although the ban affected only 62 racks, while leaving some 2000 racks unaffected.  *Id.* at

15  417-18.  Most importantly, the City of Cincinnati's justification for singling out

16  commercial papers was premised on nothing more than a "naked assertion that

17  commercial speech has 'low value.'"  *Id.* at 429.  In invalidating the regulation, the Court

18  stated: "Not only does Cincinnati's categorical ban on commercial newsracks place too

19  much importance on the distinction between commercial and noncommercial speech, but

20  _____

21  Supreme Court has since held, however, that Washington's Constitution affords no greater
protection to commercial speech than does the First Amendment.  *Ino Ino, Inc. v. City of*

22  *Bellevue*, 937 P.2d 154, 163, *amended in non-relevant part*, 943 P.2d 1358 (Wash. 1997).

1    in this case, the distinction bears no relationship whatsoever to the particular interests that

2    the city has asserted." *Id.* at 424.  Accordingly, the Court found that the ban was "an

3    impermissible means of responding to the city's admittedly legitimate interests." *Id.*

4      The Supreme Court's "narrow" holding in *Discovery Network* does not undermine

5    the City's Ordinance here. *Id.* at 428.  Plaintiffs argue that just as newspapers in

6    Cincinnati continued to litter the street, the Ordinance here fails because it "imposes no

7    similar requirements on distribution of any other printed material." (S.J. Mot. at 22.)

8    Thus, although the City's interests "apply just as strongly to other materials as they do to

9    yellow pages," City residents will continue to receive other unwanted printed materials

10   on their doorsteps.  (*Id.*)  This analogy fails, however, because the City considered opt-

11   out legislation specifically in response to concerns raised by Seattle residents regarding

12   the unwanted delivery of yellow pages directories.  (Rasmussen Decl. ¶ 4.)  Thus, while

13   the City of Cincinnati singled out commercial handbills based on nothing more than what

14   it perceived as the lesser speech value of handbills as opposed to newspapers, the

15   decision by the City in this case to single out yellow pages directories bears a direct

16   relationship to the concerns raised by the City's residents and the City's stated interest in

17   protecting its residents' privacy and reducing unwanted waste.

18     Furthermore, the fact that residents will continue to receive "junk" mail or "other

19   printed materials" does not mean that the City has failed to establish a reasonable fit.

20   *See, e.g., World Wide Rush, LLC v. City of Los Angeles.*, 606 F.3d 676, 689 (9th Cir.

21   2010).  The government is not required to legislate in a way that wholly eliminates a

22   particular problem; rather, it may advance its goals in piecemeal fashion with a graduated

response.  *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 910 (9th Cir. 2009).

Thus, the court is unable to conclude that the Plaintiffs are likely to succeed on the merits

of their assertion that the Ordinance fails the *Central Hudson* test or violates their First

Amendment rights.

### 4.  The City's Required Message Does Not Violate the First Amendment

Plaintiffs assert that the City's required message is compelled speech in violation

of the First Amendment.  (S.J. Rep. at 11-12.)  The Supreme Court has upheld compelled

commercial speech where the state required inclusion of "purely factual and

uncontroversial information," and the compelled speech was "reasonably related to the

State's interest."  *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 966

(9th Cir. 2009) (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651

(1985) (upholding state's requirement that attorney include in his advertisements a

disclosure that clients may be responsible for litigation costs because the disclosure was

factual in nature and served the state's interest in preventing customer deception)); *see

also United States v. Schiff*, 379 F.3d 621, 630-31 (9th Cir. 2004) (holding that

government could compel website operator to post factual information about potential

criminal liability patrons could face if they used the website to evade taxes).

The standard set forth in *Zauderer* applies in this case.  *See, e.g., Nat'l Elec. Mfrs.

Ass'n v. Sorrell,* 272 F.3d 104, 115 (2d Cir. 2001) (finding state labeling law requiring

manufacturers of mercury containing products to disclose information about product

1    disposal governed by reasonable relationship rule of *Zauderer).*[6]  As the Supreme Court

2    has stated, "[b]ecause the extension of First Amendment protection to commercial speech

3    is justified principally by the value to consumers of the information such speech provides,

4    . . . [Plaintiffs'] constitutionally protected interest in *not* providing any particular factual

5    information . . . is minimal." *Zauderer,* 471 U.S. at 651 (italics in original; citation

6    omitted).

7            The City's required message includes only "purely factual and uncontroversial

8    information" because it simply informs residents about the availability and process of the

9    opt-out program.  (Lilly Decl. (Dkt. # 55) Ex. 5).  Indeed, the required message makes no

10   mention of the value or the necessity of recycling yellow pages.  (*Id.*)  The message

11   furthers the City's interest in reducing both waste and maintaining resident privacy

12   because it notifies residents about the availability of the opt-out program.  Thus, because

13   the required message about the City's opt-out registry is factual in nature and because it

14   is consistent with the City's regulatory goals and overall scheme of the Ordinance, the

15   required message does not offend the First Amendment.

16           Having now concluded all of the various twists and turns of its analysis of

17   Plaintiffs' First Amendment claim, the court cannot conclude that Plaintiffs have

18   demonstrated a likelihood of success on the merits with regard to that claim.  The court

19   now turns to an analysis of Plaintiff's assertions that they will likely suffer irreparable

20

21
_____

22           [6] *See Video Software Dealers*, 556 F.3d at 966 (citing *Sorrell* with approval).

1  harm in the absence of a preliminary injunction and that such an injunction would be in

2  the public interest.

3      C. **Likelihood of Irreparable Harm**

4          Central to the court's ruling on Plaintiffs' motion for preliminary injunction is

5  whether they can establish a likelihood that they will suffer irreparable harm.[7]  *See Kotok*

6  *v. Homecomings Fin., LLC,* No. C09-662RSM, 2009 WL 1652151, at *2 (W.D. Wash.

7  June 12, 2009) ("The showing of irreparable harm is considered 'the single most

8  important prerequisite for the issuance of a preliminary injunction.'") (quoting *Dominion*

9  *Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004)).

10  As noted above, satisfaction of this element is required under either the preliminary

11  injunction test set forth by the Supreme Court in *Winter,* or the Ninth Circuit's

12  reformulated sliding-scale test in *Cottrell*.

13          Here, Plaintiffs assert that they are likely to suffer irreparable harm in the absence

14  of a preliminary injunction because complying with the Ordinance "would not only

15  trench upon the First Amendment," but also impose other significant burdens.  (Mot. at

16  2.)  For example, Plaintiffs contend that complying with the Ordinance would cost

17  thousands of dollars in additional production and distribution costs.  (Stonecipher Decl. ¶

18  17; *see* Supp. Stonecipher Decl. (Dkt. # 38) at 5; *see also* Mot. at 2.)  In addition,

19  Plaintiffs assert that complying with the Ordinance would inhibit revenue generation by

20

21          [7] Defendants note that although the motion for preliminary injunction is brought on
behalf of all Plaintiffs, only Dex has asserted that it is likely to suffer irreparable injury absent

22  preliminary injunctive relief.  (Resp. at 1.)

1    displacing advertising on the cover with the City's message.  (Stoneciper Decl. ¶ 17; *see*

2    *also* Mot. at 2.)  Plaintiffs also argue that the Ordinance will require them to spend

3    thousands of dollars to make changes to databases, processes, and staffing levels, to

4    enable them to act on data from the City's opt-out program.  (Stonecipher Decl. ¶17; *see*

5    *also* Mot. at 3.)

6         Except for their alleged First Amendment injury, the burdens asserted by Plaintiffs

7    are all economic in nature.  It is, however, a well-established principle that irreparable

8    injury cannot be established where harm is measurable in damages.  *See eBay, Inc. v.*

9    *MercExchange, LLC,* 547 U.S. 388, 391 (2006) (recognizing in the context of a

10   permanent injunction that a plaintiff must demonstrate "that remedies available at law,

11   such as monetary damages, are inadequate to compensate for that injury.").  A harm that

12   is merely monetary will not ordinarily support injunctive relief.  *Rent-A-Center, Inc.,* 944

13   F.2d at 603 ("It is true that economic injury alone does not support a finding of

14   irreparable harm, because such injury can be remedied by a damage award.").

15        Accordingly, to satisfy the irreparable injury element, Plaintiffs' assertion of harm

16   must be grounded in their alleged First Amendment injury.  Because the court finds that

17   Plaintiffs have failed to establish that they are likely to succeed on the merits of their First

18   Amendment claim (*see supra* § III.B), the court cannot find that Plaintiffs have

19   established that they are likely to suffer irreparable First Amendment injury in the

20   absence of a preliminary injunction.  *See Preminger v. Principi*, 422 F.3d 815, 826 (9th

21   Cir. 2005) (holding that a preliminary injunction was not warranted because Plaintiff

22   failed to show likelihood of success on the merits of the First Amendment claim and

1  demonstrated no irreparable harm); *see also Putzer v. Donnelly*, No. 07-00620, 2009 WL

2  3271315, at *5 (D. Nev. Aug. 17, 2009) ("[P]laintiff has not demonstrated a likelihood of

3  success on his First Amendment claim. Therefore, plaintiff has not presented evidence

4  sufficient to show a likelihood of irreparable injury."); *Comfort v. Maclaughlin*, 473 F.

5  Supp. 2d 1026, 1029-30 (C.D. Cal. 2006) ("Because Plaintiffs' First Amendment claim is

6  unlikely to succeed, the Court does not find that the prohibition on speech is currently

7  causing an irreparable injury.").[8]  Because the court finds that Plaintiffs are unable to

8  establish that they are likely to suffer irreparable harm, their request for a preliminary

9  injunction necessarily fails both the four-part *Winters* test and the sliding-scale test in

10  *Cottrell*.  On this basis alone, the court may deny Plaintiffs' motion for preliminary

11  injunction.  *Center for Food Safety v. Vilsack*, ___ F.3d ___, 2011 WL 676187, at *6 (9th

12  Cir. Feb. 25, 2011) ("Because Plaintiffs have failed to show that they are likely to suffer

13  irreparable harm in the absence of preliminary relief,. . . we need not address the district

14  court's analysis of the remaining elements of the preliminary injunction standard.").

15

16  _____

17  [8] In 2003, the Ninth Circuit held that to establish irreparable injury in the First
Amendment context, the Plaintiff "need only 'demonstrat[e] the existence of a colorable First
18  Amendment claim.'"  *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003)
(quoting *Sammartano v. First Judicial Court*, 303 F.3d 959, 973 (9th Cir. 2002)).   This standard
19  is no longer viable because the analysis in *Brown*  and *Sammartano* was based on the balancing
test for preliminary injunction formulated by the Ninth Circuit prior to the Supreme Court's
20  decision in *Winter*.  Specifically, the *Sammartano* court states that "even if the merits of the
constitutional claim were not 'clearly established'…the fact that a case raises serious First
21  Amendment questions compels a finding that there exists the *potential* for irreparable injury")
(italics added).  The finding of the mere potential of irreparable injury is no longer sufficient to
22  support entry of a preliminary injunction after *Winter*.  555 U.S. at 24; *see also Cottrell,* 632 F.3d
at 1135.

1

2       **D.  The Public Interest**

3           To be entitled to a preliminary injunction, Plaintiffs must also demonstrate that an

4   injunction would be in the public interest.  *Winter,* 555 U.S. at 24; *Cottrell,* 632 F.3d at

5   1135.  A court's inquiry into the public interest element of a preliminary injunction

6   motion primarily addresses the impact on non-parties rather than parties.  *Sammartano,*

7   303 F.3d at 974.

8           Courts considering motions for preliminary injunctions have recognized a

9   significant public interest in upholding First Amendment principles.  *Id.*  As discussed

10  above, however, Plaintiffs here have failed to demonstrate a likelihood of success on the

11  merits of their First Amendment claim.  (*See supra* § III.B.)  This failure undermines any

12  assertion of a First Amendment public interest in this instance.  *See Preminger,* 422 F.3d

13  at 826.  Further, the Ninth Circuit has recognized that in some cases "[t]he public interest

14  in maintaining a free exchange of ideas . . . [can be] overcome by a strong showing of

15  other competing public interests, especially where the First Amendment activities of the

16  public are only limited, rather than entirely eliminated."  *Sammartano,* 303 F.3d at 974.

17  Here, any First Amendment impact on the public, to the extent there is such an impact at

18  all, would be limited because the Ordinance will not prevent delivery to any City

19  residents who wish to receive yellow pages directories.  Further, the Ordinance was

20  enacted in large measure after considerable public testimony that Plaintiffs' opt-out

21  system was ineffective and that unwanted deliveries by Plaintiffs violated City residents'

22  right to privacy and generated large amounts of waste.  (Rasmussen Decl. ¶ 4; O'Brien

1    Decl. Ex. 2.)   Because Plaintiffs have failed to demonstrate a likelihood of success on the

2    merits of their First Amendment claim, because any First Amendment impact on the

3    public is limited, and because the City and its residents have competing public interests in

4    privacy and waste reduction, the court finds that Plaintiffs have failed to demonstrate that

5    a preliminary injunction is in the public interest.   Accordingly, the court denies

6    Plaintiffs' motion for a preliminary injunction on this ground as well.

7                          **IV.    CONCLUSION**

8           For the reasons stated above, the court DENIES Plaintiffs' motion for preliminary

9    injunction (Dkt. # 41).

10          Dated this 8th day of May, 2011.

11

12

13                                          _____

14                                          JAMES L. ROBART
                                            United States District Judge

15

16

17

18

19

20

21

22

ORDER- 26