1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10 | DEX MEDIA WEST, INC., et al.,

11 |             Plaintiffs,

12 |         v.

13 | CITY OF SEATTLE,

14 |             Defendant.

CASE NO. C10-1857JLR

ORDER

15

16 | **I.    INTRODUCTION**

This matter comes before the court on Plaintiffs Dex Media West, Inc. ("Dex"),

SuperMedia, LLC ("Supermedia"), and Yellow Pages Integrated Media Association's

("YPA") (collectively "Plaintiffs") motion for partial summary judgment with regard to

their claims under the First Amendment and the Commerce Clause (Dkt. # 14) and

Defendant City of Seattle's ("City") cross-motion for partial summary judgment with

regard to the same claims (Dkt. # 28) filed in response.  Having reviewed the submissions

1   of the parties, the relevant law, and having heard oral argument on July 7, 2011, the court

2   DENIES Plaintiffs' motion and GRANTS Defendant's cross-motion for partial summary

3   judgment.[1]

## II.   BACKGROUND & FINDINGS OF FACT

### A.  The Ordinance

6       Over a period of six public meetings, between June and October 2010, the City

7   heard testimony from residents who were frustrated by the delivery of unwanted yellow

8   pages directories to their homes.  (Rasmussen Decl. (Dkt. # 30) ¶ 4.)  Many of these

9   deliveries occurred despite residents' requests under Plaintiffs' opt-out services that

10  Plaintiffs cease delivery of the yellow pages directories to particular residents' homes.

11  (*Id.*)  Residents complained that these unwanted deliveries violated their right to privacy

12  and pointlessly generated large amounts of waste.  (*Id.*; *see also* O'Brien Decl. (Dkt. #

13  32) Ex. 2 (attaching copies of complaints emailed to the City).)

14      In October 2010, the City enacted Ordinance 123427, which bans the distribution

15  of "yellow pages phone books" in Seattle unless telephone phone book publishers meet

16  certain conditions.  First, phone book publishers must "obtain[] an annual yellow pages

---

18      [1] On May 11, 2011, Plaintiffs filed a notice of appeal concerning the court's denial of their motion for preliminary injunction.  (Dkt. # 68.)  Ordinarily, an appeal to the Ninth Circuit Court of Appeals divests the district court of jurisdiction.  An appeal of the denial of a motion for preliminary injunction, however, is an appeal from an interlocutory order.  Accordingly, this court retains jurisdiction to consider the parties' motions for summary judgment. *See, e.g., Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982) ("[I]t is firmly established that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the case."); *see also Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1019 (9th Cir. 2009) ("When the district court denied the [preliminary] injunction, [plaintiff] brought its initial appeal to [the Ninth Circuit], but the underlying summary judgment motions remained before the district court.").

phone book distributor license," "separate from and in addition to . . . the business license required pursuant to [SMC] chapter 5.55."  SMC 6.225.030.[2]  Second, publishers or "distributors" must pay the City 14 cents "for each yellow pages book distributed within the City."  SMC 6.255.100(A).[3]  Third, publishers must "prominently and conspicuously display on  . . . the front cover of each yellow pages phone book distributed within the City" and "on their websites" a message mandated by the City about the City's program for opting out of receiving phone books.  SMC 6.255.110.  Finally, the Ordinance creates an "Opt-Out Registry . . . for residents and businesses to register and indicate their desire not to receive delivery of some or all yellow pages phone books."  SMC 6.255.090(A).

The Ordinance defines a "[y]ellow pages phone book" as "a publication that consists primarily of a listing of business names and telephone numbers and contains display advertising for at least some of those businesses."  SMC 6.255.025(D).  "Distribution" is defined to mean "the unsolicited delivery of more than four tons annually of yellow pages phone books to the addresses of residents and businesses within the City, but does not include the delivery of yellow pages phone books by membership organizations to their members or to other outside residents or businesses requesting or expressly accepting delivery."  SMC 6.255.025(B).  "Membership organization" is defined to mean "an organization that is organized and operated primarily or exclusively

---

[2] The annual license fee is one hundred dollars ($100.00).  SMC 6.255.060.

[3] On January 31, 2011, the City amended the Ordinance to eliminate a $148 per ton recovery fee for the cost of recycling that the City had originally enacted with the Ordinance.  (O'Brien Decl. Ex. 1.)  The 14 cent distribution fee, however, remains.

1    for the purpose of providing services or benefits to a designated group of members

2    (identified, for example, by having to pay membership dues or participating in

3    membership events)."  SMC 6.255.025(C).

4          Three purposes motivated the City in its decision to enact the Ordinance: waste

5    reduction, protection of residents' privacy from unwanted intrusions, and the recovery of

6    costs incurred to maintain and enforce the opt-out registry.  (Mullins Decl. (Dkt. # 17)

7    Ex. A, Preamble to Ordinance; Third Rasmussen Decl.  (Dkt. # 52) Ex. 9.)  The

8    Ordinance took effect in mid-November, 2010.  (*See* Third Rasmussen Decl. Ex. 9.)  As

9    of May 12, 2011, City residents had made 136,651 opt-out requests through the City's

10   opt-out system – averaging 17,081 new opt-outs per day.  (Second Teller Decl. (Dkt. #

11   71) ¶ 2.)

12   **B.  Yellow Pages Phone Books**

13         Washington requires local exchange carriers ("LECs"), such as Qwest and

14   Verizon, to publish and distribute residential and business listings, as well as certain other

15   consumer information.  *See* WAC 480-120-251.  Neither Dex nor SuperMedia are LECs.

16   (Norton Decl. (Dkt. # 18) Ex. A. ¶ 9.)  Nevertheless, Dex contracts to publish directories

17   that satisfy these requirements on behalf of Qwest, while SuperMedia does the same on

18   behalf of Verizon.  (*Id*.)  Directory companies, such as Dex and SuperMedia, do not

19   charge residents or businesses for this service.  (*Id.* ¶¶ 12-13.)  Dex and SuperMedia

20   utilize advertising to defray the cost of printing and distribution.  (*Id.* ¶ 17.)

21         The directories published by Dex and SuperMedia are commonly called "yellow

22   pages."  (*Id.* ¶ 7.)  The contents of a yellow pages directory typically include a business

ORDER- 4

1   "white pages" section, providing the names, addresses, and telephone numbers of local

2   businesses and professionals.  (*See* Stonecipher Decl. (Dkt. # 19) ¶ 5.)  The Dex 2010

3   Seattle Metro Directory contains 404 such pages.  (*Id.*)  Further, a yellow pages directory

4   typically contains a section of public-interest material such as community information,

5   maps, and government listings.  (*See id.* ¶ 6.)  The Dex 2010 Seattle Metro Directory

6   contains nearly 100 pages of such information.  (*See id.*)  Finally, the publication contains

7   listings of businesses by category of product or service.  (*See id.* ¶ 5; Mot. (Dkt. # 14) at

8   6.)  This section, which comprises 844 pages in the Dex 2010 Seattle Metro Directory,

9   contains a significant amount of advertising.  (*Id*; *see also* Dex 2010 Seattle Metro

10  Directory (*see* Dkt. ## 20, 22).)  Although advertising can be found in every section of

11  the Dex 2010 Seattle Metro Directory, including the front and back covers (*see id.*; *see*

12  *also infra* note 5), overall it typically comprises less than half of the content of a typical

13  yellow pages directory (Norton Decl. ¶ 24).  Display advertising, in-column display,

14  coupons, and advertising on the cover and tabbed inserts comprise approximately 35% of

15  the Dex 2010 Seattle Metro Directory.  (Stonecipher Decl. ¶ 8.)  Similarly, display

16  advertising ranges from 15-35% of SuperMedia's Seattle area yellow pages directories.

17  (Gatto Decl. (Dkt. # 16) ¶ 4.)

18                    **III.  ANALYSIS & CONCLUSIONS OF LAW**

19          **A. Summary Judgment Standard**

20          Summary judgment is appropriate if the evidence, when viewed in the light most

21  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

22  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

1   P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los*

2   *Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of

3   showing there is no genuine issue of material fact and that he or she is entitled to prevail

4   as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her

5   burden, then the non-moving party "must make a showing sufficient to establish a

6   genuine dispute of material fact regarding the existence of the essential elements of his

7   case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477

8   F.3d at 658.  In adjudicating cross-motions for summary judgment, the Ninth Circuit

9   "evaluate[s] each motion separately, giving the nonmoving party in each instance the

10  benefit of all reasonable inferences."  *ACLU of Nevada v. City of Las Vegas,* 466 F.3d

11  784, 790-91 (9th Cir. 2006) (citations omitted); *see also Friends of Columbia Gorge, Inc.*

12  *v. Schafer,* 624 F. Supp. 2d 1253, 1263 (D. Or. 2008).

13  **B.  The City's Ordinance Does Not Violate the First Amendment**

14  **1.  Yellow Pages Directories Are Commercial Speech**

15  Plaintiffs allege that yellow pages directories constitute "fully protected,"

16  noncommercial speech, entitled to the highest level of First Amendment protection, and

17  that accordingly, the City's Ordinance which regulates the distribution of those

18  directories violates the First Amendment.  (Mot. at 11-15.)  The degree of protection

19  afforded by the First Amendment depends on whether the activity sought to be regulated

20  constitutes commercial or noncommercial speech.  *Bolger v. Youngs Drug Prods. Corp.*,

21  463 U.S. 60, 65 (1983).  With respect to noncommercial speech, "content-based

22  restrictions [are permitted] only in the most extraordinary of circumstances."  *Id.*

1   However, "the Constitution accords less protection to commercial speech than to other

2   constitutionally safeguarded forms of expression." *Id.* at 64-65.  "[C]ontent-based

3   restrictions on commercial speech may be permissible." *Id.* at 65.  Thus, the court must

4   first determine the proper classification of the publications at issue.  Are yellow pages

5   directories commercial or noncommercial speech?

6          "Although the boundary between commercial and noncommercial speech has yet

7   to be clearly delineated, the 'core notion of commercial speech' is that it 'does no more

8   than propose a commercial transaction.'" *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d

9   894, 906 (9th Cir. 2002) (quoting *Bolger*, 463 U.S. at 66).  The Supreme Court has

10  defined commercial speech as "expression related solely to the economic interests of the

11  speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of

12  N.Y.*, 447 U.S. 557, 561 (1980).  Any consideration of whether speech is commercial

13  should rest on "'the commonsense' distinction between speech proposing a commercial

14  transaction, which occurs in an area traditionally subject to government regulation, and

15  other varieties of speech." *Bolger*, 463 U.S. at 64.

16         Under *Bolger,* "[w]here the facts present a close question, 'strong support' that the

17  speech should be characterized as commercial speech is found where the speech is an

18  advertisement, the speech refers to a particular product, and the speaker has an economic

19  motivation" for engaging in the speech. *Hunt v. City of Los Angeles*, 638 F.3d 703, 715

20  (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66-67).  In applying this test, a finding of just

21  one of the factors does not make speech commercial. *See Bolger*, 463 U.S. at 67.  Rather,

22  "the combination of *all* of these characteristics . . . provides strong support for the . . .

ORDER- 7

1  conclusion that the [speech in question can be] properly characterized as commercial

2  speech." *Id.* (italics in original).

3      In *Bolger*, the Supreme Court held that condom pamphlets, which were produced

4  and distributed by a contraceptives manufacturer, and which contained advertising as

5  well as discussions of family planning and disease prevention, were properly regulated as

6  commercial speech. *Id.* at 66.  Although the Court noted that the pamphlets could not "be

7  characterized merely as proposals to engage in commercial transactions" and contained

8  discussion of important public information, they were properly characterized as

9  commercial speech because they were advertisements, referenced specific products, and

10  the publisher had an economic motivation for mailing them.  *Id.* at 66-68.

11      In the present case, Plaintiffs argue that yellow pages directories should receive

12  the highest level of First Amendment protection because each publication provides a

13  guide not only to commercial activities, but also to community, public safety, and

14  political information.  (Mot. at 12.)  The court disagrees.  Although yellow pages

15  directories, like the pamphlets in *Bolger*, "cannot be characterized merely as proposals to

16  engage in commercial transactions," 463 U.S. at 66, a consideration of the three factors

17  outlined in *Bolger* dictates that yellow pages directories constitute commercial speech.

18  First, yellow pages directories contain many advertisements for many different products.[4]

19

20

21      [4] (*See, e.g.,* Dex 2010 Seattle Metro Directory (*see* Dkt. # 22) at Business White Pages at 1, 5, 12, 27, 35, 39, 42; Business Yellow Pages at 6, 30, 31, 38, 39, 44, 45; Government Pages at 66 ("You deserve a vacation. Call now…"); Community Pages at 11 ("Call now to learn how to donate your car").)

22

ORDER- 8

1    Indeed, as noted above, various forms of advertising comprise approximately 35% of the

2    Dex 2010 Seattle Metro Directory and approximately 15-35% of SuperMedia's Seattle

3    area yellow pages directories.  (Stonecipher Decl. ¶ 8; Gatto Decl. ¶ 4.)  Second, yellow

4    pages directories reference specific products.  For example, the front cover of the Dex

5    2010 Seattle Metro Directory contains a specific advertisement for Geico Auto Insurance,

6    while the back cover contains an advertisement for South West Plumbing.  (Dex 2010

7    Seattle Metro Directory (*see* Dkt. ## 20, 22).)  In fact, that same directory contains

8    myriad specific advertisements for Dex itself and Dex's advertising services.  (*See, e.g.,*

9    *id.* at Business Yellow Pages 9 ("Discover Directory Advertising Services from Dex"),

10   10, 11, 17, 18, 29, 38, 41, 43, 51, 52, 53, 54, 57, 58, 68, 69.)[5]  Third, Plaintiffs have an

11   economic interest or motive in publishing the directories and delivering the yellow pages

12   to residents' doorsteps.  (*See* Norton Decl. ¶¶ 17-20; *see also* Baldasty Decl. (Dkt. # 15) ¶

13   7.)  Originally, the LECs published the residential and business listings contained in the

14   yellow pages.  (*See* Norton Decl. ¶ 7.)  Plaintiffs recognized the "potential profitability of

15   display and other advertising" in yellow pages directories, however, and have contracted

16

17

---

18   [5] During oral argument, Plaintiffs' counsel asserted that under *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469 (1989), whether the speaker is the advertiser or

19   seller, or whether the speaker is merely the publisher of advertisements obtained from others makes a difference with regard to First Amendment analysis.  In other words, Plaintiffs' counsel

20   implies that the publisher of an advertisement may be entitled to greater First Amendment protection than the advertiser or seller itself.  While the court can certainly imagine scenarios in which this might be true, the issue is not one the court needs to decide in the context of this case.

21   As discussed above, the record before the court demonstrates that the Dex 2010 Seattle Metro Directory contains numerous advertisements for Dex's own advertising services.  Thus, although

22   Dex may be a publisher of others' advertisements, under the facts presented to the court, it is a seller and advertiser of its own services as well.

1   with LECs to publish the residential and business listings as a part of their yellow pages

2   directories.  (*Id.* ¶¶ 9, 17; *see also* Rasmussen Decl. Exs. 5-6.)

3          Besides the *Bolger* factors, commonsense – the touchstone of the commercial

4   speech doctrine – dictates that the yellow pages directories should not receive the highest

5   level of protection afforded by the First Amendment.  *See, e.g., Central Hudson*, 447 U.S.

6   at 562-63.  Despite Plaintiffs' emphasis on the percentage of noncommercial material

7   contained within the directories, the presence of noncommercial speech does not alter the

8   commonsense conclusion that yellow pages directories are commercial speech.  *See*

9   *Bolger,* 463 U.S. at 68 ("We have made clear that advertising which 'links a product to a

10   current public debate' is not thereby entitled to the constitutional protection afforded

11   noncommercial speech.") (quoting *Central Hudson,* 447 U.S. at 563 n.5).  In fact, one of

12   the pamphlets considered by the Supreme Court in *Bolger* contained only one reference

13   to a product on the bottom of the last page of an eight-page pamphlet.  *Bolger*, 463 U.S.

14   at 67 n.13.  Nevertheless, the Supreme Court still found the overall character of the

15   informational pamphlet to be commercial in nature.  *Id.* at 67.  As the Supreme Court has

16   stated, "[a] company has a full panoply of protections available to its direct comments on

17   public issues, so there is no reason for providing similar protection where such statements

18   are made in the context of commercial transactions."  *Id.* at 68 (footnote omitted).  Thus,

19   the court finds that Plaintiffs' yellow pages directories are properly characterized as

20   commercial speech under the First Amendment.

21

22

ORDER- 10

### 2.  Commercial and Noncommercial Speech Are Not "Inextricably Intertwined" in the Yellow Pages

Plaintiffs nevertheless assert that even if the court were to find that yellow pages directories constitute commercial speech, the directories would still be entitled to the highest level of First Amendment protection because the commercial speech in the directories is "inextricably intertwined" with fully protected noncommercial speech. (Mot. at 14.)  Commercial speech does not retain its commercial character "when it is inextricably intertwined with otherwise fully protected speech."  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

The Supreme Court's decisions in *Riley* and *Board of Trustees of State University of New York  v. Fox*, 492 U.S. 469 (1989), provide a framework for the court's analysis here.  In *Riley*, the Supreme Court considered a state-law requirement that professional fundraisers must include in any appeal for charitable funds information setting forth the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charities (as opposed to retained as commissions).  487 U.S. at 786; *see also Fox,* 492 U.S. at 474 (describing *Riley*).  The Court has held that charitable fundraising is fully protected speech.  *Id.*  Assuming without deciding that the statement compelled by the regulation was commercial speech, the Court concluded that the commercial speech was "inextricably intertwined" with the fully protected charitable fundraising.  *See id.* (citing *Riley*, 487 U.S. at 796.)  A professional fundraiser could not engage in fully protected charitable fundraising without including the arguably commercial portions of the speech because a state law required the commercial portions

1    to be included.  *Id.*  As a result, the Supreme Court applied its "test for fully protected

2    expression" in evaluating the state law even though portions of the speech may have been

3    considered commercial.  *Id.*

4           Conversely, in *Fox*, the Supreme Court considered a university's refusal to permit

5    product demonstrations, such as Tupperware parties, in dorm rooms.  The Court found

6    that there was "no doubt" that the Tupperware parties proposed commercial transactions.

7    492 U.S. at 473.  The Court also recognized, however, that other subjects were also

8    touched upon during the demonstrations such as "how to be financially responsible and

9    how to run an efficient home."  *Id.* at 474.  Nevertheless, the Court rejected the argument

10   that the commercial speech of selling Tupperware and the fully protected discussions of

11   financial responsibility were "inextricably intertwined."  *Id.* at 474-75.  Unlike *Riley*,

12   where the state law at issue made it impossible for the noncommercial messages to be

13   delivered without the compelled commercial speech, in *Fox* the Court found that "no law

14   of man or nature makes it impossible to sell housewares without teaching home

15   economics, or to teach home economics without selling housewares."  *Id.* at 474.  The

16   *Fox* court elaborated that nothing in the nature of the university's restriction "prevents the

17   speaker from conveying, or the audience from hearing, these noncommercial messages,

18   and nothing in the nature of things requires them to be combined with commercial

19   messages."  *Id.*  Because the commercial and noncommercial aspects of the

20   demonstrations or Tupperware parties were not inextricably intertwined, the *Fox* Court

21   analyzed the speech as a whole and the university's regulation of that speech under

22   standards applicable to commercial and not fully protected speech.  *Id.* at 475.

The court here finds the City's Ordinance to be more like the restriction at issue in *Fox* and less like the state law in *Riley*.  Unlike *Riley* – where the protected charitable solicitation could not be made without the compelled commercial disclosures – and like *Fox* – where housewares could be sold without teaching economics – nothing in the City's Ordinance nor in the nature of these directories requires that their noncommercial aspects, such as maps, listings, and street guides, be combined with advertising.  The two aspects of these directories – the commercial and the noncommercial – are therefore not inextricably intertwined.

Plaintiffs advance three reasons why yellow page advertising is nevertheless inextricably intertwined with fully protected speech.  First, Plaintiffs assert that the City could not address its objectives without regulating the combination of commercial and noncommercial speech.  (Mot. at 14.)  This assertion, however, looks at the question through the wrong lens.  The analysis in *Riley* and *Fox* indicates that it is the contents of the speech itself which determine whether the speech is inextricably intertwined, and therefore entitled to heightened protection or not.  *See Riley*, 487 U.S. at 796-97; *Fox*, 492 U.S. at 473-75.  In other words, it is Plaintiffs' objectives, and not the City's, which are determinative of the level of protection accorded to Plaintiffs' speech under the First Amendment.

Second, Plaintiffs contend that like the regulation in *Riley*, the WAC 480-120-251 requires the publication of basic business listings.  (Pls. Reply (Dkt. # 37) at 4.)  Plaintiffs' attempts to draw an analogy between their circumstances with those of the plaintiffs in *Riley*, however, fails.  While it is true that WAC 480-120-251 requires LECs

1    to publish basic business listings, the Plaintiffs are not LECs.  Furthermore, unlike *Riley*,

2    where the restriction at issue required commercial speech to be added to noncommercial

3    speech, here there is no legal requirement that business and residential listings or other

4    noncommercial material be published in conjunction with commercial advertising.

5         Third, Plaintiffs argue that, like newspapers, the distribution of the noncommercial

6    content is dependent on the funding provided by advertising.  (Mot. at 14.)  As the Court

7    noted in *Fox*, however, including home economics elements in a Tupperware party would

8    no more convert the parties into educational speech than opening a sales presentation

9    with a prayer or the Pledge of Allegiance would convert it into religious or political

10   speech.  *Fox*, 492 U.S. at 474-75.  While advertising may be a convenient way to defray

11   the expense of the state-mandated directories, and while the noncommercial information

12   may render receipt of the advertising contained in these directories more palatable to

13   portions of the public, Plaintiffs point to no legal mandate or other circumstance requiring

14   the combination of the commercial and noncommercial aspects in these directories.

15        Indeed, Plaintiffs attempt to liken their yellow pages directories to newspapers is a

16   stretch too far for this court.  Both common sense and the Supreme Court's jurisprudence

17   tells us that the two cannot be equated.  In *Bolger* and *Fox*, the Supreme Court found that

18   the speech at issue was not motivated by or intertwined with the speaker's political

19   message.  As courts have recognized, "commenting on public issues in the context of a

20   commercial transaction does not elevate speech from commercial to political rank."

21   *Hays Cnty. Guardian v. Supple,* 969 F.2d 111, 120 (5th Cir. 1992).  Here too, any

22   noncommercial aspects of the speech at issue in yellow pages directories are merely

ORDER- 14

1  tangential to Plaintiffs' predominantly commercial purpose.  While the noncommercial

2  aspects of the directories may render their receipt more welcome by some residents, these

3  aspects of the directories are not at the core of their purpose.

4    In contrast, newspapers have played an "historic role" in our democracy "as

5  conveyers of individual ideas and opinions."  *Pac. Gas and Elec. Co. v. Pub. Utils.*

6  *Comm'n of Cal.*, 475 U.S. 1, 33 (1986) (Rehnquist, J., dissenting).  "Newspapers have

7  traditionally been a major forum for political speech and are at the heart of historical

8  justification for freedom of the press, and courts view with skepticism any law that could

9  have a significantly damaging impact on the Fourth Estate."  *Nat'l Coalition of Payer,*

10  *Inc. v. Carter,* 455 F.3d 783, 791 (7th Cir. 2006) (citing *Minneapolis Star & Tribune v.*

11  *Minn. Comm'r of Revenue,* 460 U.S. 575 (1983) (invalidating tax on ink that imposed

12  significant burden on newspapers as violation of the First Amendment)).[6]  The Supreme

13  Court has recognized the constitutionally unique place the press holds within First

14  Amendment analysis:

15    Whatever differences may exist about interpretations of the First
  Amendment, there is practically universal agreement that a major purpose
16    of that Amendment was to protect the free discussion of governmental
  affairs. . . . The Constitution specifically selected the press . . . to play an
17    important role in the discussion of public affairs. . . . [, and it is] one of the
  very agencies the Framers of our Constitution thoughtfully and deliberately
18    selected to improve our society and keep it free.

19  _____

20   [6] *See also Gasparo v. City of N.Y.,* 16 F. Supp. 2d 198, 206 (E.D.N.Y. 1998) ("[T]he
historical purpose of the First Amendment was in large part to protect the free circulation of
21  newspapers and periodicals."); *Century Fed., Inc. v. City of Palo Alto*, 648 F. Supp. 1465, 1472
(N.D. Cal. 1984) ("[N]ewspapers, the most traditional form of the media, are historically the
22  source of most of the debate on politics and government at the core of First Amendment
values.").

ORDER- 15

*Mills v. Alabama,* 384 U.S. 214, 218-19 (1966).  While yellow pages directories may play a commercially important role in portions of our community, they simply are not analogous to newspapers in the context of First Amendment analysis.  The court, therefore, finds that the various noncommercial aspects of the yellow pages directories are not inextricably intertwined with the commercial aspects.

### C.  The Ordinance Satisfies the Intermediate Scrutiny of *Central Hudson*

Having concluded that Plaintiffs' yellow pages directories are properly characterized as commercial speech, the court considers whether the Ordinance violates the First Amendment under the lesser intermediate level of scrutiny applicable to commercial speech.  A restriction on commercial speech must satisfy the four-part test announced in *Central Hudson*: (1) the speech concerns lawful activity that is not misleading; (2) the government interest is substantial; (3) the regulation directly advances that interest; and (4) the regulation is not more extensive than necessary.  447 U.S. 557, 566 (1980).  Here, the parties do not contest the first factor; therefore the court turns to the remaining *Central Hudson* factors.

### 1.  The City's Interests are Substantial

The City expresses three primary interests in enacting the Ordinance, summarized as (1) waste reduction, (2) resident privacy, and (3) cost recovery.  (*See* Resp. (Dkt. # 28) at 8-9; Mullins Decl. Ex. A, Preamble.)  First of all, an interest "in promoting resource conservation and reducing the burden on . . . brimming landfills" is substantial.  *See Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 735 (9th Cir. 1994).  Second,

1   governments have a significant interest in protecting residents' privacy.  *See Watchtower*

2   *Bible & Tract Soc'y of New York., Inc. v. Village of Stratton*, 536 U.S. 150, 165 (2002);

3   *Bland v. Fessler*, 88 F.3d 729, 734 (9th Cir. 1996).  Third, the City's interest in recouping

4   the costs expended in the Ordinance's enforcement and administration is substantial.  *See,*

5   *e.g., Trans. Alts., Inc. v. City of New York*, 218 F. Supp. 2d 423, 439 (S.D.N.Y 2002),

6   *aff'd*, 340 F.3d 72 (2d Cir. 2003).

7        Plaintiffs rely on *Bolger*, 463 U.S. at 72, however, to argue that the City has no

8   substantial privacy interest in enforcing a resident's decision to disinvite the distribution

9   of yellow pages to their doorstep because residents may simply dump unwanted yellow

10  pages in the trash.  (Pls. Reply at 9.)  In *Bolger*, the Court rejected the government's

11  interest in shielding residents from receiving potentially offensive advertisements for

12  contraceptives in the mail, because the government's stated interest and the regulation it

13  devised (banning the advertisements unless residents indicate a desire to receive them)

14  were paternalistic.  *Id.* at 71-74.  Similarly, in *Sorrell v. IMS Health, Inc.*, the Court

15  rejected the government's interest in protecting doctors from the harassing sales behavior

16  of pharmaceutical companies by restricting the sale of pharmacy records that reveal an

17  individual doctor's prescribing practices unless the doctor opts-in and permits disclosure.

18  *Sorrell v. IMS Health, Inc.*, No. 10-779, 564 U.S. ___, 2011 WL 2472796 at *14 (U.S.

19  June 23, 2011).  Here, by contrast, the City's interest in the privacy of its citizens does

20  not suffer from the type of paternalism that the Supreme Court rejected in both *Bolger*

21  and *Sorrell*.  Unlike the opt-in regulations in *Bolger* and *Sorrell*, the Ordinance creates an

22  opt-out system, where the resident, and not the City, makes the choice not to receive the

1    speech or directories at issue.  *Anderson v. Treadwell*, 294 F.3d 453, 464 (2d Cir. 2002)

2    (unlike some commercial restrictions where an interest is vulnerable because of

3    paternalism, a resident opt-out ordinance "entirely avoids such concerns because it

4    applies only where homeowners elect to seek its protection"); *see Rowan v. U.S. Post*

5    *Office Dept.,* 397 U.S. 728736-37 (1970) (upholding regulation designed to protect

6    residents' privacy where "the mailer's right to communicate is circumscribed only by an

7    affirmative act of the addressee giving notice that he wishes no further mailings.").

8    Because the City's regulation places the citizen rather than itself in the role of

9    decisionmaker, it avoids the type of governmental paternalism that the Supreme Court

10   has previously rejected, and thus the Ordinance survives Plaintiffs' First Amendment

11   challenge on that basis.  S*ee Sorrell,* 2011 WL 2472796, at *14 ("[P]rivate

12   decisionmaking can avoid governmental partiality and thus insulate privacy measures

13   from First Amendment challenge.").

14          The City needs only to identify one substantial interest to meet the *Central*

15   *Hudson* test.  *See Bland*, 88 F.3d at 734 n.8 (noting that the government need only

16   identify one substantial interest).  Based on the record before the court in the context of

17   this motion for summary judgment, as well as the foregoing case authority, it appears that

18   the City has established three.  The court, therefore, concludes that the City has a

19   substantial interest underpinning the Ordinance.

20                    **2.  The Fit Between the Ends and the Means is Reasonable**

21          The Supreme Court has effectively collapsed the last two *Central Hudson*

22   elements into a single inquiry of whether the City has shown a "reasonable fit" between

1   the government's ends and the means chosen to accomplish those ends.  *See City of*

2   *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 415 (1993).  This fit requirement

3   does not need to be

> necessarily perfect, but reasonable; that represents not necessarily the single
> best disposition but one whose scope is in proportion to the interest served,
> . . . that employs not necessarily the least restrictive means but, as we have
> put it in the other contexts . . . , a means narrowly tailored to achieve the
> desired objective.

7   *Fox,* 492 U.S. at 480 (internal quotation marks and citations omitted).  In other words,

8   regulation of commercial speech (or the means) must simply "provide more than

9   ineffective or remote support for a legitimate governmental policy goal."  *Lungren,* 44

10  F.3d at 732 (internal quotation marks omitted).

11          The Ordinance's opt-out registry, recovery fee, and license requirement all

12  "provide more than ineffective or remote support" for the City's stated interests.  First,

13  the opt-out registry provides the City a means to enforce residents' choices and is limited

14  because it only restricts delivery to those individuals who do not wish to receive yellow

15  pages directories.  *See, e.g., Mainstream Mktg. Servs., Inc. v. Fed. Trade Comm'n*, 358

16  F.3d 1228 (10th Cir. 2004) (upholding "do-not-call" registry).

17          Second, the "recovery fee is intended to reflect the cost to the City of

18  administering the Opt-Out Registry" and thus is a precise means to recoup the opt-out

19  registry's actual costs.  SMC 6.255.100(A).  Charges made by cities to recoup expenses

20  incurred as a result of regulation have been upheld even in the realm of fully protected

21  speech.  *See, e.g., Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1081 (9th Cir. 1990).

22

ORDER- 19

1    Finally, the Ordinance's licensing requirement is a narrowly tailored means of

2    protecting residential privacy and recovering administrative costs.[7]  In addition to

3    providing a means for the City to collect distribution data and set proportionate recovery

4    fees, the licensing requirement is a mechanism through which the City may ensure

5    compliance with the opt-out list.  *See S.O.C., Inc. v. County of Clark*, 152 F.3d 1136,

6    1147 (9th Cir. 1998) (noting that an acceptable, less-restrictive alternative to banning

7    handbilling would be to issue canvassing permits, and that a "permit system could help

8    regulate congestion and build in accountability should problems arise"), *amended on*

9    *other grounds*, 160 F.3d 541 (9th Cir. 1998).[8]

10    Plaintiffs rely primarily on *Discovery Network* in support of their argument that

11   the City has failed to establish a reasonable fit between the Ordinance and its interests in

12   _____

13    [7] Citing *O'Day v. King County*, 749 P.2d 142, 146-47 (Wash. 1988), Plaintiffs argue that
14   even if the licensing system could survive under the federal Constitution, the licensing system
     would still violate the Washington Constitution which "categorically rules out prior restraints on
     constitutionally protected speech under any circumstances."  (Mot. at 17.)  The Washington
15   Supreme Court has since held, however, that Washington's Constitution affords no greater
     protection to commercial speech than does the First Amendment.  *Ino Ino, Inc. v. City of*
16   *Bellevue*, 937 P.2d 154, 163, *amended in non-relevant part*, 943 P.2d 1358 (Wash. 1997).

17    [8] Plaintiffs nevertheless contend that the Ordinance's licensing requirement is a prior
     restraint on speech.  The Ninth Circuit recently noted, however, that "[i]t is an open question
18   whether the prior restraint doctrine even applies to commercial speech."  *Hunt*, 638 F.3d at 718
     n.7 (citing *Central Hudson,* 447 U.S. at 571 n.13 ("We have observed that commercial speech is
     such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it.")).
19   Regardless, "[a] 'prior restraint' refers to an ordinance that either 'vests unbridled discretion in
     the licensor' or 'does not impose adequate time limits on the relevant public officials.'"  *Id.* at
20   718 (quoting *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 894 (9th Cir. 2007)).
     Neither concern is present here.  First, the Ordinance provides specific conditions for obtaining a
21   license and under what conditions the license may be denied.  *See* SMC 6.255.060; SMC
     6.255.080; SMC 6.255.120; SMC 6.255.130.  Second, the Ordinance imposes adequate time
22   limits because the City is required to rule on a license request within 20 days.  (O'Brien Decl.
     Ex. 1.)

ORDER- 20

1   waste reduction and resident privacy.  In *Discovery Network*, the Court invalidated a city

2   ordinance that prohibited commercial handbills from being displayed in news racks,

3   while allowing ordinary newspapers.  507 U.S. at 413-14.  The Court concluded that the

4   City's regulation violated the First Amendment under the "reasonable fit" standard.  *Id.* at

5   417.  The City of Cincinnati's purported interest was in limiting sidewalk debris,

6   although the ban affected only 62 racks, while leaving some 1,500-2000 racks unaffected.

7   *Id.* at 417-18.  Moreover, the City of Cincinnati's justification for singling out

8   commercial papers was premised on nothing more than a "naked assertion that

9   commercial speech has 'low value.'"  *Id.* at 429.  In invalidating the regulation, the Court

10  stated:  "Not only does Cincinnati's categorical ban on commercial newsracks place too

11  much importance on the distinction between commercial and noncommercial speech, but

12  in this case, the distinction bears no relationship whatsoever to the particular interests that

13  the city has asserted."  *Id.* at 424.  Accordingly, the Court found that the ban was "an

14  impermissible means of responding to the city's admittedly legitimate interests."  *Id.*

15          The Supreme Court's "narrow" holding in *Discovery Network* does not undermine

16  the City's Ordinance here.  *Id.* at 428.  Plaintiffs argue that just as newspapers in

17  Cincinnati continued to litter the street, the Ordinance here fails because it "imposes no

18  similar requirements on distribution of any other printed material."  (Mot. at 22.)  Thus,

19  although the City's interests "apply just as strongly to other materials as they do to

20  yellow pages," City residents will continue to receive other unwanted printed materials

21  on their doorsteps.  (*Id.*)  This analogy fails, however, because the City considered opt-

22  out legislation specifically in response to concerns raised by Seattle residents regarding

ORDER- 21

1   the unwanted delivery of yellow pages directories.  (Rasmussen Decl. ¶ 4.)  Thus, while

2   the City of Cincinnati singled out commercial handbills based on nothing more than what

3   it perceived as the lesser speech value of handbills as opposed to newspapers, the

4   decision by the City in this case to single out yellow pages directories bears a direct

5   relationship to the concerns raised by the City's residents and the City's stated interest in

6   protecting its residents' privacy and reducing unwanted waste.

7        Furthermore, the fact that residents will continue to receive "junk" mail or "other

8   printed materials" does not mean that the City has failed to establish a reasonable fit.

9   *See, e.g., World Wide Rush, LLC v. City of Los Angeles.*, 606 F.3d 676, 689 (9th Cir.

10  2010).  The government is not required to legislate in a way that wholly eliminates a

11  particular problem; rather, it may advance its goals in piecemeal fashion with a graduated

12  response.  *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 910 (9th Cir. 2009);

13  *see also Mainstream Mktg.*, 358 F.3d at 1238-39 ("The underinclusiveness of a

14  commercial speech regulation is relevant only if it renders the regulatory framework so

15  irrational that it fails materially to advance the aims that it was purposefully designed to

16  further.").  Here, the City was faced with specific complaints from its residents

17  concerning the large size of yellow pages directories and resulting waste they engender,

18  the invasion of privacy in having these directories dropped on their doorsteps, as well as

19  the ineffectualness of Plaintiffs' own opt-out systems.  (Rassmussen Decl. ¶¶ 3-4.)  The

20  Court finds that in light of these specific citizen-generated concerns, the Ordinance is a

21  reasonable fit.  "[I]t is precisely co-extensive with those who are experiencing the

22  particular harm that it is designed to alleviate."  *Anderson,* 294 F.3d at 462.  Thus, the

ORDER- 22

1    court finds that under the *Central Hudson* test, the Ordinance is a reasonable fit between

2    the ends and the means.

3        Finally, this court is mindful that the Supreme Court has "categorically reject[ed]

4    the argument that a vendor has a right under the Constitution or otherwise to send

5    unwanted material into the home of another." *Rowan,* 397 U.S. at 738. *Rowan* involved

6    a statute which provided householders with a mechanism to opt-out of receiving in the

7    mail from individual senders "pandering advertisements" which the householder believed

8    to be erotically or sexually provocative. *Id.* at 730. The Supreme Court found that even

9    "[i]f this prohibition operates to impede the flow of even valid ideas, the answer is that no

10   one has a right to press even 'good' ideas on an unwilling recipient." *Id.* at 738. The

11   *Rowan* court found that the plaintiffs' asserted right to distribute their materials "stop[ed]

12   at the outer boundary of every person's domain." *Id; see also Hill v. Colorado,* 530 U.S.

13   703, 717 (2000) ("The right to avoid unwelcome speech has special force in the privacy

14   of the home, . . . and its immediate surroundings . . . ."). Similarly, the City's Ordinance

15   provides its residents with a mechanism to communicate their individual wishes not to

16   receive yellow pages directories on their doorsteps, and that the court finds that as such it

17   does not offend the First Amendment.

18   **D. The City's Required Message Does Not Violate the First Amendment**

19       The Ordinance requires Plaintiffs to inform City residents on the cover of

20   Plaintiffs' yellow pages directories and on their websites about the City's opt-out

21   procedure. SMC 6.255.110. Plaintiffs assert that the City's required message is

22   compelled speech in violation of the First Amendment. (Pls. Reply at 11-12.) The

1   Supreme Court has upheld compelled commercial speech where the state required

2   inclusion of "purely factual and uncontroversial information" in advertising.  *Zauderer v.*

3   *Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see also United States v. Schiff*,

4   379 F.3d 621, 630-31 (9th Cir. 2004) (holding that government could compel website

5   operator to post factual information about potential criminal liability patrons could face if

6   they used the website to evade taxes); *Video Software Dealers Ass'n v. Schwarzenegger,*

7   556 F.3d 950, 966 (9th Cir. 2009), *aff'd Brown v. Entm't Merch. Ass'n,* No. 08-1448, ___

8   U.S. ___, 2011 WL 2518809 (June 27, 2010).

9          The standard set forth in *Zauderer* applies in this case.  In *Zauderer,* the Supreme

10  Court upheld a regulation that required attorneys to provide information about

11  contingency fees in their advertising.  *Id.* at 652.  The State's interest in its regulation was

12  to prevent potential deception of the public.  *Id.* at 629.  The Court found that "[b]ecause

13  the extension of First Amendment protection to commercial speech is justified principally

14  by the value to consumers of the information such speech provides, . . . appellant's

15  constitutionally protected interest in *not* providing any particular factual information in

16  his advertising is minimal."  471 U.S. at 651 (citation omitted; emphasis in original).

17  Accordingly, the Supreme Court held that First Amendment rights were "adequately

18  protected as long as disclosure requirements are reasonably related to the State's interest

19  in preventing deception of consumers."  *Id.*

20         Based on the foregoing language, Plaintiffs maintain that *Zauderer* requires that

21  any compelled commercial speech must be reasonably related only to a government's

22  "interest in preventing deception of customers."  (Pls. Reply at 11-12.)  Consequently,

they assert that because the City's public service message does not prevent deception it is

unconstitutional.[9]  (*Id.*)  While consumer deception was at issue in *Zauderer*, the rule has

not been limited to those facts, and Plaintiffs have articulated no sound basis for doing so.

*See, e.g., Envtl. Def. Ctr., Inc. v. United States E.P.A.*, 344 F.3d 832, 849 (9th Cir. 2003)

(finding statute that required certain sewer providers to educate the public about the

hazards of improper waste disposal constitutional where the purpose of the provision is

legitimate and consistent with the regulatory goals of the Clean Water Act); *N.Y. State*

*Rest. Ass'n v. N.Y. City Bd. of Health,* 556 F.3d 114, 133 (2d Cir. 2009) (". . . *Zauderer's*

holding was broad enough to encompass nonmisleading disclosure requirements.");

*Pharm. Care. Mgmt. Ass'n v. Rowe,* 429 F.3d 294, 310 n.8 (1st Cir. 2005) ("[Plaintiff]

states that the holding in *Zauderer* is limited to potentially deceptive advertising directed

at consumers. . . . [W]e have found no cases limiting *Zauderer* in such a way.") (internal

---

[9] The court is not convinced that consumer deception (whether intentional or not) and confusion are not at issue here.  Certainly the record before the court is rife with complaints by City residents who continue to receive yellow pages directories on their doorsteps despite repeated attempts to opt-out of such deliveries using Plaintiffs' opt-out systems.  *See* Rasmussen Decl. ¶ 4; O'Brien Decl. Ex. 2; Third Rasmussen Decl. Ex. 1.  Based on this evidence, it is logical to infer that these residents might indeed feel deceived or confused when they continue to receive deliveries despite their requests on Plaintiffs' opt-out systems to opt-out of such deliveries, and that providing information about the City's opt-out system, which includes meaningful audit and enforcement tools, and is operated by an independent, non-profit third-party (*see* Teller Decl. (Dkt. # 53) Ex. 2 at 1, 2-4 § B), might serve "to dissipate the possibility of consumer confusion or deception."  *See, e,g,. Zauderer,* 471 U.S. at 651; *see also Milavetz, Gallop & Milavetz, P.A. v. United States,* ___ U.S. ___, 130 S. Ct. 1324, 1340 (2010) ("Evidence in the . . . record demonstrating a pattern of advertisements that hold out the promise of debt relief without alerting customers to its potential costs, . . . is adequate to establish that the likelihood of deception in this case is hardly a speculative one.") (internal quotations and citations omitted).  Nevertheless, because the City has not asserted this interest as a justification for its regulation, the court has not factored it in its analysis.

1   quotations omitted); *Nat'l Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 115 (2d Cir. 2001)

2   (finding state labeling law requiring manufacturers of mercury containing products to

3   disclose information about product disposal was governed by reasonable relationship rule

4   of *Zauderer*).[10]   As the Supreme Court has stated, "[b]ecause the extension of First

5   Amendment protection to commercial speech is justified principally by the value to

6   consumers of the information such speech provides, . . . [Plaintiffs'] constitutionally

7   protected interest in *not* providing any particular factual information . . . is minimal."

8   *Zauderer,* 471 U.S. at 651 (italics in original; citation omitted).[11]

9        The City's required message includes only "purely factual and uncontroversial

10   information" because it simply informs residents about the availability and process of the

11   City's opt-out program.  (Second Lilly Decl. (Dkt. # 55) Ex. 5.)  Indeed, the required

12   message makes no mention of the value or the necessity of recycling yellow pages.  (*Id.*)

13   _____

14       [10] The Ninth Circuit has cited *Nat'l Elec. Mfrs. Ass'n* with approval.  *See Video Software Dealers Ass'n,* 556 F.3d  at 966 (9th Cir. 2009); *Envtl. Def. Ctr.,* 344 F.3d at 851 n.27.

15       [11] Some courts have suggested that the appropriate level of scrutiny is the intermediate
16   test found in *Central Hudson*.  *See, e.g., Borgner v. Brooks,* 284 F.3d 1204, 1210-13 (11th Cir.
     2002); *Mason v. Florida Bar,* 208 F.3d 952, 954-55 (11th Cir. 2000); *but see Int'l Dairy Foods*
17   *Assoc. v. Boggs,* 622 F.3d 628, 641-42 (6th Cir. 2010) ("[I]n neither case did the Eleventh Circuit
     explain its decision to employ the *Central Hudson* test instead of *Zauderer*.").  While this court
18   believes that *Zauderer* provides the correct standard, the City's required message would pass the
     *Central Hudson* test as well.  The required message certainly advances the City's substantial
19   interests in citizen privacy and waste reduction by disseminating information concerning the
     City's opt-out program in an effective manner.  In addition, there is a "reasonable fit" between
20   the City's ends and its means with regard to the required message.  Publicizing information about
     the opt-out registry only on the City's website or in mailings would not be as effective as also
21   supplying the information to residents on the very yellow pages directories at issue.  (*See* First
     Lilly Decl. (Dkt. # 31) ¶ 13 (". . . [P]rovid[ing] public service information to Seattle residents on
     the covers of yellow pages and on the publishers' websites . . . is the single, most effective way
22   for Seattle residents to be advised of the mechanism to use if they wish to stop the delivery of
     yellow pages to their homes or businesses.").)

1   The message furthers the City's interest both in reducing waste and maintaining resident

2   privacy because it notifies residents about the availability of the opt-out program.  Thus,

3   because the required message about the City's opt-out registry is factual in nature and

4   because it is consistent with the City's regulatory goals and the overall scheme of the

5   Ordinance, the required message does not offend the First Amendment.  Having now

6   concluded all of the various elements of its analysis of Plaintiffs' First Amendment claim,

7   the court finds that there is no genuine issue of material fact with regard to the parties'

8   cross-motions for summary judgment on this claim, and that the Ordinance satisfies the

9   First Amendment.

10   **E.  The Ordinance Does Not Violate the Dormant Commerce Clause**

11   The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o

12   regulate Commerce . . .  among the several States."  U.S. Const. Art. I, § 8, cl. 3.  The

13   Commerce Clause as written is an affirmative grant of power to Congress to regulate

14   interstate commerce, but from it courts have long inferred a prohibition on state action

15   limiting interstate commerce.  *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S.

16   93, 98 (1994).  The "central rationale" to this inference, commonly referred to as the

17   dormant Commerce Clause, is to prohibit state or local laws whose object is local

18   economic protectionism.  *Nat'l Ass'n of Optomertrists & Opticians LensCrafters, Inc. v.*

19   *Brown*, 567 F.3d 521, 523 (9th Cir. 2009); *S.D. Myers, Inc. v. City & Cnty. of S.F.*, 253

20   F.3d 461, 466 (9th Cir. 2001).

21   Plaintiffs assert that the City designed the Ordinance to avoid regulating local

22   directory publishing organizations by adding a definition of "distribution" which included

1    only "the unsolicited delivery of more than four tons annually of yellow pages phone

2    books" within the City, and which exempted "the delivery of yellow pages phone books

3    by membership organizations to their members" or others "requesting or expressly

4    accepting delivery." SMC 6.255.025(B). Plaintiffs assert that this exception is

5    discriminatory and that the City designed it to ensure that local Chamber of Commerce

6    business directories would not be subject to the Ordinance. (Mot. at 5, 24-29.)

7         To determine whether the dormant Commerce Clause is applicable, the court must

8    first determine if the Ordinance "regulate[s] an activity that 'has a substantial effect of

9    interstate commerce such that Congress could regulate the activity.'" *LensCrafters, Inc.*

10    *v. Brown,* 567 F.3d at 524 (quoting *Conservation Force, Inc. v. Manning,* 301 F.3d 985,

11    993 (9th Cir. 2002)). Here, both Plaintiffs and the City appear to have assumed this to be

12    so, and the court also concludes that dormant Commerce Clause applies because the

13    publication and delivery of yellow pages phone directories involves and affects interstate

14    commerce such that Congress could regulate in the area.

15         Once the court determines that the dormant Commerce Clause applies, the next

16    step is to determine whether the challenged ordinance discriminates against out-of-state

17    entities. *LensCrafters,* 567 F.3d at 524. "Laws that discriminate against out-of-state

18    entities are subject to strict scrutiny, while non-discriminatory laws only need to satisfy a

19    less rigorous balancing test to survive constitutional scrutiny." *Id.* at 524-25. The Ninth

20    Circuit has also described its two-tiered approach when reviewing dormant Commerce

21    Clause challenges as follows:

22

[1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry.  [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*S.D. Myers*, 253 F.3d at 466.

The party challenging the statute bears the burden of showing discrimination, *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979), and to take advantage of the heightened scrutiny offered under the first approach, "[p]laintiffs must offer substantial evidence of an actual discriminatory effect."  *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1233 (9th Cir. 2010) (quotation marks and citation omitted).

### 1.   The Ordinance Does Not Discriminate Against Interstate Commerce

A statute or regulation, such as the Ordinance at issue here, can discriminate against out-of-state interests (1) facially, (2) in practical effect, or (3) purposefully. *LensCrafter,* 567 F.3d at 525.  First, Plaintiffs do not assert that the Ordinance is facially discriminatory, and the court finds that it is not.  The explicit terms of the Ordinance do not distinguish between distributors located in Seattle and those located elsewhere. Indeed, the Ordinance requires an annual license "regardless of where publication takes place or the location of the business's offices, storage or transshipment facilities."  SMC 6.255.030.  It applies to any "person or organization engaged in the business of arranging for the distribution of yellow pages phone books in the City."  SMC 6.255.025.  Further, the specific exemptions about which Plaintiffs complain (for companies that distribute

1  less than four tons of directories annually and for membership organizations) do not

2  facially discriminate between local and out-of-state entities.  The exemptions, on their

3  face, apply equally to organizations irrespective of locale.

4        Second, the Ordinance does not discriminate against interstate commerce in

5  practical effect.  The "critical inquiry" in determining whether a regulation directly

6  regulates or discriminates against interstate commerce, is to look at the regulation's

7  practical effect.  *S.D. Myers*, 253 F.3d at 467.  To determine whether a regulation has a

8  practical discriminatory effect, the court must compare the allegedly burdened out-of-

9  state entities with similarly situated in-state entities.  *Black Star Farms*, 600 F.3d at 1230;

10  *LensCrafters*, 567 F.3d at 525.

11        Plaintiffs contend that they are similarly situated to exempt membership

12  organizations, such as the Greater Seattle Business Association ("GSBA"), and contend

13  that this exemption effectively favors local publishers over out-of-state publishers.  (Mot.

14  at 25.)  Despite the fact that Plaintiffs must supply "substantial evidence of

15  discriminatory effect," *Black Star Farms*, 600 F.3d at 1231, the only evidence Plaintiffs

16  offer to support their contention that they are similarly situated to the exempt

17  membership organizations is testimony by the President of YPA that "[y]ellow pages

18  publishers compete for advertisers with other media, including . . . the local exempt

19  directories."  (Norton Decl. ¶ 18; *see* Mot. at 25.)  As *LensCrafters* makes clear, however,

20  "competing in the same market is not sufficient to conclude that entities are similarly

21  situated."  567 F.3d at 527.

22

1    In *LensCrafters*, opticians challenged a California law which prevented them from

2    offering services in the same locations as licensed optometrists and ophthalmologists.

3    567 F.3d at 522.  Plaintiffs argued that the law violated the dormant Commerce Clause

4    and impermissibly burdened interstate commerce because optometrists and

5    ophthalmologists, who were largely local individuals and entities, could set up a practice

6    offering one-stop shopping where patients could get an eye examination and also buy

7    prescription eyewear, but opticians, who were largely out-of-state practitioners, were

8    prohibited from offering this convenience.  *Id.*  Like Plaintiffs here, the *LensCrafters*

9    plaintiffs argued that the law constituted economic protectionism because opticians

10   compete with optometrists and ophthalmologists in the eyewear market.  *Id.* at 527.  The

11   court rejected this argument, however.   Relying on *Exxon Corp. v. Governor of*

12   *Maryland,* 437 U.S. 117, 125-27 (1978), the *LensCrafters* court noted that a state may

13   legitimately distinguish between entities based on their business structures, and that an

14   "entity's structure is a material characteristic for determining if entities are similarly

15   situated."  *LensCrafters,* 567 F.3d at 527.  Ultimately, the court held:

16   Because they have different responsibilities, different purposes, and
     different business structures, opticians are not the same as optometrists or
17   ophthalmologists.  Although LensCrafters competes in the same market as
     in-state optometrists and ophthalmologists, LensCrafters is an optician.  As
18   such, it is similarly situated to in-state opticians, not in-state optometrists or
     ophthalmologists.   Because the California laws make no geographical
19   distinction between similarly situated entities, they are not invalidated by
     the dormant Commerce Clause.

20   *Id.* at 527-28.

21

22

ORDER- 31

1    Just as opticians were not similarly situated with ophthalmologists and

2  optometrists in *LensCrafters*, Plaintiffs are not similarly situated with membership

3  organizations.  Membership organizations serve different constituencies than yellow page

4  distributors.  Membership organizations serve a self-selected interested group of

5  members, while Plaintiffs distribute to a much broader group of residents, none of whom

6  have expressly chosen to receive yellow pages directories.  The Ordinance treats all

7  distributors of yellow pages directories the same (regardless of whether they are located

8  within Washington or not), and it treats all membership organizations the same (also

9  regardless of whether they are located within Washington or not).  The City, therefore,

10  had the right to distinguish between these groups based on their different purposes and

11  structures.  *Id.* at 527.  Because the ordinance "make[s] no geographical distinction

12  between similarly situated entities, [it is] not invalidated by the dormant Commerce

13  Clause."  *Id.* at 527-28.

14    Plaintiffs also contend that the Ordinance's exemption for any entity distributing

15  less "than four tons annually of yellow pages," SMC 6.255.025(B), also discriminates in

16  practical effect against interstate commerce.  (Pls. Reply at 14.)  The only evidence

17  Plaintiffs' cite in this regard is an email from a City administrator who appears to be

18  suggesting an exemption to the Ordinance for publishers of yellow pages directories

19  which distribute less than four or five tons annually.  (Mullins Decl. (Dkt. # 17) Ex. H;

20  *see* Pls. Reply at 14.)  The administrator suggests that such an exemption would cover

21  nine local community Chamber of Commerce business directories, all of which are

22

1    apparently published by one entity.[12]  (Mullins Decl. Ex. H.)  This evidence is

2    insufficient to meet the heavy burden placed on Plaintiffs to "offer substantial evidence

3    of an actual discriminatory effect."  *Black Star Farms*, 600 F.3d at 1233.

4         In *Black Star Farms,* the Ninth Circuit was considering a dormant Commerce

5    Clause challenge to a small winery exception to Arizona's three-tiered alcohol beverage

6    distribution system.  The district court conceded that "more out-of-state wineries than in-

7    state wineries are required to adhere to Arizona's three-tiered distribution system."  *Id.* at

8    1233.  Nevertheless, this fact alone was insufficient to establish that Arizona's small

9    winery exception was discriminatory in effect against interstate commerce.  *Id.*  The

10   Ninth Circuit cited with approval the district court's rationale that such evidence did not

11   support the conclusion that the small winery exception created a market under which

12   local goods constituted a larger share, and goods with an out-of-state source constituted a

13   smaller share, of the total sales in the market.  *Id.*  The district court concluded that, at

14   best, such evidence supports the contention that the statutory scheme places an incidental

15   burden on interstate commerce.  *Id.*  If the court had found otherwise, "then no distinction

16   would exist between statutes that are patently discriminatory in effect and those that are

17   subject to the incidental burden test under [the second tier of the dormant Commerce

18   Clause] analysis."  *Id.* (quoting with approval *Black Star Farms, LLC v. Oliver,* 544 F.

19   Supp. 2d 913, 928 (D. Ariz. 2008)).  Accordingly, the Ninth Circuit affirmed the district

20   _____

21        [12] Plaintiffs' briefing implies that all local organizations or publishers fall within the
     confines of the Ordinance's exemptions (*see* Mot. at 26; Pls. Reply at 14), but the court could
     find no support for this conclusion in the record.  Likewise, the court found no evidence in the

22   record that the exemptions did not apply to any out-of-state publishers.

1   court's order denying summary judgment to the plaintiffs and granting the state's cross-

2   motion. *Id.* at 1233, 1235.

3          Here too, construing the evidence most favorably to Plaintiffs, Plaintiffs have

4   merely demonstrated that the small tonnage exemption applies to several local

5   organizations.  Indeed, the email Plaintiffs rely upon cites nine.  (Mullins Decl. Ex. H.)

6   However, the fact that the small tonnage exemption may apply to more local than out-of-

7   state entities does not establish that the exemption is discriminatory in effect against

8   interstate commerce.  *Id.* at 1233.  Plaintiffs have offered no evidence that that the

9   exemption creates a market under which local publishers are able to obtain a greater share

10  of the advertising market and out-of-state publishers a smaller share.  *Id.*

11         Finally, Plaintiffs contend that the Ordinance has a discriminatory purpose

12  because the exemptions for membership organizations and small tonnage were in reality

13  adopted to intentionally exclude local business directories in King and Snohomish

14  counties.  (Mot. at 25; Pls. Reply at 14.)  The words of the legislative body itself, written

15  contemporaneously with the passage of the law in question, are usually the most

16  authoritative guide to legislative purpose.  *See, e.g., Minnesota v. Clover Leaf Creamery*

17  *Co.,* 449 U.S. 463 n.7, 471 n.15 (1981) (". . . [T]his Court will assume that the objectives

18  articulated by the legislature are actual purposes of the statute, unless examination of the

19  circumstances forces us to conclude that they "could not have been a goal of the

20  legislation.").  Here, the Ordinance itself identifies three purposes that motivated the City

21  Council:  waste reduction, protection of residents' privacy from unwanted intrusions, and

22

1  the recovery of costs incurred to maintain and enforce the opt-out registry.  (Mullins

2  Decl. Ex. A, Preamble.)

3        The evidence Plaintiffs present to the contrary, even construed in a light most

4  favorable to them, is scant at best.  For example, Plaintiffs have submitted an email string

5  consisting of three messages that occurred prior to the passage of the Ordinance.  The

6  email string involves various City Council members and a local lobbying interest and

7  discusses proposed amendments to the Ordinance.  (*Id.* Ex. G.)  While the emails indicate

8  an interest in exempting membership and non-profit organizations, and "in crafting

9  language that will effectively meet the intent of the ordinance and withstand

10 constitutional scrutiny," nothing in these emails expressly indicates an interest in

11 impermissibly discriminating in favor of local interests or against out-of-state interests.

12 (*Id.*)

13        In addition, as already noted above, Plaintiffs also point to email correspondence

14 from a City administrator which suggests an exemption to the Ordinance for publishers

15 who distribute less than four or five tons of directories per year.  (*Id.* Ex. H.)  While it is

16 apparent from the administrator's email that the proposed exemption would apply to nine

17 local Chamber of Commerce business directories, nothing in the email expresses a

18 purpose to discriminate against out-of-state interests (*id.*), and in fact the exemption

19 applies to all small tonnage distributors irrespective of locale.

20        Plaintiffs also assert that the fact that the Ordinance was amended to exempt

21 membership organizations and small tonnage distributors, after local organizations sought

22 these or similar revisions, demonstrates a purpose to impermissibly discriminate against

1   out-of-state economic interests.  (Mot. at 25; Pls. Reply at 14.)  The court, however, can

2   find no such evidence in the record cited by Plaintiffs.  In fact, one of the emails from a

3   lobbyist expressly references the potential negative impact on nonprofit organizations

4   "throughout the City and *region*."  (Mullins Decl. Ex. G (emphasis added).)

5       Even if comments by the lobbyists and the City administrator could be construed

6   to indicate some impermissible motivation, such isolated and stray statements would be

7   insufficient to override the City Council's formal statements of purpose in the Ordinance

8   itself.  The court's review of the record indicates that the City Council heard extensive

9   testimony during at least six hearings occurring over four months in which residents

10  provided detailed testimony regarding their concerns about the waste generated by yellow

11  pages directories, the invasion of their privacy, and their frustration at receiving yellow

12  pages directories on their doorsteps despite their attempts to opt-out on Plaintiffs' opt-out

13  systems.  (Rasmussen Decl. ¶ 4; *see also* O'Brien Decl. ¶4.)  This substantial evidence is

14  consistent with the City Council's formal statements of purpose within the Ordinance

15  itself.  In this context, stray and isolated comments by lobbyists and City administrators,

16  even if they articulate an impermissible interest in discriminating against interstate

17  commerce, will not serve to invalidate a law under the dormant Commerce Clause.  *See*

18  *Maine v. Taylor,* 477 U.S. 131, 150-51 (1986) (plaintiff's evidence, including statement

19  by state administrator indicating protectionist motivation for challenged law, would not

20  establish violation of dormant Commerce Clause where evidence did not demonstrate

21  that the state had no legitimate interest in enacting the challenged law); *Allstate Ins. Co.*

22  *v. Abbott,* 495 F.3d 151, 161 (5th Cir. 2007) (stray protectionist remarks of certain

1    legislators were insufficient to condemn statute under the dormant Commerce Clause

2    where overall legislative record revealed legitimate, nondiscriminatory purposes).   Thus,

3    the court finds that because the Ordinance is not facially discriminatory, and because it

4    does not directly regulate or discriminate against interstate commerce in practical effect

5    or purpose, the Ordinance is not subject to strict scrutiny under the Commerce Clause.

6              **2.   The Local Benefits Outweigh any Burden Imposed on Interstate
                    Commerce**

7

8              When a regulation is non-discriminatory and has only incidental or indirect effects

9    on interstate commerce, the regulation is analyzed under the second tier of the dormant

10   Commerce Clause.   *S.D. Myers*, 253 F.3d at 466.   These regulations are valid unless the

11   burden imposed on interstate commerce is clearly excessive in relation to the local

12   benefits.   *Id.*; *see also Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th

13   Cir. 1991) ("For a facially neutral statute to violate the Commerce Clause, the burdens of

14   the statute must so outweigh the putative benefits as to make the statute unreasonable or

15   irrational.").   The party challenging the regulation bears the burden of proof on this issue.

16   *LensCrafters*, 567 F.3d at 528.   Under this rational basis test, the City is not required "to

17   convince the courts of the correctness of their legislative judgments."   *Spoklie v.*

18   *Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005) (quoting *Clover Leaf Creamery Co.*, 449

19   U.S. at 464.   Instead, Plaintiffs "must convince the court that the legislative facts on

20   which the classification is apparently based could not reasonably be conceived to be true

21   by the governmental decisionmaker."   *Id.*

22

ORDER- 37

1    Here, the court finds that the Ordinance passes the rational basis test.  The court

2 first notes that the interests the Ordinance advances are legitimate.  (*See supra* at 14-15.)

3 Plaintiffs advance several reasons, however, for why the burdens imposed by the

4 Ordinance are clearly excessive in relation to the local benefits.  First, Plaintiffs argue

5 that any benefit obtained by the Ordinance is minimal because yellow pages publishers

6 already have an opt-out system that many Seattle residents currently use.  (Mot. at 27.)

7 Under the rational basis test, however, courts do not "second guess the empirical

8 judgments of lawmakers concerning the utility of legislation."  *CTS Corp. v. Dynamics*

9 *Corp. of Am.*, 481 U.S. 69, 92 (1987); *see also Valley Bank of Nev. v. Plus Sys., Inc.*, 914

10 F.2d 1186, 1197 (9th Cir. 1990) ("Unwise legislation does not constitute a commerce

11 clause violation."); *Spoklie*, 411 F.3d at 1059.  Although Plaintiffs believe their opt-out

12 system is sufficient, this does not make the City's judgment irrational and

13 unconstitutional.[13]

14    Second, Plaintiffs claim that these meager benefits are outweighed by the financial

15 burdens Plaintiffs will suffer if the Ordinance remains in effect.  (Mot. at 27-28.)  The

16 Commerce Clause protects the interstate market, however, not individual companies from

17 prohibitive or burdensome regulations.  *Exxon Corp. v. Governor of Md.*, 437 U.S. 117,

18

19    _____

20 [13] In any event, the City's opt-out system appears to be wildly more popular among City
residents than Plaintiffs' opt-out systems.  According to Plaintiffs, as of November 29, 2010,
approximately 17,000 people had opted out of delivery of Dex's Seattle yellow pages using
21 Dex's opt-out system.  (Stonecipher Decl. ¶ 10.)  On the other hand, between May 5 and May 13,
2011, Seattle residents had utilized the City's opt-out system to opt-out of the delivery of
22 136,651 yellow pages directories, averaging over 17,000 new opt-outs per day.  (Second Teller
Decl. ¶ 2.)

1    126-128 (1978) ("The fact that the burden of a state regulation falls on some interstate

2    companies does not, by itself, establish a claim of discrimination against interstate

3    commerce.").  Thus, the fact that Plaintiffs may be financially burdened does not

4    demonstrate that there is a burden on interstate commerce.

5         Finally, Plaintiffs claim that there will be a significant burden on interstate

6    commerce if other cities enact similar legislation.  (Mot. at 28-29.)  It is insufficient for

7    Plaintiffs to speculate about the possibility of conflicting legislation.  *S.D. Myers*, 253

8    F.3d at 470.  Plaintiffs' reliance on statements made by the Ordinance's sponsor

9    encouraging other jurisdictions to adopt similar legislation falls short of the requirement

10   that Plaintiffs must produce evidence that conflicting legislation is already in place or that

11   the threat of legislation is actual and pending.  *Id.* at 470-71.  Regardless of the fact that it

12   might increase Plaintiffs' financial costs, it would be constitutional for other cities to

13   enact similar legislation.  *See Exxon Corp.*, 437 U.S. at 127-28.  Despite the concerns

14   raised by Plaintiffs, any burden imposed on interstate commerce does not clearly

15   outweigh its legitimate benefits.  Thus, the court finds that the Ordinance satisfies the

16   dormant Commerce Clause.

17                          **III.    CONCLUSION**

18        For the reasons stated above, the court DENIES Plaintiffs' motion for partial

19   summary judgment (Dkt. # 14) and GRANTS the City's cross-motion for partial

20

21

22

1   summary judgment (Dkt. # 28) with regard to Plaintiffs' claims under the First

2   Amendment and the Commerce Clause.

3         Dated this 28th day of June, 2011.

4

5

6         _____

7         JAMES L. ROBART
          United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 40