1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   DEX MEDIA WEST, INC. et al.,                    CASE NO. C10-1857JLR

11              Plaintiffs,                          ORDER ON SECOND CROSS-
                                                     MOTIONS FOR PARTIAL
12         v.                                        SUMMARY JUDGMENT

13   CITY OF SEATTLE, et al.

14              Defendants.

15                        **I.       INTRODUCTION**

16         This matter comes before the court on Defendants City of Seattle and Ray

17   Hoffman's (collectively, "the City") second motion for partial summary judgment (Dkt. #

18   81) and Plaintiffs Dex Media West, Inc. ("Dex"), SuperMedia, LLC ("SuperMedia"), and

19   Yellow Pages Integrated Media Association's (collectively, "the Yellow Pages

20   Companies" or "Plaintiffs") cross-motion for partial summary judgment (Dkt. # 87).

21   Having reviewed the submissions of the parties, the record, and the relevant law, the

22

ORDER- 1

court GRANTS the City's second motion for partial summary judgment, and DENIES

the Yellow Pages Companies' cross-motion.

## II.   BACKGROUND & PROCEDURAL HISTORY

### A.  The Ordinance

In a series of public meetings conducted between June and October 2010, the City

heard testimony from residents who were frustrated by the delivery of unwanted yellow

pages directories to their homes and complained that these deliveries violated their right

to privacy and pointlessly generated large amounts of waste. (Rasmussen Decl. (Dkt. #

30) ¶¶ 3-4; *see also* O'Brien Decl. (Dkt. # 32) Ex. 2 (attaching copies of complaints

emailed to the City).)  In response, the City enacted Ordinance 123427 ("the Ordinance"),

which places certain regulations upon the distribution of "yellow pages phone books"[1] in

Seattle.  First, publishers must "obtain[] an annual yellow pages phone book distributor

license." SMC 6.225.030.  Second, publishers must pay the City fourteen cents "for each

yellow pages phone book distributed within the City." SMC 6.255.100(A).[2]  Third,

publishers must "prominently and conspicuously display on  . . . the front cover of each

yellow pages phone book distributed within the City" and "on their websites" a message

mandated by the City about the City's program for opting out of receiving phone books.

---

[1] The Ordinance defines a "[y]ellow pages phone book" as "a publication that consists primarily of a listing of business names and telephone numbers and contains display advertising for at least some of those businesses."  SMC 6.255.025(D).

[2] On January 31, 2011, the City amended the Ordinance to eliminate a $148 per ton recovery fee for the cost of recycling that the City had originally enacted with the Ordinance. (O'Brien Decl. Ex. 1.)

ORDER- 2

1   SMC 6.255.110.  Finally, the Ordinance creates an "Opt-Out Registry . . . for residents

2   and businesses to register and indicate their desire not to receive delivery of some or all

3   yellow pages phone books."  SMC 6.255.090(A).

4        The annual license fee is $100 and must be accompanied by a statement of the

5   number and weight of yellow pages phone books the applicant distributed in the City

6   during the previous calendar year.  SMC 6.255.060; SMC 6.255.080.  After completion

7   of the year's distribution of yellow pages directories, each Yellow Pages Company will

8   be required to pay a $0.14 recovery fee for each yellow pages directory it distributed in

9   the City to pay for the City's opt-out registry.  SMC 6.255.100.

10       Within 20 days of the City's receipt of a complete license application, the City

11  "shall issue or deny the license."  SMC 6.255.050.  If the City fails to act on the license

12  application within that time period, "the license is deemed issued on the last day of the 20

13  day period."  *Id.*  If the City denies a license application and the applicant files a notice of

14  administrative appeal, the City "shall immediately issue the license applicant a temporary

15  license," which "shall authorize the license applicant . . . to engage in the business of

16  arranging for the distribution of yellow pages phone books, in the same manner as if the

17  license had been granted, pending the Hearing Examiner's decision."  SMC

18  6.202.280(B).  Thereafter, if the Hearing Examiner affirms the license denial, "the

19  temporary license shall remain in effect pending a motion for reconsideration before the

20  Hearing Examiner," and, if the applicant timely files a writ or review to the Superior

21  Court, the temporary license shall continue in place "until the court either issues a writ or

22  denies the writ application."  SMC 6.202.280(B)(1).  Alternatively, if the Hearing

1  Examiner overturns the license denial, the City "shall immediately issue" the license.

2  SMC 6.202.280(B)(2).

3       A publisher who fails to comply with the Ordinance may be fined, SMC

4  6.255.140(A), or lose its license, SMC 6.255.130.  Specifically, the Ordinance provides

5  that "[f]ailure of a licensee to comply with the provisions of the chapter is sufficient

6  grounds for the denial, suspension or revocation of the license."  *Id.*  The Seattle Public

7  Utilities ("SPU") rule implementing the Ordinance specifies that:

8         For purposes of assessing performance and enforcing the requirements of
   Ordinance 123427, the Director of [SPU] will consider seeking civil

9         penalties whenever the Director determines that the number of complaints
   of wrongful distribution exceeds one-half of one percent (0.5%) of the

10         number of residents and businesses who filed timely opt-out requests with
   the Registry.

11  (Praecipe (Dkt. # 55) to Lilly Decl. (Dkt. # 51) Ex. 5 ¶ 4.B.1.)

12  **B.  Policy Goals and Regulatory Authority Related to the Ordinance**

13       In enacting the Ordinance, the City recognized the policy goal of the Washington

14  State Legislature found in RCW 70.95.010(8)(a), which directs that waste reduction

15  should be "the first priority for the collection, handling, and management of solid waste."

16  (Mullins Decl. (Dkt. # 17) Ex. A (Preamble to Ordinance at 1).)  The City was also

17  guided by the Legislature's finding that "[w]aste reduction must become a fundamental

18  strategy of solid waste management," RCW 70.95.010(4), necessitating changes in

19  "waste generation behaviors to reduce the amount of waste that becomes a governmental

20  responsibility."  (Mullins Decl. Ex. A (Preamble to Ordinance at 1(citing RCW

21  70.95.010(4))).)  The City also acknowledged the Legislature's directive that "[i]t is the

22

ORDER- 4

responsibility of county and city governments to assume primary responsibility for solid waste management and to develop and implement aggressive and effective waste reduction and source separation strategies." (*Id.* (citing RCW 70.95.010(6)(c)).) Two additional purposes also motivated the City to enact the Ordinance: protection of residents' privacy from unwanted intrusions and the recovery of costs incurred to maintain and enforce the opt-out registry. (*Id.* Ex. A (Preamble to Ordinance at 1).)

### C.  State of Washington Publication Requirements for Local Exchange Company

The State of Washington requires local exchange companies ("LECs") (e.g., Qwest and Verizon) to publish and distribute residential, business listings, and certain consumer information. *See* WAC 480-120-251. Specifically, the State of Washington requires that:

> (1) A[n] . . . LEC . . . must ensure that a telephone directory is regularly published for each local exchange it serves, listing the name, address . . . , and primary telephone number for each customer who can be called in that local exchange and for whom subscriber list information has been provided.

********

> (3) A[n] . . . LEC must provide each customer a copy of the directory for the customer's local exchange area . . . .

********

> (5) Each LEC that publishes a directory, or contracts for the publication of a directory, must print an informational listing . . . when one is requested by any other LEC providing service in the area covered by the directory . . . .

> (6) Telephone directories published at the direction of the LEC must include a consumer information guide that details the rights and responsibilities of its customer. . . .

1 | WAC 480-120-251.[3]

2 |      An LEC is defined as "a company providing local exchange telecommunications

3 | service."  WAC 480-120-021.  There is no dispute that the Yellow Pages Companies are

4 | not LECs.  Rather, Plaintiffs have entered into private contracts with the LECs to be the

5 | exclusive publishers of the listings and information that the LECs are required by state

6 | law to make available to their customers pursuant to WAC 480-120-251.  (*See* Norton

7 | Decl. (Dkt. # 18) ¶ 9; Rasmussen Decl. Exs. 5 & 6 (Dkt. # 33) (filed under seal).)  Dex

8 | contracts with Qwest to publish directories that satisfy the WAC requirements on

9 | Qwest's behalf, and Supermedia does the same with respect to Verizon.  (Norton Decl. ¶

10 | 9.)

11 | **D.  Exceptions to the Ordinance**

12 |      The Ordinance specifically excepts or expressly does not apply to (1) publishers of

13 | less than four tons of yellow pages phone books, *see* SMC 6.255.025(B); (2) directories

14 | distributed by local membership organizations, *see* SMC 6.255.025(B) & (C); and (3)

15 | LECs "whose distribution of phone books in the City is limited to only those phone

16 | books required by WAC 480-120-251," *see* SMC 6.255.035.

17 | **E.  Procedural History**

---

[3] Washington Utilities and Transportation Commission ("WUTC") tariffs are in accord with the WAC requirements.  The tariff for Qwest, the primary LEC serving Seattle, requires that Qwest provide all business customers "listing in the alphabetical [i.e., white pages] and classified [i.e., yellow pages] sections of the directory at no additional charge."  (Norton Decl. (Dkt. # 18) Ex. A.)

ORDER- 6

1    The City enacted the Ordinance in October 2010.  The Yellow Pages Companies

2  filed suit on November 15, 2010, asserting claims for violations of the First Amendment

3  and the Commerce Clause of the federal Constitution, deprivation of rights actionable

4  under 42 U.S.C. § 1983, and violation of the Washington's constitution's free speech

5  clause, Wash. Const. art. I, § 5, supremacy clause, *id.,* art. XI, § 1, and privileges and

6  immunities clause, *id.* art. I, § 12.  (*See generally,* Compl. (Dkt. # 1).)

7    In January 2011, the parties filed cross-motions for partial summary judgment

8  concerning the Yellow Pages Companies' claims for violation of the First Amendment

9  and violation of the Commerce Clause.  (Dkt. ## 14, 28.)  On February 10, 2011, the

10  Yellow Pages Companies moved for a preliminary injunction (Dkt. # 41), and on May 5,

11  2011, they moved for a temporary restraining order (Dkt. # 64).  The court denied

12  Plaintiffs' motions for preliminary injunction and temporary restraining order on May 9

13  and 11, 2011, respectively.  (Dkt. ## 66, 67.)

14    On May 11, 2011, the Yellow Pages Companies filed a notice of appeal

15  concerning the court's denial of their motion for a preliminary injunction.  (Dkt. # 68.)

16  They also filed a motion for preliminary injunction pending appeal (Dkt. # 69), which the

17  court denied as well (Dkt. # 72).[4]  While Plaintiffs' appeal to the Ninth Circuit

18  concerning the court's denial of their motion for preliminary injunction was pending, the

19  court denied their motion for partial summary judgment concerning their First

20  Amendment and Commerce Clause claims, and granted the City's cross-motion

21  _____

22    [4] The Ninth Circuit also denied Plaintiffs' motion for a preliminary injunction pending
appeal.  (Dkt. # 74.)

1  regarding the same.  (Dkt. # 84.)  The Ninth Circuit has now requested letter briefs from

2  the parties concerning whether the pending appeal is moot in light of the court's ruling on

3  partial summary judgment concerning the First Amendment and Commerce Clause.

4        In the meantime, on June 28 and July 25, 2011, the parties filed additional cross-

5  motions for partial summary judgment (Dkt. ## 81, 87) with regard to Plaintiffs'

6  remaining claims under various provisions of the Washington constitution, including (1)

7  violation of the free speech clause contained in article I, section 5; (2) violation of the

8  supremacy clause contained in article XI, section 11; and (3) violation of the privileges

9  and immunities clause contained in article I, section 12.[5]  (Compl. ¶¶ 29-34.)  It is these

10  claims under the Washington constitution that the court considers now.

11                 **III.**     **ANALYSIS**

12     **A. Summary Judgment Standard**

13        Summary judgment is appropriate if the evidence, when viewed in the light most

14  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

15  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

16  P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

17  477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

18  there is no genuine issue of material fact and that he or she is entitled to prevail as a

19  _____

20     [5] Plaintiffs also assert a claim based on 42 U.S.C. § 1983.  (Compl. ¶¶ 27-28.)  Plaintiffs
have admitted, however, that this claim "is dependent on their First Amendment and Commerce

21  Clause claims."  (Resp. (Dkt. # 87) at 1.)  Because the court has already dismissed both of these
claims on summary judgment (Dkt. # 84), the court likewise grants the City's motion for

22  summary judgment concerning Plaintiffs' § 1983 claim on the same grounds as stated in its prior
order.

ORDER- 8

1    matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden,

2    then the non-moving party "must make a showing sufficient to establish a genuine

3    dispute of material fact regarding the existence of the essential elements of his case that

4    he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658.

5    Here, cross-motions for summary judgment are at issue. The court "evaluate[s] each

6    motion separately, giving the nonmoving party in each instance the benefit of all

7    reasonable inferences." *ACLU of Nevada v. City of Las Vegas,* 466 F.3d 784, 790-91 (9th

8    Cir. 2006) (citations omitted); *see also Friends of Columbia Gorge, Inc. v. Schafer,* 624

9    F. Supp. 2d 1253, 1263 (D. Or. 2008).

10       **B.  The Ordinance Does Not Violate the Washington Constitution's Free
             Speech Clause**

11

12          The Yellow Pages Companies assert three arguments with regard to their claim

13    that the Ordinance violates the Washington constitution's free speech clause. First, they

14    assert that this court's prior ruling concerning the First Amendment to the federal

15    Constitution (Dkt. # 84) represents an "unprecedented expansion of the commercial

16    speech doctrine," "beyond its prior boundaries," which "the Washington Supreme Court

17    likely would not follow." (Resp. (Dkt. # 87) at 1, 6, 7.) Second, they assert that even if

18    the yellow pages directories at issue are properly categorized as commercial speech,

19    Washington courts would nevertheless apply a higher level of scrutiny than federal courts

20    do, or at least than this court did in its prior order concerning the First Amendment. (*Id.*

21    at 7-9.) Finally, they argue that the Ordinance is an impermissible prior restraint on

22    speech under Washington law. (*Id.* at 9-11.) The City counters each of these positions,

and argues that summary judgment in its favor is appropriate.  (Reply (Dkt. # 91) at 1-9; *see also* Mot. (Dkt. # 81) at 5-6.)  In particular, the City asserts that analysis of Plaintiffs' claim under Washington's free speech clause is coterminous with an analysis of Plaintiffs' claim under the First Amendment.  Because the court has previously granted summary judgment with regard to the latter, the City asserts that summary judgment with regard to the former is appropriate as well.  No party asserts that there is any material factual dispute inhibiting a ruling on summary judgment with regard to this issue.

The court begins with an analysis concerning whether Washington has adopted federal analysis with regard to commercial speech under the Washington constitution's free speech clause, and concludes that it has.  The court then considers whether its prior order represents an expansion of the federal commercial speech doctrine such that Washington courts would not follow this court's prior ruling, and concludes that it does not.  The court next considers whether Washington's prior restraint doctrine is applicable here, and concludes that it is not.  Accordingly, the court grants the City's motion for partial summary judgment with regard to the Yellow Pages Companies' claim under the Washington constitution's free speech clause, and denies the Yellow Pages Companies' cross-motion as discussed below.

      1.  **Washington Courts Apply a Federal Analysis to Commercial Speech**

The Washington Supreme Court has long held that the free speech clause contained in article I, section 5 of the Washington constitution does not afford any greater protection to commercial speech than does the First Amendment.  Indeed, although

1   Plaintiffs declare that they are relying upon *Bradburn v. North Central Regional Library*

2   *District,* 231 P.3d 166, 172 (Wash. 2010), for the proposition that article I, section 5, is

3   subject to independent state constitutional analysis (Resp. at 6), *Bradburn* makes clear

4   that no such independent analysis is required with regard to commercial speech.  *Id.*

5   ("This does not mean that the state provision always affords greater protection than the

6   First Amendment, however. . . . [N]o greater protection is afforded to . . . commercial

7   speech. . . .") (internal citations omitted); *see also Ino Ino, Inc. v. City of Bellevue,* 937

8   P.2d 154, 163 (Wash. 1997) ("The federal analysis also applies when confronting art. I, §

9   5 challenges to regulations of commercial speech.").

10          Accordingly, the court's analysis of the commercial speech doctrine in its prior

11  order concerning the First Amendment is equally applicable to the Yellow Pages

12  Companies' assertion of a claim under the Washington constitution's free speech clause.

13  Because the court granted summary judgment in favor of the City with regard to

14  Plaintiffs' First Amendment claim on the basis of the court's analysis and application of

15  the federal commercial speech doctrine, the City is entitled to summary judgment with

16  regard to Plaintiffs' claim under the Washington constitution's free speech clause on this

17  same basis.[6]

18  _____

19
20          [6] Further, as the City points out, to establish that the Yellow Pages Companies deserve
    more protection under article I, section 5, than they are entitled to under the First Amendment,
    the Yellow Pages Companies must provide an analysis of the six interpretive principles outlined
21  in *State v. Gunwall,* 720 P.2d 808, 811 (Wash. 1986).  Those criteria include:  (1) the textual
    language, (2) differences in the texts, (3) constitutional history, (4) preexisting state law, (5)
    structural differences, and (6) matters of particular state or local concern.  *Id.*  As the Washington
22  Supreme Court stated in *State v. Furman,* 858 P.2d 1092, 1098 (Wash. 1993):

## 2.   This Court's Prior Ruling Did Not Represent an Expansion of the Commercial Speech Doctrine

Plaintiffs, nevertheless, repeatedly assert that the court's prior ruling with regard to the First Amendment represents an "unprecedented expansion" of the commercial speech doctrine, which Washington courts would not adopt.  (Resp. at 6; *see also id.* at 1, 7.)  Plaintiffs have asserted that the commercial speech doctrine applies only where the publisher of the material at issue is also the advertiser/seller, and that in this instance, while they may be the publisher of yellow pages directories, they are neither the advertiser nor the seller.  (*Id.* at 7 ("Here, of course, the publisher is not the advertiser and does not sell the advertised product, and the advertiser does not control the predominant noncommercial content.").)[7]  Plaintiffs' argument, however, is based not only on an

---

We will consider whether to apply our state constitutional provisions more strictly than parallel federal provisions only when we are asked to do so, "and even then only if the argument includes proper analysis of the six 'interpretive principles' outlined in *State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808 (1986)."

*Id.* (footnote omitted) (quoting *State v. Motherwell,* 788 P.2d 1066, 1074 (Wash. 1990)); *accord State v. Worrell,* 761 P.2d 56, 57 n.1 (Wash. 1988); *State v. Wethered,* 755 P.2d 797, 800-01 (Wash. 1988).  Here, the Yellow Pages Companies offer no such analysis, and so, for this reason as well, the court appropriately confines its analysis to the federal Constitution.  *See Furman,* 858 P.2d at 1098.

[7] There is no dispute that the majority of the pages of the Dex 2010 Seattle Metro Directory consist of noncommercial material.  (*See* First SJ Order (Dkt. /# 84) at 5.)  However, in its prior order, the court found that "the various noncommercial aspects of the yellow pages directories are not inextricably intertwined with the commercial aspects," and therefore the publication as a whole is appropriately considered under a commercial speech analysis.  (*See id* at 16.)  The court has already rejected the notion that a simple calculation based on the number of pages in a publication that can be characterized as commercial, as opposed to noncommercial, is determinative with regard to the commercial or noncommercial character of that publication.  (*Id.* at 10.)

1  inaccurate characterization of the factual record before this court, but an incomplete

2  analysis of federal precedent as well.

3      The court begins with the inaccurate factual assertion underpinning Plaintiffs'

4  argument.  While the court recognizes that this is an issue involving complex

5  Constitutional analysis, it is troubled by counsel's apparent mischaracterization of the

6  record in an attempt to support an argument.  It is simply false for Plaintiffs to assert that

7  while they may be publishers of the directories at issue, they are neither sellers nor

8  advertisers in this context.  (*See id.*)  The factual record before the court is replete with

9  evidence to the contrary.  As the court noted in its prior ruling, the Dex 2010 Seattle

10 Metro Directory is flush with advertisements for Dex itself and its advertising and other

11 services.  (First SJ Order (Dkt. # 84) at 9 & n. 5.)  Based on the court's review, more than

12 200 pages of the Dex 2010 Seattle Metro Directory contain advertisements for Dex

13 itself.[8]  Indeed, it appears that Dex is the single largest advertiser and seller of services

14

15      [8] *See* Dex 2010 Seattle Metro Directory (Dkt. ## 20, 22), displaying advertisements for
16 Dex in Business Yellow Pages at 1, 8 (more than half page), 9 (full page), 10 (more than half
   page), 11, 17, 18, 29, 38, 41, 43, 51-54, 57-58, 68, 69 (half page), 74-75, 77, 79, 83-86, 98, 100
   (half page), 105-06, 108, 111-12, 115, 118 (half page), 124-25, 137, 155, 160, 164, 170 (half
17 page), 173, 175, 178, 193, 206, 210-11, 220 (half page), 236-38, 241, 243, 245, 246 (half page),
   247, 248 (half page), 250, 251 (three-quarter page), 252, 253 (half page), 259, 272, 275, 276 (full
18 page), 281, 295, 302, 311, 315, 320, 322, 329, 330-31, 333, 335-36, 338, 343, 344, 347, 351,
   354, 356, 357-58 (both half pages), 359, 360-61, 366-67, 375, 383, 385, 388-89, 395, 405-06,
19 413-15, 417 (half page), 419, 420 (full page), 425, 429, 442, 445, 448, 452, 455, 456 (half page),
   461 (half page), 467-69, 475, 480, 484-85, 488-90, 493 (near full page), 505 (half page), 506
20 (three-quarter page), 508, 512, 517, 524, 526, 527 (half page), 528-29, 535-36, 538 (more than
   half page), 543, 546-47, 553, 559-60, 563, 567, 569, 570, 572-73 (half pages), 574-75, 576 (more
21 than half page), 557-58, 581 (half page), 582-83, 604, 615 (more than half page), 618, 630-31,
   632 (full page), 634, 636, 646-47, 649, 652, 654-56, 668-69, 685, 686, 688, 693, 696, 698, 703-
22 04, 706, 708-09, 712, 713 (half page), 718, 720-21, 723, 734-35 (both half pages), 741, 745, 753,
   756, 758, 759 (half page), 766 (half page), 768, 773, 777, 779, 785, 791, 795 (three-quarter

1  (based on volume of advertising space utilized) in its own yellow pages directory.  There

2  is no countervailing evidence in the record before this court.  Accordingly, although Dex

3  may be a publisher of others' advertisements, under the facts presented to this court, it is

4  indisputably a seller and advertiser of its own services as well.  The court will not ignore

5  the plain undisputed factual record simply because Plaintiffs persist in repeating an

6  inaccuracy.

7         In any event, even were the Yellow Pages Companies simply publishers in this

8  context, and not advertisers or sellers, it would not alter the court's First Amendment

9  analysis here.  The court's prior ruling falls squarely within the Supreme Court's and the

10  Ninth Circuit's jurisprudence with regard to the commercial speech doctrine and does not

11  represent any expansion of that line of authority.  Indeed, prior to 1975, commercial

12  advertisements of services or goods for sale "were considered to be outside the protection

13  of the First Amendment."  *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 505

14  (1981).  It was not until *Virginia Pharmacy Board v. Virginia Citizens Consumer*

15  *Council,* 425 U.S. 748 (1976), that the Supreme Court plainly held that commercial

16  speech enjoys a substantial degree of First Amendment protection.  *Metromedia,* 453

17  U.S. at 505.  *Virginia Pharmacy Board*, however, did not equate commercial speech with

18  other forms of speech for First Amendment purposes.  *Id.*  From that time forward, all of

19  the Supreme Court's and Ninth Circuit's jurisprudence has treated commercial and non-

20

21

22  page), 804 (half page), 805-06, 809, 812 (half page), 815, 816 (more than half page), 819, 826,
   836 (more than half page), 837 (full page), 838, 840 (three-quarter page).

1   commercial speech differently for purposes of First Amendment analysis – permitting

2   regulation of the former where the later could not be regulated.  *See id.* at 505-06.

3       Plaintiffs' argument that the commercial speech at issue here should be treated

4   differently based on the status of the speaker (whether publisher, seller, or advertiser) is

5   incorrect.  The Supreme Court has declared that "[i]f commercial speech is to be

6   distinguished, it 'must be distinguished by its content.'"  *Id.* at 505, n. 11 (quoting *Va.*

7   *Pharmacy Bd.,* 425 U.S. at 761); *see also Bates v. State Bar of Ariz.,* 433 U.S. 350, 363

8   (1977).  Further, contrary to the assertions of Plaintiffs, both the Supreme Court and the

9   Ninth Circuit (as well as other federal circuit courts) have applied the commercial speech

10  doctrine where the speaker is merely the publisher of the content and not the seller or

11  advertiser.  For example, in *Metromedia,* an action brought by billboard owners, a

12  majority of the Supreme Court found that traffic safety or aesthetic considerations were

13  sufficient to justify a content-neutral ban on all outdoor advertising signs,

14  notwithstanding the extent to which such signs convey First Amendment protected

15  messages.  *See, e.g., Metromedia,* 453 U.S. at 507-08 (plurality opinion); *id.* at 552-53

16  (Stevens, J., dissenting in part); *id.* at 559-61 (Burger, C.J., dissenting); *id.* at 570

17  (Rehnquist, J., dissenting).  Further, the Ninth Circuit has repeatedly applied the

18  commercial speech doctrine to advertisements published on billboards where the plaintiff

19  is neither the advertiser nor the product's seller.  *See, e.g., World Wide Rush, LLC v. City*

20  *of L.A.,* 606 F.3d 676 (9th Cir. 2010) (in an action by the lessors of advertising space, the

21  Ninth Circuit upheld a freeway facing sign ban based on commercial speech doctrine

22  analysis); *Metro Lights, LLC v. City of Los Angeles,* 551 F.3d 898 (9th Cir. 2009) (in an

action brought by a company owning and operating outdoor signs, the Ninth Circuit

upheld a ban on offsite commercial advertising based on commercial speech doctrine

analysis); *see also Clear Channel Outdoor, Inc. v. City of N.Y.,* 594 F.3d 94 (2d Cir.

2010) (in an action by owners of billboards and panel signs, the Second Circuit upheld

zoning resolution restricting outdoor advertising signs near highways based on

commercial speech doctrine analysis).[9] Thus, Plaintiffs' assertion that this court

somehow extended the commercial speech doctrine "well beyond prior decisions" by

applying the doctrine to a matter involving a publisher of commercial speech rather than

solely an advertiser or seller (Resp. at 7) is incorrect.

Finally, the court notes that the Yellow Pages Companies also have repeatedly

asserted that the commercial speech doctrine should not apply to them because like

newspapers (which indisputably are entitled to the highest level of protection under the

First Amendment) the distribution of the noncommercial content in their directories is

funded by advertising.[10] (*See* Resp. at 4 (Like newspapers and magazines, . . . yellow

---

[9] In addition, Yellow Pages Companies have also asserted that the court's prior ruling represents an expansion of the commercial speech doctrine because the regulation at issue is not aimed at "preventing fraud." (Resp. at 6 n. 2.) However, there is nothing in any of these cases to suggest that the commercial speech doctrine may only be applied to regulations aimed at preventing fraud in commercial transactions. Indeed, the governmental interest at issue in billboard cases is generally traffic safety and aesthetics. *See, e.g., Metromedia,* 453 U.S. at 508-10; *World Wide Rush,* 606 F.3d at 687; *Metro Lights,* 551 F.3d at 904.

[10] "Commercial speech does not retain its commercial character "when it is inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796 (1988). In its prior order on partial summary judgment, however, the court found that because the commercial and noncommercial aspects of the yellow pages directories were not "inextricably intertwined," the publication as a whole should be analyzed under the commercial speech doctrine. (*See* First SJ Order at 11-16.)

pages publishers turn[] to advertising to cover the costs of printing and distribution.").)

As the court has previously noted, Plaintiffs' attempts to liken themselves to newspapers is a stretch too far, particularly in light of the historic role that newspapers have played in the formation and life of our democracy.  (First SJ Order at 14-16.)  "Although the boundary between commercial and noncommercial speech has yet to be clearly delineated," *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 906 (9th Cir. 2002), it is enough for our purposes here that common sense dictates that these two forms of expression – yellow pages directories and newspapers – are distinct.  *See Bolger v. Youngs Drugs Prods. Corp.,* 463 U.S. 60, 64 (1983) (application of the commercial speech doctrine must rest on "commonsense distinction[s]" between speech that is commercial in nature and other varieties of speech).

"The uniqueness of each medium of expression has been a frequent refrain." *Metromedia,* 453 U.S. at 501 n.8.  As the Ninth Circuit stated when addressing a First Amendment challenge to a restriction on billboards:

> Courts have "often faced the problem of applying the broad principles of the First Amendment to unique forms of expression. . . . Each method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method.  We deal here with the law of billboards." *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 500-01 . . .  (1981) (citations, footnote, and internal quotation marks omitted).

1    *World Wide Rush,* 606 F.3d at 684.  While the court in *World Wide Rush* dealt with the

2    law of billboards, this court deals with the law of yellow pages directories, and not the

3    law of newspapers.[11]

4           There is nothing in the court's prior order with regard to the First Amendment,

5    which represents an expansion of the Supreme Court's or the Ninth Circuit's

6    jurisprudence.  The court's order falls squarely within the well-defined parameters of

7    prior precedent addressing the commercial speech doctrine.  Because Washington courts

8    have adopted federal precedent with regard to challenges concerning commercial speech

9    under the Washington constitution's free speech clause, there is no reason to find that

10   Washington courts would analyze the commercial speech issues any differently than this

11   court did in its prior order.

12                  **3.   Washington's Prior Restraint Doctrine is Inapplicable to the
                            Ordinance's License Requirement**

13
14          In their first motion for summary judgment, Plaintiffs asserted that even if the

15   City's licensing system passes muster under the federal Constitution, it does not survive

16   under the Washington constitution's prohibition against prior restraints.  (*See* Plaintiffs'

17   First SJ Mot. (Dkt. # 84) at 17.)  Because the court has already rejected this argument

18   (*see* First SJ Order at 20 n.7), Plaintiffs are not entitled to raise it again in this motion.[12]

19   _____

20          [11] *See also Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557 (1975) ("Each medium of
     expression . . . must be assessed for First Amendment purposes by standards suited to it. . . .");
21   *Berger v. City of Seattle,* 569 F.3d 1029, 1973 (9th Cir. 2009) (Kozinski, Chief J., dissenting)
     ("Context is everything in First Amendment analysis.").
            [12] The court notes that the deadline for a motion for reconsideration has long since
22   passed.  *See* Local Rules W.D. Wash. CR 7(h)(2).

ORDER- 18

1   Nevertheless, because both sides have provided considerably more briefing on the issue,

2   the court reconfirms its prior ruling and provides the parties with a more detailed

3   analysis.

4   Despite their assertion that Washington's prior restraint doctrine renders the

5   licensing provision of the Ordinance unconstitutional, Plaintiffs fail to cite a single

6   Washington case holding that Washington's prior restraint doctrine applies to commercial

7   speech.  In their first motion for partial summary judgment, Plaintiffs based their

8   argument on *O'Day v. King County,* 749 P.2d 142 (Wash. 1988).  (Plaintiffs' First SJ

9   Mot. at 17.)   *O'Day* involved free speech claims by nude and seminude dancers who

10  were being prosecuted for working in violation of a county's obscenity ordinance.  *Id.* at

11  144.  Although the Washington Supreme Court ultimately denied the dancers' free

12  speech claims, the court stated that "[u]nlike the First Amendment, article I, section 5

13  categorically rules out prior restraints on constitutionally protected speech under any

14  circumstances."  *Id.* at 146-47.  In rejecting the Yellow Pages Companies' initial prior

15  restraint argument, this court noted that the Washington Supreme Court later held that

16  Washington's constitution affords no greater protection to commercial speech than does

17  the First Amendment.  (First SJ Order at 20 n.7 (citing *Ino Ino,* 937 P.2d at 163).)

18  Accordingly, the court employed the *Central Hudson* standards for commercial speech[13]

19  and did not engage in a prior restraint analysis.  (*See id.* at 16-23.)

20

21  _____

22  [13] *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557 (1980).

ORDER- 19

1    The Washington Supreme Court's decision in *National Federation of Retired*

2    *Persons v. Insurance Commissioner,* 838 P.2d 680 (Wash. 1992), also supports the

3    conclusion that the Washington Supreme Court would analyze the Ordinance here in a

4    manner consistent with the court's prior First Amendment ruling.  In *National*

5    *Federation,* the Washington Supreme Court upheld a licensing requirement that applied

6    to insurance solicitations, finding that the permitting scheme need only satisfy the

7    commercial speech doctrine under *Central Hudson* test to pass muster under both the

8    First Amendment and under article I, section 5 of the Washington constitution.  *Id.* at

9    686-88 (repeatedly citing *Central Hudson,* 447 U.S. 557).  Thus, this court's prior

10   analysis of the free speech and licensing issues surrounding the City's Ordinance based

11   on the commercial speech doctrine formulated in *Central Hudson* (*see* Dkt. # 84) is

12   consistent with the Washington Supreme Court's analysis of similar issues in *National*

13   *Federation*.

14       The *National Federation* court found that a licensing requirement, while not the

15   sole method for addressing the problem of fraud in the insurance business, did directly

16   advance the State's interest.  *Id.*  Specifically, the *National Federation* court stated:

17       Requiring licenses for insurance solicitors or those engaging in insurance
         solicitations enables the Insurance Commissioner to monitor the content
18       and quality of insurance information distributed in Washington, as well as
         the identity of those distributing the information.  Licensing is also a
19       means of providing accountability for those in the insurance business in
         this state.

20

21   *Id.*  Thus, like the permitting requirement in *National Federation*, the licensing

22   requirement at issue here enables the City to monitor compliance and provide

ORDER- 20

1    accountability with regard to other aspects of the Ordinance such as the City's opt-out

2    system. *See id.*

3         The *National Federation* court also expressly rejected another argument advanced

4    by the Yellow Pages Companies here, namely, that the challenged regulation must be the

5    least restrictive means of serving the government's interest.  (*See* Resp. at 8.)

6    Specifically, the *National Federation* court stated:

7        Appellant impliedly argues that restrictions on commercial speech must
        constitute the least restrictive means of serving the government's interest.
8       This is not correct.  There needs to be only a "fit" between the ends sought
        by the government and the means chosen to accomplish those ends.
9

10    838 P.2d at 688.  The *National Federation* court found that the licensing requirement fit

11    the government's goals by providing the state with a "useful enforcement tool" with

12    respect to regulating insurance transactions.  *Id.* at 688-89.  Here too, the licensing

13    requirement fits the City's goals by providing it with a useful enforcement tool with

14    respect to its opt-out program and other aspects of the Ordinance.

15         The Yellow Pages Companies nevertheless argue that *National Federation* is

16    inapposite because the *National Federation* court failed to expressly consider a prior

17    restraint analysis, and "silence as to whether the licensing requirement . . . was a prior

18    restraint . . . is hardly a holding."  (Resp. at 10.)  As the City notes, however, although the

19    *National Federation* court did not specifically utter the words "prior restraint," the court

20    did consider and reject application of its prior decision in *O'Day,* 749 P.2d 142, in which

21    it had set forth the strict prior restraint standard under article I, section 5.  *Nat'l Fed'n,*

22    838 P.2d at 689.

1       Specifically, the *National Federation* court stated:

2       Washington case law provides no clear rule for constitutional restrictions
      on commercial speech.  In an obscenity case, *O'Day v. King Cy.,* this court
3       stated that the state constitution provides greater protection for speech than
      the federal constitution.  In a later case, this court held that at least in
4       obscenity cases, the Washington Constitution does *not* provide greater
      protections than the federal constitution.  We therefore follow the
5       interpretative guidelines under the federal constitution.  Under that test, the
      licensing requirement in this case does not violate article I, section 5 of the
6       Washington Constitution.

7   *Id.* (footnotes omitted; italics in original).  Thus, prior to selecting the application of

8   federal standards for commercial speech, the Washington Supreme Court specifically

9   considered and rejected application of the decision in which it had announced that

10   "article I, section 5 categorically rules out prior restraints on constitutionally protected

11   speech under any circumstances."  *O'Day,* 749 P.2d at 146-47.[14]

12

13   _____

14      [14] The court is not persuaded by the Yellow Pages Companies' assertion that *Kitsap County v. Mattress Outlet/Kevin Gould,* 104 P.3d 1280 (Wash. 2005), "governs application of
15   the commercial speech doctrine under the Washington Constitution." (Resp. at 8.)  First, in *Mattress Outlet* court's free speech analysis was based entirely on the First Amendment of the
16   federal Constitution and not on article I, section 5 of the Washington constitution.  *Id.* at 1284 n. 1.  Further, for the same reasons that the court previously found Plaintiffs' analogy to *City of Cincinnati v. Discovery Network,* 507 U.S. 410 (1993) to be inapt (*see* First SJ Order at 21-22),
17   the court rejects Plaintiffs' attempts to analogize this case to *Mattress Outlet,* which is factually similar to and relies heavily upon *Discovery Network* in its analysis.  *See Mattress Outlet,* 104
18   P.3d at 1285-86 (515) ("Here, as in *Discovery Network,* the Kitsap County ordinance distinguishes between commercial and noncommercial speech, although that distinction does not
19   bear any relationship to the county's interests in aesthetics and safety.").  Finally, the *Mattress Outlet* court found that the ordinance prohibiting persons from wearing signage did not meet the
20   *Central Hudson* test because there was "no evidence" that it furthered the county's goals of aesthetics and traffic safety.  *Id.* at 1285 ("There is no evidence the . . . signs have any effect on
21   traffic safety.").  Unlike the county in *Mattress Outlet,* here, the City has provided evidence that the Ordinance and its licensing provision advances its interests.  (*See, e.g.,* Lilly Decl. (Dkt. #
22   31) ¶¶ 10-11.)

Consistent with the Washington Supreme Court's analysis in *National Federation*, this court also rejects the notion that a prior restraint analysis under Washington's constitution is appropriate with regard to the licensing and commercial speech issues here. *See also Knight v. Browne,* No. C07-0738MJP, 2007 WL 2900279, at *3 (W.D. Wash. Oct. 2, 2007) ("Because the Washington Supreme Court follows the interpretive guidelines under the Federal Constitution when judging the constitutionality of licensing requirements, the Court will follow the Federal analysis with respect to [plaintiff's free speech] claims."). Accordingly, the court considers only the federal analysis with regard to the licensing and commercial speech issues raised by the Ordinance.[15] Consistent with this ruling, the court grants the City's motion for partial summary judgment with respect to the Yellow Pages Companies' claim based on article I, section 5 of the Washington constitution, and denies Plaintiffs' cross-motion regarding the same.

## C. The Ordinance Does Not Violate the Washington Constitution's Supremacy Clause

The Yellow Pages Companies also claim that the Ordinance violates article XI, section 11 of Washington's constitution because it "conflicts with WAC 480-120-251." (Compl. ¶ 32. Article XI, section 11 allows local governments to create "all such local police, sanitary and other regulations as are not in conflict with general laws."[16] Wash.

---

[15] The court has previously rejected the notion that the Ordinance operates as a prior restraint under federal law. (*See* First SJ Order at 20 n.8.)

[16] The court assumes for purposes of this decision, but does not rule, that WAC 480-120-251 constitutes a "general law" within the meaning of article XI, section 11, of Washington's constitution.

ORDER- 23

1  Const. art. XI, § 11.  The City and the Yellow Pages Companies have cross-moved for

2  summary judgment with regard to this claim.

3      Section 480-120-251 of Washington's Administrative Code ("WAC") requires

4  that every LEC "ensure that a telephone directory is regularly published for each local

5  exchange it serves" and "provide each customer a copy of the directory for the

6  customer's local exchange area."  WAC 480-120-251.  The City asserts that there is no

7  conflict between its Ordinance and this provision of the WAC because (1) its Ordinance

8  does not prohibit publication of the required material, (2) the Ordinance exempts a

9  publication that contains only the required LEC information, and (3) "there is no reason

10 why the Yellow Pages Companies cannot comply with both the . . . regulation and the

11 [City's] Ordinance."  (Mot. at 8 (underlining in original).)  The Yellow Pages

12 Companies, on the other hand, assert that the Washington Utilities and Transportation

13 Commission ("WUTC") treats advertising revenues from the distribution of yellow pages

14 directories as a "regulatory asset," and imputes the revenues to the LEC even when

15 published by a separate corporation.  (Resp. at 1, 4-6, 12.)  Thus, the Yellow Pages

16 Companies assert that the City's Ordinance, which regulates yellow pages directories that

17 contain advertising, is in conflict with WAC 480-120-251.  (Resp. at 4-6, 12.)

18     Under article XI, section 11, an ordinance may be deemed invalid in two ways: (1)

19 the ordinance directly conflicts with a state statute or (2) the legislature has manifested its

20 intent to preempt the field.  *Heinsma v. City of Vancouver,* 29 P.3d 709, 712 (Wash.

21 2001); *see also Chaney v. Fetterly,* 995 P.2d 1284, 1290 n.24 (Wash. Ct. App. 2000).

22 The Yellow Pages Companies have challenged the Ordinance only upon the first of these

ORDER- 24

1   grounds.  "A municipality may . . . enact an ordinance concerning the same subject

2   matter as a state law provided that . . . the ordinance does not conflict with the general

3   law of the state." *Lawson v. City of Pasco,* 181 P.3d 896, 898 (Wash. Ct. App. 2008),

4   *aff'd,* 230 P.3d 1038 (2010) (citing *King Cnty. v. Taxpayers,* 949 P.2d 1260, 1274 (Wash.

5   1997)).  A local regulation conflicts with state law where it permits what state law forbids

6   or forbids what state law permits.  *Parkland Light & Water Co. v. Tacoma–Pierce Cnty.*

7   *Bd. of Health,* 90 P.3d 37, 39-40 (Wash. 2004); *see also City of Seattle v. Eze,* 759 P.2d

8   366, 372 (Wash. 1988).  To render an ordinance unconstitutional, "a conflict [with state

9   general law] must be direct and irreconcilable." *Carrick v. Locke,* 882 P.2d 173, 181

10  (Wash. 1994).  "If the two may be harmonized, however, no conflict will be found."

11  *Lawson,* 230 P.3d at 1042.

12       The Washington Supreme Court presumes that an ordinance is valid unless the

13  challenger can prove the ordinance is unconstitutional. *City of Pasco v. Shaw,* 166 P.3d

14  1157, 1163 (Wash. 2007); *HJS Dev., Inc. v. Pierce Cnty.,* 61 P.3d 1141, 1154 (Wash.

15  2003); *Heinsma,* 29 P.3d at 712.  "In establishing the constitutional invalidity of an

16  ordinance, a heavy burden rests upon the party challenging its constitutionality.  Every

17  presumption will be in favor of constitutionality." *HJS Dev., Inc.,* 61 P.3d at 1154

18  (footnote and internal quotation marks omitted).  Thus, Plaintiffs face a heavy burden in

19  establishing that the Ordinance is unconstitutional under Washington's supremacy clause.

20       The Yellow Pages Companies are correct that the Ordinance addresses the LEC

21  publication requirement that is mandated by the WUTC regulation.  (Resp. at 12.)  This

22  fact alone, however, is insufficient to invalidate the Ordinance under article XI, section

ORDER- 25

1   11 of Washington's constitution.  Nothing in the state's supremacy clause prohibits the

2   City from regulating on the same subject matter in different ways.  More importantly, the

3   Yellow Pages Companies never explain why it would be impossible for them to comply

4   with both the WUTC regulation as well as the City's Ordinance.

5        The Yellow Pages Companies assert that a conflict exists between the Ordinance

6   and the WUTC's regulation because (1) the WUTC was aware of the fact that LECs

7   and/or those who contract with them to publish the WUTC's required information rely

8   upon advertising to defray the costs of the required publication, and (2) the WUTC has

9   imputed certain advertising income of Dex to Qwest, the LEC with which Dex contracts.

10  (Resp. at 12; *see also id.* at 4-6 (citing *US West Commc'ns, Inc. v. Wash. Utils. & Trans.*

11  *Comm'n,* 949 P.2d 1337 (Wash. 1997).)  However, despite this apparent awareness by the

12  WUTC concerning the potential for advertising income associated with its required

13  publications, there is no evidence that the WUTC requires that advertising be included in

14  the publications, nor is there any evidence that the Ordinance prohibits publication of

15  anything that is required by the WUTC regulation.  The mere fact that the WUTC may

16  have been aware that LECs or their contractors use advertising to defray the expense of

17  the required directories, or to serve as an additional profit center, is insufficient to create

18  a legislative conflict under article XI, section 11 of Washington's constitution.

19       The court also notes that the WUTC considered yellow pages advertising income

20  in setting US West's rates in 1997 only "[b]ecause US West transferred its lucrative

21  yellow pages business to its sister company, US West Direct, for inadequate

22  compensation," *US West,* 949 P.2d at 1344, and not because the WUTC held that future

ORDER- 26

1    yellow pages profits of a third party should have any bearing on telephone rates charged

2    by an LEC.  In fact, the WUTC held to the contrary "that a fair contract between [US

3    West] and its affiliate for the *sale* of the [yellow pages publishing] asset would put an end

4    to any imputation of revenue." *Id.* at 1345 (italics in original).  "Never-ending

5    imputation" was never contemplated. *See id.* at  1352 (citing WUTC order).  Despite the

6    amount of briefing expended on the issue by Plaintiffs, the court finds nothing in the

7    history of the WUTC's treatment of advertising revenues that implicates article XI,

8    section 11 of the Washington constitution with regard to the City's Ordinance.

9            As the City asserts, the Ordinance effectuates the legislative policy set forth in

10   RCW 70.95.010, which requires that "city governments [] assume primary responsibility

11   for solid waste management and [] develop and implement aggressive and effective waste

12   reduction . . . strategies." RCW 70.95.010(6)(c).  Further, the Ordinance does not

13   prohibit the publication of any information required under WAC 480-120-251.  Indeed, it

14   excludes from its purview publications that contain only the information required under

15   WAC 480-120-251. *See* SMC 6.255.035.   Specifically, the Ordinance states that

16   "[LECs] whose distribution of phone books in the City is limited to only those phone

17   books required by WAC 480-120-251 are not subject to the requirements of this chapter."

18   *Id.*  "Where possible, [the court] construe[s] statutes so as to preserve their

19   constitutionality." *State v. Williams,* 251 P.3d 877, 879 (Wash. 2011).  Accordingly, the

20   court agrees with the City that this exemption would apply to the distribution of a yellow

21   pages phone book that contained only those elements required under WAC 480-120-251

22   irrespective of whether the phone book was distributed directly by the LEC itself or by an

agent or contractor of the LEC, such as Plaintiffs Dex and SuperMedia.  (*See* Mot. at 8;

Reply (Dkt. # 91) at 10.)  Further, even if not exempted, Plaintiffs cite no evidence

supporting the conclusion that it is impossible for them to comply with both WAC 480-

120-251 and the Ordinance.  (*See generally,* Resp. at 11-14.)  The Ordinance and WAC

480-120-251 "can each operate distinctly without inconsistency."  *See Lawson,* 181 P.3d

at 900.  Thus, the court finds, based on the undisputed record before it, that there is no

irreconcilable conflict between the Ordinance and WAC 480-120-251, and therefore

grants summary judgment with respect to Plaintiffs' claim under Washington's

supremacy clause in favor of the City, and denies Plaintiffs' cross-motion.

### D.  **The Ordinance Does Not Violate the Washington Constitution's Privileges and Immunities Clause**

The parties have cross-moved for summary judgment with respect to Plaintiffs'

claim that the Ordinance violates article I, section 12 of the Washington constitution.

(Compl. ¶ 34.)  Article I, section 12 provides that "[n]o law shall be passed granting to

any citizen, class of citizens, or corporation other than municipal, privileges or

immunities which upon the same terms shall not equally belong to all citizens, or

corporations."  Wash. Const., art. I, § 12.

The Yellow Pages Companies assert that the Ordinance violates the privileges and

immunities clause of the Washington constitution "by singling out yellow pages for a

regulatory scheme . . . , while imposing no such restriction on similarly situated entities

that publish analogous materials and distribute them in the same way."  (Resp. at 15.)

Plaintiffs, however, rely upon older Washington cases from the early Twentieth

ORDER- 28

1   Century,[17] which the Washington Supreme Court has since largely abandoned – albeit

2   never expressly overruled.  *See* Michael Bindas, Seth Cooper, David K. DeWolf &

3   Michael J. Reitz, *The Washington Supreme Court and the State Constitution:  A 2010*

4   *Assessment*, 46 Gonz. L. R. 1, 27 (2010-2011).  As discussed below, more pertinent

5   developments in Washington constitutional jurisprudence, as it pertains to the state's

6   privileges and immunities clause, have occurred since that time.

7          As described by recent commentators, in the second half of the Twentieth Century,

8   the Washington Supreme Court began routinely conflating the Washington constitution's

9   privileges and immunities clause with the Equal Protection Clause of the Fourteenth

10  Amendment of the federal Constitution.  *See id.* at 26 (citing *Seeley v. State,* 940 P.2d

11  604, 610 (Wash. 1997); *State v. Smith,* 814 P.2d 652, 660 (Wash. 1991)).  Accordingly,

12  in reviewing economic legislation, the Washington Supreme Court began applying a

13  standard similar to federal courts considering equal protection challenges to economic

14  legislation, namely a "rational basis" test.  *Id.* at 27 (citing *Amer. Network, Inc. v. Wash.*

15  *Utils. & Transp.Comm'n,* 776 P.2d 950, 960 (Wash. 1989)).

16         Washington courts have recently reaffirmed their reliance upon the "rational

17  basis" test when considering equal protection challenges under article I, section 12 of the

18  Washington constitution to social or economic legislation that does not implicate a

19  suspect or semi-suspect class or a fundamental or important right.  *See, e.g. State v.*

20

21         ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [17] (*See* Resp. at 14 (citing *Pearson v. City of Seattle,* 90 P.2d 1020 (Wash. 1939); *City of*
22  *Seattle v. Dencker,* 108 P. 1086 (Wash. 1910); *City of Spokane v. Macho,* 98 P. 755 (Wash.
   1909)).)

ORDER- 29

1   *Hirschfelder,* 242 P.3d 876, 883 (Wash. 2010) ("Absent a fundamental right or suspect

2   class, or an important right or semi-suspect class, a law will receive rational basis

3   review."); *King Cnty. Dept. of Adult & Juvenile Detention v. Parmelee,* 254 P.3d 927,

4   938 (Wash. Ct. App. 2011) ("The challenged classification need only be rationally related

5   to a legitimate state interest unless it violates a fundamental right or is drawn upon a

6   suspect classification such as race, religion or gender."); *In re Parentage of K.R.P. &*

7   *K.H.R.P.,* 247 P.3d 491, 498 (Wash. Ct. App. 2011).

8          In 2004, the Washington Supreme Court held for the first time that the state's

9   privileges and immunities clause, at least in some instances, "requires a separate and

10  independent constitutional analysis from the equal protection clause of the United States

11  Constitution."  *Grant Cnty. Fire Protection Dist. No. 5 v. City of Moses Lake,* 83 P.3d

12  419, 428 (Wash. 2004).  As the court elaborated two years later, however, an independent

13  analysis is only required where "the challenged law is a grant of positive favoritism to a

14  minority class," and not where law is being challenged on the basis of a violation of equal

15  protection.  *Anderson v. King Cnty.,* 138 P.3d 963, 972 (Wash. 2006) (plurality opinion).

16  Specifically, the court stated:

17          As we concluded in *Grant County* . . . , the concern underlying the state
            privileges and immunities clause, unlike that of the equal protection clause,
18          is undue favoritism, not discrimination, and the concern about favoritism
            arises where a privilege or immunity is granted to a minority class ("a
19          few").  Therefore, an independent state analysis is not appropriate unless
            the challenged law is a grant of positive favoritism to a minority class.  In
20          other cases, we will apply the same analysis that applies under the federal
            equal protection clause.
21

22  *Id.*  Although it appears that Plaintiffs are asserting an equal protection claim which

1  would not require an independent analysis under article I, section 12, they do not

2  expressly specify the precise nature of the claim (i.e. whether it is based on a grant of

3  positive favoritism to a minority class or on a violation of their right to equal protection).

4  (*See generally,* Resp. at 14-15.)  Thus, the court considers Plaintiffs' article I, section 12

5  claim under both the separate state analysis suggested in *Grant County*, as well as under a

6  federal equal protection analysis. [18]

7        When considering whether Washington's constitution provides greater protection

8  than the federal constitution, Washington court's engage in a two-step analysis.  First, the

9  court determines whether a provision of the state constitution should be given an

10  interpretation independent from that given to the corresponding federal constitutional

11  provision.  *Am. Legion Post # 149 v. Wash. State Dep't of Health,* 192 P.3d 306, 324

12  (Wash. 2008).  However, this step in the analysis is unnecessary here because the

13

_____

14        [18] In another later plurality opinion, the Washington Supreme Court appears to disavow

15  the earlier plurality's conclusion in *Anderson*, 138 P.3d at 972, that "an independent state
   analysis is not appropriate unless the challenged law is a grant of positive favoritism to a

16  minority class."  In *Madison v. State,* 163 P.3d 757 (Wash. 2007), the plurality states that "*Grant
   County* . . . did not impose this limitation on its determination that article I, section 12 warrants

17  an independent analysis from the equal protection clause of the United States Constitution."  *Id.*
   This court, however, notes that three years later in *Hirschfelder,* a majority of the Washington

18  Supreme Court applied only a federal analysis to an equal protection claim brought under both
   article I, section 12 and the Fourteenth Amendment.  *Hirschfelder,* 242 P.3d at 883-84.  While

19  the *Hirschfelder* court did so without any discussion of the issue raised by the plurality opinions
   in *Anderson* and *Madison*, the fact that a majority of the court analyzed an equal protection claim

20  under article I, section 12 without first engaging in an independent analysis under the state
   constitution indicates to this court that *Anderson* now represents the correct analysis on this issue

21  in Washington.  In any event, the issue is irrelevant to the determination here because the court
   engages in both an independent analysis of Plaintiffs' claim under Washington's constitution, as
   well as a federal equal protection analysis, and concludes that Plaintiffs' claim under article I,

22  section 12 fails under both.

ORDER- 31

1  Washington Supreme Court has already established that the privileges and immunities

2  clause warrants a separate constitutional analysis. *Id.* The second step in the analysis,

3  and the only one the court need consider here, is a determination regarding "whether the

4  provision in question extends greater protections for the citizens of this state." *Id.*

5  (quoting *Madison,* 163 P.3d at 764).

6         In applying this second step of the analysis, the court finds the decision in

7  *American Legion*, 192 P.3d 306, to be instructive. Like the Yellow Pages Companies, the

8  plaintiff in *American Legion* believed that it was being treated differently than similarly

9  situated businesses by a government regulation and that the regulation therefore violated

10 the state's privileges and immunities clause. *Id.* at 325. Specifically, a chapter of the

11 American Legion challenged a statewide regulation that banned smoking in places of

12 employment, arguing, among other things, that it violated the privileges and immunities

13 clause by treating similarly situated businesses differently – such as by allowing smoking

14 in hotels, but not in other establishments. *Id.* at 312.

15        Critical to the court's analysis in *American Legion* was the proper characterization

16 of the privilege at issue. *See id.* at 325-26. The Yellow Pages Companies assert that the

17 Ordinance here implicates one of their fundamental rights – namely the right "to carry on

18 business." (*See* Resp. at 15 ("[T]he Ordinance violates the Washington Privileges and

19 Immunities Clause by singling out yellow pages for a regulatory scheme that threatens

20 Plaintiffs' fundamental right to carry on business, while imposing no such restriction on

21 similarly situated entities that publish analogous materials and distribute them in the same

22 way.").)

ORDER- 32

1    In *Grant County*, the Washington Supreme Court defined the terms "privileges

2  and immunities" under the Washington constitution as

3         pertain[ing] alone to those fundamental rights which belong to the citizens
          of the state by reason of such citizenship.  These terms, as they are used in

4         the constitution of the United States, secure in each state to the citizens of all
          states the right to remove to and *carry on business* therein; the right, by usual

5         modes, to acquire and hold property, and to protect and defend the same in the
          law; the rights to the usual remedies to collect debts, and to enforce other personal

6         rights; and the right to be exempt, in property or persons, from taxes or burdens
          which the property or persons of citizens of some other state are exempt from. . . .

7         By analogy these words as used in the state constitution should receive a like
          definition and interpretation as that applied to them when interpreting the federal

8         constitution.

9  83 P.3d at 428-29 (citations omitted; italics added).  Thus, "the right to . . . carry on

10  business" is a fundamental right belonging to the citizens of Washington State.  *Id.*  The

11  *Grant County* court cautioned, however, that "not every statute authorizing a particular

12  class to do or obtain something involves a 'privilege' subject to article I, section 12."  *Id.*

13     Like the Yellow Pages Companies, the plaintiff in *American Legion* argued that

14  the fundamental right at issue with respect to the state's regulation that banned smoking

15  in workplaces was its right "to remove and to carry on business therein."  *Am. Legion*,

16  192 P.3d at 325.  While the *American Legion* court agreed that the right to carry on

17  business is a privilege for purposes of article I, section 12, the court disagreed that this

18  privilege was at issue as a result of the state-wide smoking regulation or its exemptions.

19  *Id.* at 325-26.  The court noted that unlike earlier decisions in which the court had struck

20  regulatory ordinances "that effectively prohibited nonresidents from engaging in the

21  [relevant] business," the act at issue "d[id] not prevent any entity from engaging in

22  business."  *Id.* at 325.  Instead, the court noted that the regulation merely prohibited

smoking within a place of employment.  *Id.*  The court concluded that smoking in one's

workplace is not a fundamental right of citizenship, and therefore also not a privilege for

purposes of article I, section 12.  *Id.* at 325-26.  Accordingly, the *American Legion* court

found that because there was no privilege involved, there was also no violation of article

I, section 12.  *Id.* at 326.

Just as the plaintiffs in *American Legion* asserted the right to carry on business as

the fundamental right at issue in relation to the state's regulation of work-place smoking

and its exceptions, so, too, do the Yellow Pages Companies assert the right to carry on

business as the fundamental right at issue in relation to the City's Ordinance and its

exceptions.  (*See* Resp. at 14-15.)  Contrary to Plaintiffs' assertions, however, this right is

not implicated by the City's Ordinance.  *See, e.g., Am. Legion,* 192 P.3d at 325.  As in

*American Legion,* nothing in the Ordinance at issue here prevents Plaintiffs from

engaging in or carrying on business.  *See id.*  Rather, it simply imposes certain business

regulations upon Plaintiffs, such as licensing and waste recovery fees, the submission of

annual reports, and compliance with the City's opt-out program.  *See, e.g.,* SMC

6.255.050-060 (license application and fee); SMC 6.255.100 (recovery fee); SMC

6.255.080 (annual reports); SMC 6.255.090 (opt-out registry).

As the City points out, there is no fundamental right to deliver yellow pages

directories to the doorsteps of residents who do not want them.  *See Rowan v. Post Office

Dep't,* 397 U.S. 728, 738 (1970) ("We categorically reject the argument that a vendor has

a right . . . to send unwanted material into the home of another.").  Nor can the court find

any basis for the existence of a fundamental right to employ an industry-sponsored

1    yellow pages opt-out mechanism instead of the City's opt-out program,[19] to avoid

2    licensing or recovery fees, or to avoid the submission of the type of annual reports

3    required by the Ordinance.  Accordingly, similar to the *American Legion* court, this court

4    holds that because there is no fundamental right that is implicated by the Ordinance, there

5    is no violation of article I, section 12 under the independent analysis given to that clause

6    by the Washington Supreme Court.

7           The court now turns to an equal protection analysis of article I, section 12, which

8    is consistent with federal law.  *See Anderson,* 138 P.3d 963, 973 (Wash. 2006) (where

9    plaintiffs allege discrimination, "we apply the same constitutional analysis that applies

10   under the equal protection clause of the United States constitution.").  Where, as here,

11   there is no fundamental right or suspect class at issue,[20] Washington courts have

12   repeatedly held that the type of business or economic regulations at issue in this case are

13   to be evaluated under a rational relation test when considering an equal protection

14   challenge under article I, section 12 of the Washington constitution.  *See, e.g.*

15   *Hirschfelder,* 242 P.3d at 883 ("Social and economic legislation that does not implicate a

16   suspect class or fundamental right is presumed to be rational.");  *In re Parentage of*

17   *K.R.P.,* 247 P.3d at 498 (same); *Bullseye Distributing LLC v. State of Wash. Gambling*

18   *Comm'n,* 110 P.3d 1162, 1167 (Wash. Ct. App. 2005) ("The regulation of an economic

19   _____

20         [19] Further, the court can find nothing in the Ordinance that would prohibit Plaintiffs from
     continuing to utilize their own opt-out systems in tandem with the City's opt-out system if they
21   so chose.

22         [20] The Yellow Pages Companies have not alleged that they belong to a suspect or semi-
     suspect class.  (*See generally,* Resp. at 14-15.)

1    enterprise is a non-fundamental right subject to rational basis scrutiny.").  Further,

2    "[s]ocial and economic legislation that does not implicate a suspect class or fundamental

3    right is presumed to be rational," and this presumption may be overcome only "by a clear

4    showing that the law is arbitrary and irrational."  *Hirschfelder,* 242 P.3d at 883 (quoting

5    *Am. Legion,* 192 P.3d at 326).  "In Washington, it is well established that . . . a statute's

6    challenger has a heavy burden to overcome that presumption; the challenger must prove

7    that the statute is unconstitutional beyond a reasonable doubt."  *In re Parentage of*

8    *K.R.P.,* 247 P.3d at 498-99 (quoting *Sch. Dists.' Alliance for Adequate Funding of*

9    *Special Educ. v. State,* 244 P.3d 1, 4 (Wash. 2010)).

10          A regulation or legislative distinction will withstand a rational relation analysis if

11    (1) all members are treated alike, (2) there is a rational basis for treating differently those

12    within and without the class, and (3) the classification is rationally related to the purpose

13    of the legislation.  *Hirschfelder,* 242 P.3d at 883 (citing *Am. Legion,* 192 P.3d at 326).

14    The Washington Supreme Court has further delineated the parameters of a rational

15    relation analysis as follows:

16          In reviewing the statute, the court may assume the existence of any conceivable
            state of facts that could provide a rational basis for the classification. . . . The
17          classification need not be made with mathematical nicety, and its application may
            result . . . in some inequality. . . . It is no requirement of equal protection that all
18          evils of the same genus be eradicated or none at all. . . .

19    *Am. Legion,* 192 P.3d at 326 (internal citations and quotations omitted).

20          Applying the rational basis standard, Plaintiffs' claim under article I, section 12 of

21    the Washington constitution fails.  Plaintiffs have failed to meet their steep burden of

22    clearly demonstrating beyond a reasonable doubt that the Ordinance "is arbitrary and

1    irrational." *Hirschfelder,* 242 P.3d at 883.   Indeed, Plaintiffs cite no evidence in support

2    of their assertions that other types of unsolicited publications, such as "free newspapers,"

3    "advertising shoppers," "flyers," or "other business solicitations," although unregulated,

4    are "similarly situated."  (*See* Resp. at 14-15.)[21]  Plaintiffs submit no evidence that these

5    types of publications are analogous materials, are distributed in analogous ways, or have

6    analogous environmental or privacy impacts.  Absent any such showing, Plaintiffs cannot

7    sustain their burden with regard to this claim.

8        The City, however, asserts that directories published by membership organizations

9    for their members, *see* SMC 6.255.025(B), by definition are not similarly situated with

10   yellow pages directories whose delivery is unsolicited.  The court agrees.  Further, yellow

11   pages directories and other forms of "junk mail" are not similarly situated due to the

12   City's concern (which is unchallenged by Plaintiffs) that it could not directly regulate

13   mail due to federal preemption.  (Reply at 12 (citing Reply to City's First SJ Mot. (Dkt. #

14   43) at 7-8 & n.8.)[22]  In addition, the exception in the Ordinance for publishers who

15   distribute less than four tons of yellow pages phone books, *see* SMC 6.255.025(B),

16   rationally relates to the Ordinance's purpose of waste reduction.  As the Washington

17   ───────────────

18       [21] The court relies upon "the nonmoving party to identify with reasonable particularity
     the evidence that precludes summary judgment," and is not obligated to "scour the record in
19   search of a genuine issue of triable fact."  *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996)
     (internal quotation marks and citation omitted).
20       [22] The court also notes that the form of delivery of yellow pages directories (which are
     hand delivery to a homeowner's doorstep) differs from junk mail (which of course arrives in a
21   homeowner's mailbox), a distinction that may rationally relate to residents' privacy concerns.
     *See KMS Fin. Servs., Inc. v. City of Seattle,* 146 P.3d 1195, 1200 (Wash. Ct. App. 2006) ("[A]
22   classification based solely on a different method of operation of a particular kind of business is
     permissible.") (quoting *Sonitrol N.W., Inc.  v. City of Seattle,* 528 P.2d 474, 477 (Wash. 1974)).

1   Supreme Court has stated, "it is no requirement of equal protection that all evils of the

2   same genus be eradicated or none at all." *Am. Legion,* 192 P.3d at 326.  Under the

3   rational relation test, the court finds that the City's decision to regulate the largest

4   contributors to the waste issue surrounding yellow pages directories while exempting the

5   smaller players creates no constitutional infirmity.  *See, e.g., City of Seattle v. Rogers*

6   *Clothing for Men, Inc.,* 787 P.2d 39, 50-51 (1990) (upholding disparate tax treatment for

7   large department stores and small individual retailers).

8         Finally, the court can find no basis for overturning the Ordinance due to the

9   exception for LECs "whose distribution of phone books in the City is limited to only

10  those phone books required by WAC 480-120-251."  SMC 6.255.035.  The court finds

11  that the City's exemption for distributions that are "limited to only those phone books

12  required by WAC 480-120-251" is rationally based on the state's regulation in this area.

13  Further, as previously noted, the court interprets this exception to apply irrespective of

14  whether the LEC's distribution of qualifying yellow pages phone books occurs directly or

15  through an agent or contractor. *See supra* at 27-28.  Accordingly, the exemption would

16  apply to qualifying yellow pages phone books distributed by Plaintiffs on behalf of LECs

17  with whom Plaintiffs contract to publish the information required under WAC 480-120-

18  251.  Based on the forgoing analysis, the court grants the City's motion for summary

19  judgment with respect to Plaintiffs' claim under article I, section 12 of the Washington

20  constitution, and denies Plaintiffs' cross-motion regarding the same.

21

22

ORDER- 38

1

## IV. CONCLUSION

2        For the reasons stated above, the court GRANTS the City's second motion for

3   partial summary judgment with regard to Plaintiffs' claims under the free speech clause,

4   the supremacy clause, and the privileges and immunities clauses of the Washington

5   constitution, as well as 42 U.S.C. § 1983 (Dkt. # 81), and DENIES the Yellow Pages

6   Companies' cross-motion with regard to these same claims (Dkt. # 87).[23]

7        Dated this 16th day of September, 2011.

8

9

10   _____

     JAMES L. ROBART
11   United States District Judge

12

13

14

15

16   _____

17        [23] Plaintiffs have also requested that the court certify certain questions of state law to the
     Washington Supreme Court.  (*See* Resp. at 15-16.)  Such requests are within the court's sound
18   discretion.  *Riordan v. State Farm Mut. Auto. Ins. Co.,* 589 F.3d 999, 1009 (9th Cir. 2009).
     "Even where state law is unclear, resort to the certification process is not obligatory."  *Id.*
19   Furthermore, mere difficulty in ascertaining local law is no excuse for remitting the parties to a
     state tribunal for the start of another lawsuit.  *Id.*  Here, such a move would appear to be contrary
20   to Plaintiffs' repeated requests to expedite this lawsuit.  (*See* Dkt. ## 41, 64, 69.)  Further, had
     Plaintiffs wanted a state court to consider their many state law claims, they could have easily
21   filed this lawsuit in state court originally.  Instead, Plaintiffs chose the federal forum.  In any
     event, the court does not find certification of the state law issues is necessary here.  Accordingly,
22   the court DENIES Plaintiffs' request to certify any questions concerning the forgoing state law
     claims to the Washington Supreme Court.